FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★   MAY 12 2006   ★

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
........................................................................ X
SUSAN TROPEANO, JOSEPH TROPEANO,

Plaintiffs,

-against-

THE CITY OF NEW YORK; NEW YORK CITY
DEPARTMENT OF EDUCATION (d/b/a The New York
City Department of Education); JOEL KLEIN,
individually and in his official capacity as Chancellor of
the New York City Department of Education; PHYLLIS
LEINWAND, individually and in her official capacity as
Principal at P.S. 66; PATRICIA SHEEHAN, individually
and in her official capacity as Assistant Principal at
P.S. 66; KATHLEEN LAVIN, individually and in her
official capacity as Local Instructional Superintendent
of District 27, Region 5; KATHLEEN CASHIN,
individually and in her official capacity as Regional
Superintendent of District 27, Region 5; MICHELLE
LLOYD-BEY, individually and in her official capacity as
Community Superintendent of District 27, Region 5;
AUDREY JACOBSON, individually and in her official
capacity as Medical Director of the New York City
Department of Education; KAREN MARINO,
individually and in her official capacity as Personnel
Manager of the New York City Department of
Education; MARTIN F. SCHEINMAN, individually and
in his official capacity as Arbitrator/Hearing Officer in
accordance with the American Arbitration Association;
UNITED FEDERATION OF TEACHERS, Queens
Borough Office; MARILYN COOPER, individually and
in her official capacity as District Representative of the
Queens UFT; HAROLYN FRITZ, individually and in her
official capacity as Queens Borough Representative of
the Queens UFT; EVELYN SEROY, individually and in
her official capacity as Special Representative of the
Queens UFT; AL SAMUELS, individually and in his
official capacity as Special Representative of the
Queens UFT; PETER MAYGLOTHLING, individually
and in his official capacity as Special Representative of
the Queens UFT; ROGER ROTH, individually and in
his official capacity as Special Representative of the
Queens UFT; MARY GRACE O'GARA, individually

CV-06 2218

DOCKET NO.

(NSI)

COMPLAINT
JURY TRIAL DEMANDED

TOWNES, J.

BLOOM, M.J.

1

and in her official capacity as UFT Chapter Leader at
P.S. 66; **UNITED FEDERATION OF TEACHERS,**
Manhattan Headquarters; **HOWARD SOLOMON,**
individually and in his official capacity as Director of the
UFT Grievance Department, Manhattan Headquarters;
**ELLEN PROCIDA,** individually and in her official
capacity as Special Representative, Manhattan
Headquarters; **TY CHESS,** individually and in his
official capacity as Assistant to the President of the
UFT, Manhattan Headquarters; **RANDY**
**WEINGARTEN,** individually and in her official capacity
as President of the **UFT,** Manhattan Headquarters;
**KITTY WILLISTON,** individually and in her official
capacity as UFT Program Director, Manhattan
Headquarters; **NEW YORK STATE UNITED**
**TEACHERS; JAMES R. SANDNER,** individually and in
his official capacity as General Counsel of New York
State United Teachers,

                                           Defendants.

--------------------------------------------------------------------- X

Plaintiffs, SUSAN TROPEANO and JOSEPH TROPEANO, proceeding pro se, allege as follows:

### PARTIES

1.  At all times hereafter mentioned, Plaintiffs SUSAN TROPEANO AND JOSEPH TROPEANO were and still are residents of the County of Nassau, State of New York. Plaintiff SUSAN TROPEANO, is, at all times relevant , a licensed and appointed, tenure teacher within The New York City Department of Education (d/b/a The New York City Board of Education). Her last teaching position was at P.S. 66, located at 85-11 102 Street, Richmond Hill, New York 11418.

2.  At all times hereinafter mentioned, Defendant, New York City Department of Education ("DOE"), formerly

known as The New York City Board of Education, was and still is a duly incorporated municipal entity of the State of New York, with its principle place of business located at 65 Court Street, Brooklyn, New York 11201. THE COMPLAINT IS TO BE SERVED UPON The New YORK CITY DEPARTMENT OF EDUCATION AT: 100 CHURCH STREET, 4TH FLOOR, NEW YORK, NEW YORK 10007.

3.    At all times hereinafter mentioned, Defendant, The City of New York, was and still is a municipal corporation duly organized pursuant to the laws of the State of New York. The City of New York Office of the Comptroller is located at 1 Centre Street, New York, New York 10007-2341. THE COMPLAINT IS TO BE SERVED UPON THE CITY OF NEW YORK AT: 100 CHURCH STREET, 4TH FLOOR, NEW YORK, NEW YORK 10007.

4.    At all times hereinafter mentioned, Defendant, Phyllis Leinwand, since September 2001, was and still is the Principal at P.S. 66, located at 85-11 102nd Street, Richmond Hill, New York 11418. Phyllis Leinwand's former school was J.H.S. 210 where she became an Assistant Principal.

5.    At all times hereinafter mentioned, Defendant, Patricia Sheehan ("Sheehan") since September 2001, was and still is the Assistant Principal at P.S. 66, located at 85-11 102nd Street, Richmond Hill, New York 11418. Patricia Sheehan's former school was J.H.S. 210 where she was a dean.

6.    At all times hereinafter mentioned, Defendant, Kathleen Cashin ("Cashin"), was and still is the Regional Superintendent of District 27, Region 5, located at 82-01 Rockaway Boulevard, Room 460, Ozone Park, New York 11416. Kathleen Cashin ("Cashin") became Regional Superintendent in September 2001.

7.    At all times hereinafter mentioned, Defendant, Kathleen Lavin ("Lavin") was and still is the Local

3

Instructional Superintendent of District 27, Region 5, located at 82-01 Rockaway Boulevard, Room 460, Ozone Park, New York 11416.  Kathleen Lavin became Local Instructional Superintendent in September 2001.

8.    At all times hereinafter mentioned, Defendant, Chancellor Joel Klein ("Klein") was and still is charged with the responsibility of serving as the chief executive officer of The New York City Department of Education.  The Chancellor conducts his business from Central Office, located at 52 Chambers Street, New York, New York 10007.

9.    At all times hereinafter mentioned, Defendant, Karen Marino ("Marino") was and still is the Personnel Manager of District 27, Region 5, located at New York City Department of Education, 28-11 Queens Plaza North, Long Island City, New York 11101.

10.  At all times hereinafter mentioned, Defendant, Michelle Lloyd Bey ("Bey") was and still is the Community School Superintendent of District 27, Region 5, located at 82-01 Rockaway Boulevard, Room 406, Ozone Park, New York 11416.

11.  At all times hereinafter mentioned, Defendant, Audrey Jacobson ("Jacobson") was and stilli s the Medical Director of The New York City Department of Education, Medical Leaves & Benefits Office located at 65 Court Street, Room 201, Brooklyn, New York 11201.

12.  At all times hereinafter mentioned, Defendant, Martin F. Scheinman ("Scheinman") was and still is an arbitrator/hearing officer, in accordance with the American Arbitration Association as agreed upon by the DOE and UFT, located at 38 Arden Lane, Sands Point, New York 11050.

4

13. At all times hereinafter mentioned, Defendant, Audrey Jacobson ("Jacobson") was and still is the Medical Director of The New York City Department of Education, medical Leaves & Benefits Office, 65 Court Street, Room 201, Brooklyn, New York 11201.

14. At all times hereinafter mentioned, Defendant, United Federation of Teachers (UFT") Queens Borough Office was and still is Plaintiff's Collective Bargaining unit. It's place of business is 97-77 Queens Boulevard, 5th Floor, Rego Park, New York 11374-3327.

15. At all times hereinafter mentioned, Defendant, Marilyn Cooper ("Cooper"), was and still is the Queens District Representative, at the Queens Borough Office located at 97-77 Queens Boulevard, 5th Floor, Rego Park, New York 11374-3327.

16. At all times hereinafter mentioned, Defendant, Harolyn Fritz ("Fritz"), was and still is the Queens Borough Representative at the Queens Borough Office, located at 97-77 Queens Boulevard, 5th Floor, Rego Park, New York 11374-3327.

17. At all times hereinafter mentioned, Defendant, Evelyn Seroy ("Seroy") was and still is a Special Representative at the Queens Borough Office, located at 97-77 Queens Boulevard, 5th Floor, Rego Park, New York 11374-3327.

18. At all times hereinafter mentioned, Defendant, Al Samuels ("Samuels") was and still is a Special Representative at the Queens Borough Office, located at 97-77 Queens Boulevard, 5th Floor, Rego Park, New York 11374-3327.

5

19. At all times hereinafter mentioned, Defendant, Roger Roth ("Roth") was and still is a Special Representative at the Queens Borough Office, located at 97-77 Queens Boulevard, 5th Floor, Rego Park, New York 11374-3327.

20. At all times hereinafter mentioned, Defendant, Peter Mayglothing ("Mayglothing") was a Special Representative at the Queens Borough Office, located at 97-77 Queens Boulevard, 5th Floor, Rego Park, New York 11374-3327. Upon information and belief, Mayglothing retired in the year 2004 or 2005. This is his last known address.

21. At all times hereinafter mentioned, Defendant, Mary Grace O'Gara ("O'Gara") was and is the UFT Chapter Leader and teacher at P.S. 66, located at 85-11 102nd Street, Richmond Hill, New York 11418.

22. At all times hereinafter mentioned, Defendant, United Federation of Teachers, Manhattan Headquarters, was and still is Plaintiff's Collective Bargaining Unit. It's principle place of business is 52 Broadway, 14th Floor, New York, New York 10004.

23. At all times hereinafter mentioned, Defendant, Mr. Howard Solomon ("Solomon") was and is the Director of UFT Grievance Department located at 52 Broadway, 16th Floor, New York, New York 10004.

24. At all times hereinafter mentioned, Defendant, Mr. Ty Chess ("Chess") was and is the Assistant to the President Randy Weingarten, at Manhattan Headquarters located at 52 Broadway, 14th Floor, New York, New York 10004.

25. At all times hereinafter mentioned, Defendant, Ellen Procida ("Procida") was and is a Special

6

Representative at Manhattan Headquarters, located at 52 Broadway, 16th Floor, New York, New York 10004.

26.  At all times hereinafter mentioned, Defendant, Kitty Williston, was and still is Program Director, UFTWF Health and Cancer Helpline, located at 52 Broadway, 7th Floor, New York, New York 10004.

27.  At all times hereinafter mentioned, Defendant, New York State United Teachers, an affiliate of The United Federation of Teachers, is located at 52 Broadway, 9th Floor, New York, New York 10004.

28.  At all times hereinafter mentioned, Defendant, James Sandner ("Sandner") was and still is General Counsel of New York State United Teachers, located at 52 Broadway, 9th Floor, New York, New York 10004.

## JURISDICTION AND VENUE

29.  This action is being brought to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §200-e to 2000e-17, Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §621-634, Americans with Disabilities Act of 1990, as codified 42 U.S.C. §12112-12117, Section 1983 based upon the First Amendment, ADEA 29 U.S.C. Secs. 216(b), 626(b); attorney fees, 29 U.S.C. Sec 216(b), jury trial, 29 U.S.C. Sec. 626(c)(2), ERISA, Section 510 of the Employee Retirement Income Security Act, 29 U.S.C. Sec. 1140, 29 U.S.C. §1001 et. seq., 29 U.S.C. §1161 et. seq., Statute of Frauds, law enacted in England in 1677, Workers' Compensation Acts, 5 U.S.C. §8101 et. seq. (1916) and 42 U.S.C. Section 1983, as against the Defendant Department of Education, and individual Defendants of the Department of Education.

30.  Additionally, this action also seeks redress as against the Department of Education, and the individual Defendants of the DOE, Title IX, 20 U.S.C. 1681 et. seq. New York State Law Section 290, Section 296 of

7

New York State Human Rights Law, and The New York City Human Rights Law, N.Y.C. Admin. Code Title 8 et. seq., as well as violation and denial of civil and individual rights under state and federal laws, violation and denial of due process under state and federal law, and unfair labor practices. Plaintiffs are being violated under the first amendment, fifth amendment and fourteenth amendment.

31. The following laws involve Collective Bargaining Agreement Laws which seeks redress against the Defendants, Department of Education and the individual Defendants of the DOE; the Defendants of the UFT and NYSUT, and the individual Defendants of the UFT and NYSUT. The laws are Labor Management Reporting and Disclosure Act (LMRDA), popularly Landrum-Griffin Act, 29 U.S.C. §401 et seq. (1959), National Industrial Recovery Act (NIRA), 295 U.S.C. §495 (1935). . DOE, NYSUT, UFT and all individual Defendants, violated 5 U.S.C. §500 et seq. (1984), Administrative Rules and Professional Conduct (APPA).

32. By recklessly and intentionally refusing to represent Plaintiff, the UFT and the individual UFT Defendants, as well as NYSUT and Defendant, Sandner, have failed in its duty of fair representation and thus violated 29 U.S.C. Section 185, 29 U.S.C. Sec. 185(a) and 28 U.S.C. §1331, Breach of Fair Representation under Federal Common Law.

33. DOE, and the individual Defendants of the DOE, violated Article 14 of the Civil Service Law as amended (Public Employees Fair Employment Act) as they engaged in improper employer practices, by violating subsections 209-a1(a), 209-a1(b), 209-a1(d) and 209-a1(e).

34. UFT, NYSUT and the individual Defendants of the UFT and NYSUT, violated Article 14 of the Civil Service Law as amended (Public Employees Fair Employment Act) as they engaged in improper employee organization practices; by violating subdivisions 209-a2(a), 209-a2(b) and 209-2(c).

8

35. UFT, NYSUT and the individual Defendants of UFT and NYSUT, violated Plaintiff's rights pursuant to 42 U.S.C. §1983 as Plaintiff was violated pursuant to the first, fifth and fourteenth amendments.

36. DOE, UFT and NYSUT and all the individual Defendants of the DOE, UFT and NYSUT are responsible for the violations pursuant to 18 U.S.C.A §1964, 18 U.S.C. §1961(3), U.S.C.A. §1961(5), U.S.C.A §1962(a), 18 U.S.C.A. §1962(b), 18 U.S.C. 1961 et seq., 18 U.S.C. §1961, 18 U.S.C. §1341, 18 U.S.C. §1343, 18 U.S.C. §1962, 18 U.S.C. §1344, 18 U.S.C. §1344(2), 18 U.S.C. §1951, §1962(c), §1962(a), 18 U.S.C. §1961(4), 18 U.S.C. §1028, 18 U.S.C. §1503, 18 U.S.C. §664, 18 U.S.C. §1962(d), and any other Rico violations which can be inferred from the facts set forth herein.

37. All defendants violated Section 15 of The New York City Civil Rights Law or under the State Education Law or under applicable civil service laws and regulations, and under the Collective Bargaining Agreement dated november 16, 2000 - May 31, 2003, which was in full force until, on or about February 2006, when a new contract was enforced.

38. This action is brought pursuant to 42 U.S.C. Section 1983 to vindicate the civil rights of Plaintiffs. Plaintiffs contend that all Defendants severely altered the terms, conditions, and privileges of their municipal corporation in violation of their due process, equal protection, and liberty interest rights, as well as freedom of speech, and any other laws which can be inferred from the facts set forth herein.

39. Plaintiffs live in Nassau County. Plaintiff, Susan Tropeano, is declared long-term disabled by the Federal Government, as a result of the severe hostile work environment she encountered compounded with the abandonment of the UFT. She is stripped of all compensation, medical and welfare benefits, pension, and TDA, etc., as the DOE and Leinwand claim she is on an ongoing unauthorized leave although all the proper

9

medical documentation was submitted by Plaintiff's doctors and the Federal government.  Plaintiffs spent huge amounts of legal fees, but received no legal help as the attorneys aided and abetted the DOE, UFT and NYSUT.  These high legal fees depleted Plaintiffs' funds.

40.  Due to Plaintiffs' severe financial hardships, and Plaintiff, Susan Tropeano's disability, venue is proper in Central Islip as transportation to this court is by car, the most comfortable means for Plaintiff, Susan Tropeano, to travel.  Additionally, travelling by car is the most economical, as the Long Island Railroad and The New York City Transit System costs approximately $45.00 round trip.

41.  Furthermore, venue at Central Islip is the most accommodating venue for a disabled "poor" person(s), as there is free ample parking; and the most conducive venue to carry three huge crates of documents which support Plaintiffs' lawsuit.  It's impossible for a non-disabled person to use public transportation and carry these heavy crates of documents, let alone a disabled person.

42.  For all these reasons, Federal Court in Central Islip is proper venue for Plaintiffs.

43.  All conditions precedent to maintaining this action have been fulfilled.  A charge of Discrimination was duly filed with the EEOC and a Right to Sue Letter was issued on February 24, 2006 (see Exhibit A attached hereto).  This action was properly instituted within 90 days of said issuance.

## BACKGROUND FACTS

44.  Plaintiff,  Susan Tropeano, has been employed as a Teacher in the New York City School System for approximately nineteen (19) years.  She is fully certified, and has obtained tenure pursuant to the existing Collective Bargaining Agreement ("CBA") between the DOE and the United Federation of Teachers ("UFT").

10

Exhibit A

EEOC Form 161 (3/98)          U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: Susan Tropeano<br>30 Grace Avenue<br>Great Neck, NY 11021 | From: New York District Office - 520<br>33 Whitehall Street<br>5th Floor<br>New York, NY 10004 |
|---|---|

| | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) | |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 520-2006-00173 | Vikki L. Barno,<br>Investigator | (212) 336-3680 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[X] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[ ] Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[ ] While reasonable efforts were made to locate you, we were not able to do so.

[ ] You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

[ ] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

Spencer H. Lewis, Jr.,
Director

FEB 24 2006
(Date Mailed)

Enclosures(s)

cc:  NYC DEPARTMENT OF EDUCATION
c/o Robin Greenfield, Deputy Counsel
52 Chambers Street
Room 308
New York, NY 10007

Plaintiff maintains an Undergraduate and Master's Degree in English Language Arts Education with thirty (30) graduate credits in education courses above a Master's Degree.

45. Plaintiff's job performance has always been praised by past and present administrators, including Principal Phyllis Leinwand ("Leinwand"). On October 2003, Plaintiff received her last formal observation report from Leinwand of a lesson she was teaching which was very complimentary in nature, like all past formal observations, for the past nineteen (19) years. Plaintiff's school file was impeccable. She has never been disciplined for the past nineteen (19) years of teaching.

46. Soon after Leinwand commenced employment at P.S. 66, she implemented a pattern of unjustified and malicious harassment against Plaintiff which has continued an escalated during the 2003-2004 school year.

47. On February 13, 2004, the hostile work environment became so unbearable, Plaintiff's psychologist, Dr. Victor J. DeFazio ("DeFazio") forbid her to return back to school; as he informed Plaintiff that she will suffer irreparable harm, physical, and psychological mental ailments, from the malevolent conduct of Leinwand and Lavin.

48. Lavin and Leinwand created an intolerable environment and made the performance of Plaintiff's duties difficult. Lavin's and Leinwand's behavior has included unprofessional interactions, unprofessional comments, false allegations of wrongdoing, excessive meetings, public humiliation, public announcements, public, loud reprimands, excessive letter writing and unequal treatment. Their conduct has extended beyond all bounds of decency and should not be tolerated in a school community.

49. Plaintiff has repetitively complained about the treatment. Plaintiff has the right to complain without

11

fear of retaliation.  Lavin and Leinwand met her complaints with further harassment and retaliation.  Plaintiff
called and wrote many letters to the UFT regarding these matters.  UFT did not help except to fill out
approximately four (4) grievance forms, but grievances were never pursued as the UFT ultimately abandoned
Plaintiff shortly afterwards.

50.  The environment that Plaintiff has encountered, began shortly after Leinwand became Principal at P.S.
66.  At the time, Leinwand consistently and falsely argued with Plaintiff that she was teaching out of
license, was not grandfathered in, and was in danger of being excessed.  Prior to the false allegations,
Plaintiff was always grandfathered in, on all school excessing lists for the past seventeen (17) years.

51.  Plaintiff was given her employee profile by the  DOE which shows her excessing seniority.  The profile
was dated June 30, 2002.  The profile was tampered with as it shows code numbers that don't exist in the
contract and incomplete information.

52.  Plaintiff wrote many letters to the UFT about her excessing seniority, including Weingarten, President of
the UFT.  Most of the Queens UFT frustrated and stressed her, offering no help, and Weingarten never
responded.

53.  On or about January 2003, Plaintiff was stunned for the very first time, when she was listed
probationary for excessing which meant plaintiff will be one of the first teachers to leave the school in case
of a budget cut, etc.  Leinwand and O'Gara had this list kept in their desk drawers under lock and key.
Under no circumstances could Plaintiff make a copy of this list in order to have it corrected.

54.  According to the DOE Teachers' Guide to Serving in The New York City Public School dated December

12

2003, it states, "The excessing list should be made available in an accessible location in the school to allow all staff members the opportunity to review the list."

55. It would be considered common practice, that if a teacher has a problem with his/her excessing status, that teacher makes a copy of it and provides this information to the UFT. Leinwand and O'Gara argued with Plaintiff that she cannot be given a copy of the excessing list.

56. Plaintiff was reminded periodically by Leinwand about her problem with excessing seniority as Leinwand arranged emergency morning excessing meetings with all the teachers at P.S. 86. These meetings took place as the children were watched by other school personnel at the onset of the school day, before the children had the opportunity to be escorted to their classrooms by their teachers.

57. Leinwand stated to the staff, "Know your place on the excessing list. We expect teachers to be excessed. Don't come crying to me when you're excessed. If you believe you are not properly placed on the list, take care of these matters now."

58. These meetings were intended for Plaintiff as she was the only teacher in the school who had a problem with excessing. Plaintiff called the Queens UFT, and depending upon which representative she spoke to, most UFT representatives said she did have excessing seniority; however, Mayglothing, Special Representative and Harolyn Fritz, Queens Borough Representative, argued with Plaintiff it's a gray area, and changed their story shortly, to inform Plaintiff that she absolutely does not have excessing seniority.

59. At one point, Leinwand approached Plaintiff and told her she would be happy to know that a new list of excessing seniority arrived at school, and that she now has excessing seniority. Plaintiff asked to see the

13

list. Leinwand did not respond and walked away.

60. Mayglothing knew Leinwand well, as he constantly spent time at Leinwand's former school, J.H.S. 210, doing grievances. Leinwand informed Plaintiff of this, and upon information and belief, Leinwand informed Mayglothing that she desired Plaintiff to be excessed. Mayglothing was very hostile towards Plaintiff, and pretended he did not know who Leinwand was. He arrogantly stated to Plaintiff and her husband, "What does the term grandfather mean? I never heard the term grandfathered in." These harassing comments greatly stressed Plaintiff and her husband as the UFT was hostile, and not acting on Plaintiff's behalf.

61. Plaintiff and her husband also spoke to Evelyn Seroy, a Special Representative of the UFT, regarding her excessing seniority. She informed Plaintiffs she would have Plaintiffs meet with an excessing specialist. However it never occurred. A month later Seroy informed Plaintiffs to "Bite the bullet!"

62. Plaintiff called the Brooklyn UFT where she was originally grandfathered in. The Brooklyn UFT representatives reassured Plaintiff the Queens UFT is incorrect and mailed to her all appropriate documents to prove that Plaintiff does have excessing seniority.

63. On or about June 2003, Plaintiff filed a Step I grievance regarding her excessing status. However, that was not an easy task. O'Gara argued with Plaintiff as Plaintiff wanted the correct facts and rules listed on her grievance regarding her excessing seniority. O'Gara was very adversarial towards Plaintiff, and did not want to state the true facts on Plaintiff's grievance. Finally, O'Gara somewhat relented and a Step I grievance was initiated. Plaintiff was very stressed from the hostile actions of O'Gara.

64. The Queens District Representative, Cooper, was on Plaintiff's side and reassured Plaintiff by stating,

14

"You do have excessing seniority. Don't listen to the Queens UFT. If we need to, we'll appeal it and you'll finally win."

65. Plaintiff lost Step I and Step II of the excessing grievance, although she showed all the documents given to her from the Brooklyn UFT proving she had excessing seniority.

66. At the Step II grievance, there was a hearing officer present, Mr. Edward Levitan ("Levitan"). There is no mention of a hearing officer in the contract at Step II. Before the grievance began, Leinwand and Levitan were conversing in front of Plaintiff about old school days and how Leinwand is still as pretty as ever. He related many personal stories to Leinwand to prove they were friends. Levitan was not a neutral decision-maker; and it was quite clear Plaintiff would lose the grievance.

67. In June 9, 2003, Fritz, wrote Plaintiff a letter stating, "In regard to your request to proceed to Step III, we regret to inform you that the Borough Grievance Department has concluded your case cannot be pursued."

68. This is a violation of the Collective Bargaining Agreement, as a teacher is entitled to grieve her issues at all steps of the grievance procedure.

69. In June 13, 2003, Plaintiff appealed the decision with Mr. Peter Lehrer ("Lehrer"), a representative at the UFT Grievance Department. Lehrer was concerned and very puzzled why Leinwand and O'Gara did not give Plaintiff a copy of the excessing list. Nonetheless, Lehrer granted Plaintiff back her excessing seniority. He informed Plaintiff she was not marked probationary on the computer as she had at that time approximately eighteen (18) years of excessing seniority. He also read all relevant documents from the

15

Brooklyn UFT.

70. A day later, Lehrer calls Plaintiff's home and informs Plaintiff's husband and her that he is sorry he cannot grant Plaintiff her excessing seniority as the Queens UFT will not permit it. Plaintiff and her husband were extremely frustrated and stressed as they thought this ordeal about excessing was solved.

71. Upon information and belief, Plaintiff never received an official letter from Peter Lehrer that her appeal was denied.

72. In January 20, 2004, Plaintiff receives a letter about initiating a "second" appeal regarding her excessing seniority from Solomon, Director of UFT Grievance Department, Manhattan Headquarters.

73. To date, this "second" appeal is now considered obsolete according to Solomon. On May 2005, he stated to Plaintiffs that a grievance for excessing seniority is not pursued unless you were actually excessed. Solomon's comment was absurd, as a teacher is instructed to take care of these matters right away, as it protects a teacher and provides job security.

74. Throughout the 2001-2002 school year, Leinwand constantly reprimanded Plaintiff to arrive early each day and to stay late after school to prepare the library for automation. This was to be without pay. Leinwand did so despite the fact that Plaintiff already had a full load of classes during the day, as any teacher. Leinwand refused to provide Plaintiff with any assistance in the library. Plaintiff even had to utilize prep periods and lunch periods to prepare for the automation, without receiving any assistance for most of the school year.

16

75. In April 2002 Sheehan screamed at Plaintiff, in the presence of children and school staff, regarding her use of a school aide, to momentarily watch her class. Plaintiff needed to telephone a parent on an urgent matter regarding the safety of a child.

76. Nearly all teachers utilize school aides in such a capacity and such practice is commonplace. However, when Plaintiff used the aide to watch her class, Leinwand threatened to report this incident to the Superintendent. Plaintiff was shocked, humiliated and hurt that Sheehan reprimanded her in front of teachers, parents and children and that Leinwand was not providing the same courtesies to all teachers. Leinwand gave a disciplinary letter to Plaintiff, but later that day rescinded it.

77. Plaintiff asked for help from O'Gara. O'Gara was of no help and aggravated and frustrated Plaintiff further as she nastily informed Plaintiff, "The onus of proof is on you." It was as if O'Gara was taking delight in the unfair situation Plaintiff was exposed to, as O'Gara refused to acknowledge to Plaintiff that the school aide is used by all teachers in the school on a daily basis; when a teacher needs to use the bathroom, or make an emergency phone call, etc.

78. After dismissal that day, Plaintiff was extremely upset, as she was relating her story to a paraprofessional in the school. Leinwand approached Plaintiff and stated, "Don't worry, Susan, I took care of the situation. I'm not reporting it to the Superintendent." Additionally, she informed Plaintiff to not worry about the disciplinary letter as she is rescinding it. Plaintiff never signed the letter.

79. The next day, Leinwand writes a demeaning two page non-file letter to Plaintiff, in which no signature was required. Plaintiff called the UFT regarding this letter, and the disciplinary letter Leinwand rescinded. UFT informed Plaintiff to forget about it, Leinwand cannot do anything with those letter as no letter was

17

signed by Plaintiff. Plaintiff took their advice.

80. Approximately two years later, Leinwand contradicts what she stated above, as she tries to incorporate
this incident in an unlawful five page letter, titled "Medical Evaluation" *Susan Tropeano,* from Phyllis Leinwand. In this 5 page
unlawful document, Leinwand commits fraud as she distorts facts about Plaintiff's present and past history
at P.S. 88, and previous schools. Plaintiff's school file portrays an unblemished work history.

81. Leinwand is neither a doctor nor an investigator, nor a judge. However in this unlawful medical
evaluation, she believes she holds the role of all three (3) professions.

82. Leinwand, once again reports the incident that happened two (2) years ago, to the Medical Bureau in
her unlawful 5 page report, "Susan Tropeano, Medical Evaluation" from Phyllis Leinwand, she states, "I
reported this incident to the District Office and asked for her immediate removal based on this behavior and
the response I received was that the Assistant Principal should not have attempted to speak to her while she
was with the children."

83. It is quite obvious, Plaintiff could not trust Leinwand and this proves Leinwand was trying every
conceivable way to have Plaintiff removed from the school, either by having her unlawfully excessed or by
"immediate removal" as expressed by Leinwand. Leinwand, once again, approximately one year later, uses
this incident although it was rejected by the DOE, one year later, as she tries to subject Plaintiff to an
unlawful 3020-a proceeding.

84. Leinwand also refused to give Plaintiff storage space for her books and materials. As a result, Plaintiff
had to maintain these items on chairs in the teachers' lunch room. The items included her file folders,

18

which, Leinwand took one day. Finally, in or about April, 2003, after several complaints, Leinwand gave Plaintiff a cart, with one small shelf. This cart was still inadequate. In May, 2003, Leinwand took the cart away.

85. In September 2003, Leinwand gives Plaintiff a desk. On or about November 2003, Leinwand informs Plaintiff, as it was directed by Lavin, her desk has to be removed, as Lavin claims it's a fire hazard. Leinwand removes Plaintiff's desk from a huge empty area on the third floor claiming it's a fire hazard. However, in this huge empty room there are children's desks, rows of chairs, boxes, children's coats and bookbags scattered on the floor. According to Lavin and Leinwand, these items are not a fire hazard only Plaintiff's desk is hazardous.

86. In June, 2002, despite having been praised for completing the automation of the library, Leinwand, without cause, informed Plaintiff that she was to be replaced as Librarian for the forthcoming year. Plaintiff was removed, despite being the most qualified teacher to be the school librarian as she was certified by the School Library Services Division and having a degree in English/Language Arts. Plaintiff was, instead, given the position of Science Cluster Teacher, beginning in September, 2002.

87. In September 2002, Leinwand gave Plaintiff a less prestigious position as Plaintiff was assigned to be the Science cluster teacher where she no longer had her own room. She had to travel from class to class teaching science and had to leave all her school materials and personal belonging which she used daily in the small teachers' lunchroom. Items got lost and misplaced, as the teachers' lunchroom is the busiest room in the school, and is definitely not an appropriate place for a teacher to store her personal and school belonging.

19

88.   During the 2001-2002 school year, Plaintiff was given all first period preps, which is unfavored prep period. Plaintiff constantly complained to Ms. Leinwand, but to no avail.

89.      Leinwand, in or about September, 2002, humiliated Plaintiff by broadcasting Plaintiff's feelings to other staff members. Plaintiff was the only teacher who had all first period preps plus all early lunches, as Leinwand tried every conceivable means to frustrate Plaintiff by not accommodating her like other teachers. Leinwand's intention was to make Plaintiff so uncomfortable, frustrated, and stressed that plaintiff would be forced to seek a transfer.

90.  On the third day of school, in September, 2002, Leinwand and Denise Sontag ("Sontag"), from the District 27 Office, visited Plaintiff's classes. Leinwand permitted Sontag to humiliate Plaintiff in front of her class.    . Sontag criticized Plaintiff's lesson and took her lesson book, although Plaintiff, who was new to the Science Cluster, had merely followed the previous year's curriculum.

91.  Plaintiff's science lesson was a very appropriate lesson as Plaintiff was introducing the topic, "Science" and the children were creating a science collage from magazine pictures they cut out the night before for homework. After their collage was completed, children were assigned to write about their collages and how it relates to science.

92.  It should be noted that when Sontag humiliated Plaintiff in front of her class, Leinwand was enjoying every moment as she had a smirk on her face sipping coffee remaining silent.  Plaintiff informed Leinwand in front of Sontag, to tell Sontag that Plaintiff's classes were not given science textbooks.  However, Leinwand ignored Plaintiff by turning her back on her, and walked out with Sontag.  Plaintiff was frustrated, stressed and trembling from this situation which occurred in front of the children.

20

93. At the end of the period, Plaintiff ran to Leinwand's office, where both Sontag and Leinwand were present. Plaintiff again explained the situation to Sontag, and informed Sontag she did not appreciate being humiliated in front of the children. Leinwand remained silent. Plaintiff asked for her planbook back. Sontag gave it to her and said, "I understand, I'm sorry."

94. As a result of not having science textbooks for the children, Plaintiff went to the school library to take out books for the children. The new school library teacher interfered with Plaintiff's efforts. Plaintiff complained to Leinwand who refused to do anything as Leinwand told Plaintiff, "I can't tell teachers what to do." Leinwand suggested that Plaintiff go to her own public library if she wanted books for her classes.

95. Plaintiff was in charge to teach science from kindergarten to second grade. O'Gara was in charge to teach science from third to fifth grade. O'Gara had science textbooks for her classes, but Plaintiff did not. O'Gara had a desk, bookshelves, and office to store all her personal and school belongings. Plaintiff did not. It was very evident, Plaintiff was not treated fairly and equitably, like other teachers; as Leinwand was creating a hostile work environment for Plaintiff, as she was trying her best, to make Plaintiff leave the school.

96. Leinwand used O'Gara, the UFT Chapter Leader, to violate the Collective Bargaining Agreement in many ways; with the goal that Plaintiff would be so stressed and frustrated, she would finally seek a transfer.

97. Leinwand forced another female teacher to leave during the school year of 2003. This teacher was an ESL tenured teacher, teaching ESL at P.S. 66 for twelve (12) years. Leinwand eliminated her ESL position and thus forced this teacher out of the school. Upon information and belief, Leinwand eliminated this teacher to save a young male teacher's position who did not have tenure, and if excessing occurred, he

21

would be the first teacher to leave the school.

98. Upon information and belief, one of the reasons why Leinwand was targeting Plaintiff to leave the school in the 2003-2004 school year, was to save this male teacher's position, once again.

99. It should be noted, that Plaintiff taught science to his class and he was always cooperative and cordial to Plaintiff. However, when Leinwand's severe harassment escalated towards Plaintiff, as Plaintiff taught his class on February 13, 2004, the last day Plaintiff attended school, this male teacher was very uncooperative and nasty with Plaintiff. He interfered in Plaintiff's science lesson by speaking to his class while Plaintiff was teaching, disturbing the children's concentration on the science work in progress.

100. It was a common tactic of Leinwand to "set-up" certain teachers against Plaintiff and in return those teachers will receive favors from Leinwand. Leinwand tried to do this with Plaintiff as well, as she wanted Plaintiff to tell her some personal information about another teacher. Plaintiff informed Leinwand she will have no part in that.

101. In October 2003, Cooper, before abandoning Plaintiff, informed Plaintiff, "Be careful of Leinwand. She makes friction between teachers. She's sadistic. She makes teacher sick. She has a history with the Union for ten (10) years." Plaintiff is living proof of Cooper's comments.

102. In November, 2002, Leinwand, unjustifiably, took Plaintiff's time card because she was one minute late. Plaintiff had to retrieve the time card from Leinwand approximately ten minutes later. She then had to needlessly punch in ten minutes later.

22

103.  In December 2002, Plaintiff became very ill while teaching.  She buzzed for Leinwand.  Leinwand refused to have someone cover the class and refused to permit Plaintiff to go home, although in such situations there is always someone to cover the class.  Another similar incident occurred in February, 2003.

104.  In December, 2002, Plaintiff hurt her back as the result of carrying too many books for her students at P.S. 66.  She filed an accident report, which Leinwand, at first, unjustifiably, refused to sign until two weeks later when Plaintiff threatened her with Union intervention.

105.  During the 2002-2003 school year, Leinwand repeatedly asked Plaintiff her age and if she had reached age 50.  This was not justified.

106.  During the 2003 school year, Plaintiff's ring got caught in the copying machine and a diamond was missing.  Plaintiff became frantic and was in no mindset to teach her next class.  The repairman was summoned.  Plaintiff did not wish to leave the machine unattended in the interim.  Leinwand, although there were people always available to cover Plaintiff's class, compelled Plaintiff to teach her class.

107.  Between March, 2003 and June, 2003 Leinwand paged Plaintiff an incessant number of times to report to her office for trivial reasons.  This often occurred while Plaintiff was teaching.  It caused Plaintiff much distress.

108.  Sometime during the 2002-2003 school year, Ms. Leinwand inappropriately reprimanded Plaintiff and accused her of not being able to deal with young children.  This occurred after a Kindergarten student fell asleep in the class, a perfectly routine occurrence.

23

109. Beginning in September, 2003, Leinwand, without reason, inappropriately humiliated Plaintiff in front of other teachers. For example, on one occasion, in or about September, 2003, Leinwand yelled at Plaintiff because she could not attend a volunteer meeting. Another teacher who could not attend was not yelled at by Leinwand.

110. In or about December 2003, Plaintiff applied to switch her tier from tier IV to the better tier, tier II, as the Teacher's Retirement System ("TRS") offered teachers to switch their tiers if they worked within a certain period which Plaintiff did work. Plaintiff was speaking to another teacher who had just had her tier changed as well. This particular teacher is very close with Leinwand. Plaintiff was stunned, when TRS stated she did not work within that timeframe.

111. Plaintiff immediately appealed the decision as she luckily saved her past work history. TRS wrote a letter back, "The DOE has reviewed your appeal and has advised TRS that you are eligible for a change. As a result your tier will be changed to tier II."

112. It is quite bizarre to say the least, since Leinwand arrived at Plaintiff's school, all her records in the DOE are in disarray. Seniority records that were in effect for nineteen (19) years were called into question and kept secret, under lock and key by O'Gara and Leinwand. Work history which was clearly on the computer could not be located, needed to go through an appeal process to be rectified. Finally, by Leinwand placing Plaintiff on an unlawful unauthorized leave every single record Plaintiff had with the DOE including pension, TDA salary, medical benefits, welfare benefits were unjustifiably, abruptly terminated.

113. As mentioned previously, during the 2003-2004 school year, Plaintiff was the only teacher in the school given all fist period preps and all early lunches. Plaintiff asked Leinwand for late preps, like the other

24

teachers had in school, as Plaintiff began to experience over tiredness and voice problems. However, Leinwand was unyielding, and hostilely remarked to Plaintiff, "I don't care if you get sick from your schedule. Don't blame it on me."

114. Other teachers observed Leinwand's harassment of Plaintiff. Mrs. DaVino, a fellow Teacher, offered the opportunity to Plaintiff to exchange one of her later preps with one of Plaintiff's first period preps. Mrs. DaVino, is one of the teachers on the Consultation Committee. The Consultation Committee was created to address issues and/or problems in the school.

115. Plaintiff informed Leinwand of the prep swap with Mrs. DaVino. Leinwand denied the change in schedule. Leinwand berated Plaintiff regarding her request for an accommodation in the presence of a class, while Plaintiff was conducting a lesson. Later, Mrs. DaVino sympathetically informed Plaintiff that there was nothing she could do to relieve Plaintiff's difficult schedule, as Leinwand was obstinate about Plaintiff having first period preps.

116. Leinwand firmly stated to Plaintiff, "No one wants your first period preps. I'm the Principal in the school. No one tells me what to do in my school."

117. In October 2003, Plaintiff notified Cooper regarding the problems with her schedule. Cooper informed Plaintiff that her schedule was not fair and equitable. Cooper further explained, that she would speak to Leinwand regarding same.

118. This was the time Cooper informed Plaintiff to be careful of Mrs. Leinwand as previously reported. Cooper advised Plaintiff to maintain a log of issues that arose with Leinwand. Cooper further told Plaintiff

25

that she would present the log to the Superintendent, but she never did, as she abandoned her shortly.

119.  In October 2003, Plaintiff sought the care of a psychologist, Dr. Victor DeFazio, due to the hostile treatment to which she was subjected by Leinwand.

120.  On Election Day, November 4, 2003, Plaintiff was called to a meeting in Leinwand's office, by Sheehan.

121.  Upon entering the office, Plaintiff observed Leinwand, Sheehan and her District Representative, Cooper.  Plaintiff was shocked to see Cooper in Leinwand's office.

122.  Cooper reprimanded Plaintiff, stating her schedule was fair and equitable, despite her earlier comments to the contrary.  Plaintiff realized that her District Representative had completely shifted her thinking since speaking privately with Leinwand.  Shortly afterwards, the UFT completely abandoned Plaintiff.

123.  Cooper informed Plaintiff at the meeting, that Leinwand wanted Plaintiff to have all first period preps and all early lunches.  Leinwand added, "I know the higher-ups in the system" and stated, that "Mrs. Tropeano was harassing her."  It was obvious, Cooper was allegedly present to stop Plaintiff from harassing Leinwand, acting as Leinwand's union representative instead of Plaintiff's.

124.  At the meeting of November 4, 2003, it is of utmost importance, and should be noted, that when Leinwand informed Cooper and Plaintiff that she knows the higher-ups in the system, and that Plaintiff is harassing Leinwand, Cooper abruptly turned her back on Plaintiff and abandoned her.  Before Leinwand expressed her threatening statement to Plaintiff and Cooper, that she knows the higher-ups in the system,

26

she asked Cooper, "You don't know who I am, Ms. Cooper, do you?" Cooper stated, "No, I don't." It was quite evident that before Plaintiff was summoned to this meeting, Leinwand demanded Cooper privately to abandon Plaintiff's plight for justice, as Leinwand warned Cooper not to help plaintiff with her schedule.

125. In October 2003, approximately one week before the disturbing meeting arranged by Leinwand, Cooper and Plaintiff were arranging a dinner date; as they became friendly with one another approximately two (2) years prior to this November 4, 2003 meeting.

126. Cooper and Plaintiff were school librarians and they met at a school library meeting, Downtown Brooklyn. They shared personal conversations, went to a future library meeting together at Queens College, and were about to go have dinner together, in October 2003. However, Leinwand changed all of that, as she deliberately and recklessly destroyed Plaintiff's friendly relationship with Cooper; as Cooper did warn Plaintiff she makes friction between teachers; as Leinwand was  putting a wedge between Plaintiff and Cooper.

127. On or about the end of October 2003, Leinwand arrogantly stated to Plaintiff "Your good friend Cooper wants to discuss your schedule with me." Plaintiff never informed Leinwand about her relationship with Cooper.

128. Upon information and belief, O'Gara informed Leinwand that Cooper and Plaintiff were friendly, as O'Gara speaks regularly to Cooper. Leinwand orders O'Gara to discriminate against Plaintiff and to find out information about her; and in return O'Gara receives favors from Leinwand for not acting on Plaintiff's behalf, a common routine tactic of Leinwand.

27

129.   Not only was Plaintiff being discriminated by O'Gara, but now Plaintiff's "good friend" Cooper was discriminating against her, as well, as a result of Leinwand's command; as Cooper reprimanded Plaintiff on November 4, 2003, in front of Leinwand and Sheehan arrogantly stating, "Don't ever speak about your schedule again.   Your schedule is fair and next year you will have all early lunches and first period preps again."   Plaintiff was shocked and trembling from Cooper's sudden, tyrannical behavior.

130.   At the meeting of November 4, 2003, Leinwand commented to Cooper, "You don't know me very well, Ms. Cooper, do you?"   Cooper said, "No."   Please note, Cooper was not stating the truth to Leinwand, as she informed Plaintiff approximately one week earlier, in October 2003, "Be careful of Mrs. Leinwand. She is sadistic.   She makes teachers sick.   She makes friction between teachers.   She has a history with the Union for ten (10) years."

131.   Thus, it was quite evident that Leinwand spoke to Cooper privately and warned her not to represent Plaintiff; as Cooper previously informed Plaintiff the alarming history of Leinwand's malicious conduct and personality.

132.   It is important to be aware that Leinwand's connection with the higher-ups is the key element as to why Cooper pretended not to know Leinwand in her presence at the November 4, 2003 meeting and the key element as to why Cooper deserted Plaintiff.

133.   Cooper was threatened by Leinwand that if she helps Plaintiff, she will lose her position as District Representative, as Leinwand does have influential, corrupt power to make it happen.   Leinwand thrives on her power as she is closely connected with the source of the DOE, the powerful Chancellor.   As a result, Leinwand is able to usurp her authority by empowering DOE employees and UFT employees succumb to her

28

wishes.

134.  The DOE indirectly controls the UFT and their representatives, as they are paid by the DOE.  UFT representatives love their positions as they get release time and many perks.  As a result, the Chancellor indirectly controls the UFT as he has the power to demote a UFT representative if they don't cooperate with the Chancellor.  Thus, the UFT representatives will abide by the wishes of the Chancellor so that their job will be secure.

135.  After this corrupted meeting of November 4, 2003, consisting of Plaintiff, Cooper, Sheehan and Leinwand,' Leinwand arrogantly announced and made it known at a faculty conference, that if any teacher does not like it here (meaning P.S. 66); she pointed, "There's the door, leave!  I'm not a happy camper when someone insults me."

136.  Please note changing Plaintiff's schedule to make it fair and equitable was insulting to Leinwand.  This message was definitely intended for Plaintiff, and to another teacher, who complained to a PTA parent about Leinwand.  This particular PTA parent, as Leinwand reported to the faculty, complained to Leinwand that the school is not the same as it was with their former principal, Jay Rosler.  He informed Leinwand that teachers appear to be upset and unhappy as they no longer smile and seem happy as they did with their former principal.  These comments were insulting to Leinwand as she was greatly infuriated by these comments and took it out on the staff.

137.  It is of utmost importance to know that Leinwand has very close connections with Chancellor Klein which Leinwand does not keep secret.  Leinwand developed her powerful connections with the Chancellor, as she is very friendly with the Chancellor's right hand man, Mr. Matthew Bromme ("Bromme").  Bromme was

29

formerly the Superintendent of District 27; where Leinwand's former school, J.H.S. 210 is located. Bromme was originally a teacher at J.H.S. 210, as Leinwand was originally a teacher at J.H.S. 210 as well. Sheehan was also a teacher at J.H.S. 210. Leinwand developed a very close, personal relationship with Bromme, as they attend each others' family functions, such as weddings, etc. Leinwand's entire work history is at J.H.S. 210, where she eventually became assistant principal and Sheehan became a dean.

138. Upon information and belief, Leinwand and Sheehan received promotions for protecting the wrongs of the administration at J.H.S. 210; as Leinwand became principal, and Sheehan became assistant principal, at Plaintiff's school, P.S. 66.

139. Leinwand flaunts the Chancellor's connection, and as a result, Leinwand believes she could target any teacher she desires, as she is confident she can get away with it. This is how Plaintiff got caught in this web of corruption.

140. Leinwand used her cohort in crime, Lavin, to fulfill her mission in targeting Plaintiff. The first goal of their deliberate and reckless mission, is to rid Plaintiff of her union. It was successfully completed as Plaintiff's UFT abandoned her.

141. The second goal of Leinwand's and Lavin's deliberate and reckless mission, is to violate Federal, State, State Education Laws and the Collective Bargaining Agreement, and heap upon Plaintiff the overwhelming violations; as this was their deliberate and reckless scheme to destroy Plaintiff's career, health and finances. Lavin and Leinwand knew very well this will cause Plaintiff irreparable harm. It was successfully completed as well, as the UFT abandoned Plaintiff and therefore Plaintiff could not seek relief from their wanton acts.

30

142.   The third goal is to expose and inflict upon Plaintiff chilling, unlawful procedures, as if Plaintiff was
living in barbaric times, when it was allowed to mutilate someone for absolutely no reason. This was
successfully completed as well as the UFT abandoned Plaintiff, and therefore Plaintiff could not receive relief
from their wanton acts.

143.   The main chief executive officer, who sits on the "throne" of the DOE, is Chancellor Klein.  He is the
almighty king of the DOE who is in charge to make sure all DOE employees are fulfilling their duties properly
and effectively. He certainly is not going to cease Leinwand's and Lavin's barbaric tactics, as he is promoting
them to prey upon Plaintiff incessantly to date; for two (2) years, three (3) months.  Plaintiffs and their
families suffer irreparable harm from the uncivilized pranks of Leinwand and Lavin who schemed and
destroyed an entire families' health and finances, as they are a close knit family and what happens to one
family member happens to all.

144.   On February 17, 2006, Plaintiffs wrote a serious, recent letter to Klein holding him responsible for
allowing DOE employees to behave in such a destructive manner.  Klein never responded to Plaintiff's letter.
As a result, Plaintiffs hold the City of New York responsible for all the barbaric acts of the DOE employees,
including the Chancellor, who promoted these acts.

145.   In February 16, 2006, Plaintiffs wrote a serious, recent letter to Weingarten, President of the UFT,
holding her responsible for all UFT employees; the UFT Representatives, who recklessly and deliberately
abandoned Plaintiff.  Weingarten did not respond to Plaintiffs' letter.

31

146.	In March 2006, Plaintiff spoke via telephone to Chess, Assistant to Weingarten. Chess was extremely hostile to Plaintiff, pretending he does not understand what's taking place; as Chess always refers to Plaintiff's case as, "your little case."

147.	In March 4, 2006, Plaintiffs wrote a letter to Regional Superintendent Cashin holding her responsible for allowing DOE employees; Lavin and Leinwand, in her Region, to abuse their powers concerning Plaintiff. Cashin called Plaintiff and informed Plaintiff she wants to help her. An appointment was made, but then cancelled. Plaintiff never heard from Cashin again.

148.	Numbers 116-134 stated previously, constitutes the beginnings of conspiracy leading into Rico Violations, which will be explained later in death in this Complaint, as the Chancellor is the "Godfather." Leinwand and Lavin are considered his "Mafia family," as they are connected and protected by the "Godfather." As a result, Leinwand and Lavin are able to abuse their authority and attack any individual they desire; with no fear of repercussions for their unlawful, wanton conduct.

149.	Lavin and Leinwand report to the Chancellor, the "Godfather," that they desire Plaintiff to be targeted. As a result of their wishes, the UFT has to abandon Plaintiff. The Chancellor, who is the "Godfather" informs all UFT Representatives not to protect Plaintiff and not to initiate grievances as Lavin's and Leinwand's unlawfulness cannot be exposed as the Mafia family must be protected.

150.	Please note, the one and only grievance initiated incorporated unlimited, unlawful grievance procedures, as rules, protocols, and laws; pursuant to the Collective Bargaining Agreement were severely violated; as the Mafia family must be protected.

32

151.     If a NYSUT or UFT Representative strays from the "Godfather's" order, their role as Representative will be destroyed; as the Chancellor, the "Godfather," is the Chief Executive of the DOE. The UFT and NYSUT Representatives are paid by the DOE. UFT and NYSUT Representatives have informed Plaintiff and her husband numerous times, "The DOE holds all the power. The UFT is weak. They follow the orders of the DOE." These statements were made by a NYSUT Representative, Antonio M. Cavallaro, and a UFT Representative, Roger Roth. Additionally, Mr. Cavallaro stated to Plaintiff and her husband that Plaintiff "has less rights than a criminal."

152.     As a result, it is very obvious from the conversations and facts reported, the UFT and NYSUT are threatened not to help Plaintiff. Rather, they are instructed by the Chancellor, the "Godfather," with the help of his "Mafia family," to unlawfully destroy Plaintiff's career, health and finances, in essence her life.

153.     As a result of Plaintiff's destroyed life, Plaintiff's husband's life is destroyed as well.

154.     A husband and wife are a unit; a bond, and when one spouse is suffering, the other spouse is suffering as well.

155.     Plaintiff's husband's good name and reputation were destroyed by the "Mafia family" when Leinwand falsely arrested him, as he wanted to speak to Leinwand about abusing Plaintiff.

156.     The goal of the Mafia is to destroy any enterprise which interferes with their unlawfulness, as no one may protect the person who is being victimized.

157.     Additionally, any sources protecting the Plaintiffs, they mock and brazenly ignore as they

33

disregard Plaintiff's doctors and the Federal government's long term Social Security disability granted to Plaintiff.

158.    This Mafia scenario is actually what took place in Plaintiff's case.  Without help from the UFT and NYSUT, the Plaintiffs are destroyed ... SMASHED!  This overwhelming "Mafia" control is destroying Plaintiffs' families as well.

159.    The "Mafia Family" has expanded to include not only the DOE, and all the individual Defendants of the DOE, but also includes UFT, NYSUT, and all the individual Defendants of NYSUT and UFT.  These powerful, corrupted entities and individuals conspire to destroy Plaintiffs' lives and their families', severely violate Plaintiffs' constitutional and civil rights; including but not limited to procedure, due process, liberty and property rights.

160.    UFT, NYSUT and the individual Defendants of the UFT and NYSUT, conspire with the DOE and the individual Defendants of the DOE, as they were very well aware that Plaintiffs would suffer irreparable harm as all NYSUT and UFT Defendants chose to aid and abet the DOE and the "Godfather," Chancellor Klein.  All individual Defendants of the DOE committed a pattern of racketeering activity, which is ongoing to date, against the Plaintiffs.  The pattern of racketeering includes  Rico violations consisting of extortion, bank fraud, embezzlement from pension and welfare funds, obstruction of justice, .    fraud in connection with identification documents, and mail and wire fraud which will be explained in detail, later in this complaint.

161.    In January 2004, Plaintiff wrote and filed a harassment log consisting of approximately fifty (50) pages, regarding Leinwand.  Within five (5) days, the Queens UFT denied Plaintiff's harassment log.  Upon

34

denial of Plaintiff's harassment log, Plaintiffs' requested a definition of the term harassment from her UFT. However, Plaintiffs' request was not addressed by the UFT.

162.     In retaliation to Plaintiff's harassment log which the UFT did not keep confidential, Leinwand recklessly and intentionally went on a rampage to ruin Plaintiff's career; as shortly afterwards, she inflicted upon Plaintiff every conceivable negative measure she could use to make it seem that Plaintiff was a misfit to society.

163.     Leinwand usurped her powers, as she recklessly and intentionally disobeyed Federal laws, State laws, the Collective Bargaining Agreement, and State Education laws.  As a result, Leinwand succeeded in destroying Plaintiff's career, health and finances, as well as the health of Plaintiffs' families; as the stress permeates to all family members.

164.     Plaintiff wrote numerous letters to the UFT regarding the above, however, the UFT and individual Defendants did not respond.  The UFT abandoned her.

165.     In January 2004, Plaintiff immediately appealed the harassment log to the Headquarters of the UFT.

166.     On January 12, 2004, Plaintiff arrived at work in a timely manner, but could not locate her time card.  Leinwand had purposely pulled Plaintiff's time card, although she was not late.  When Plaintiff questioned Leinwand about why she pulled her time card, Leinwand made a derogatory announcement to those present in the main office.  Pulling a time card is normally reserved for teachers who are late.  As Plaintiff was not late, she was very upset by Leinwand's comments, and her attempt to fabricate a falsehood

35

about Plaintiff being late.  It should be noted Plaintiff does not have a history of lateness.

167.     On or about January 13, 2004, Plaintiff was served with a letter, which was disciplinary in nature.  The letter was handed to Plaintiff by the Payroll Secretary, in the presence of one of Plaintiff's classes.  This letter pertained to an upcoming meeting that Plaintiff was to have with the Local Instructional Superintendent, Lavin, on January 16, 2004.  It stated, "You are entitled to bring UFT representation." Plaintiff requested an adjournment of the meeting until she was able to obtain representation.  Prior to this letter, Plaintiff never received any disciplinary letters during her nineteen (19) years with the DOE as she had all satisfactory observations filled with praise and all satisfactory end of year reports.

168.     Additionally, her school file is abundant with numerous praise letters from past administrators and from other District personnel.

169.     On or about January 16, 2004, Leinwand approached Plaintiff and requested her presence at the meeting with Lavin.  Plaintiff informed Leinwand that her actions were causing Plaintiff great stress, and that she could not physically withstand any more incidents or occurrences.

170.     In an effort to allay her concerns, Leinwand assured Plaintiff that the meeting was solely in order to change her schedule as per her above-mentioned requests.  Plaintiff reluctantly consented to attend without representation.  During the meeting, Lavin proceeded to question Plaintiff's health, repeatedly asking, "Are you sick?  Are you well?  Are you sure you're not sick?  Are you sure you're well?"  These belittling remarks were mind boggling to Plaintiff as she was eyed by Lavin from head to toe.  Lavin demanded full attention and eye contact from Plaintiff, as Plaintiff was reaching for a paper to show Lavin.  Plaintiff was forced to leave the meeting as she could not withstand Lavin's belittling, alarming remarks.  Leinwand

36

remained silent throughout the meeting with a smirk on her face, sipping her coffee, enjoying Plaintiff being reprimanded and belittled by Lavin.

171.     Despite Leinwand's assurances to the contrary, Plaintiff's change in schedule was not discussed at this meeting. In reality, this meeting was a set-up for the 2568 exam schemed by Lavin and Leinwand which followed shortly. A 2568 exam is conducted to determine if a teacher is safe to teach children.

172.     Plaintiff expressed her concerns to the UFT by leaving messages on their voice mails and writing numerous letters regarding Lavin's repeated, derogatory and incessant questioning regarding her health status. Plaintiff was visibly upset and traumatized by this meeting. Plaintiff's UFT and individual Defendants of the UFT, did not respond, as they abandoned her.

173.     On January 16, 2004, due to UFT abandoning Plaintiff, Plaintiff's husband requested to speak with Leinwand due to the extreme stress and anxiety caused by the meeting that Leinwand assured Plaintiff would be favorable for her with no representation needed. Leinwand called the police to remove Plaintiff and her husband from the school grounds ,as she refused to speak with Plaintiff's husband. The police were very sympathetic regarding Plaintiff and her husband's situation and her husband's reasons for wanting to speak with Leinwand.

174.     Due to escalating hostile situations at work, by Lavin and Leinwand, Plaintiff felt violated, fearful and unsafe at work. Her husband, when possible, made himself available to drive Plaintiff back and forth from the workplace.

175.     On or about February 2, 2004, Plaintiff gave Leinwand a letter documenting the dates of all the

37

ill treatment she suffered.  After her letter, Leinwand escalated her campaign of harassment and retaliation against Plaintiff because of, in part, Plaintiff complained about, and documented the ill treatment she suffered due to Leinwand's misconduct.

176.    On February 3, 2004, Leinwand and Gail Cener, a Teaching Coach, entered Plaintiff's classroom during approximately the last four (4) minutes of the teaching period.  Leinwand and Cener interrupted Plaintiff's lesson; began moving furniture, changing seat assignments, in an attempt to denigrate Plaintiff's lesson.  Gail Cener never entered Plaintiff's room before; as Plaintiff was always praised for her creativeness and excellent teaching skills, by past and present administrators; including Leinwand.

177.    As a result of Leinwand and Cener disrupting the class, Plaintiff wrote a letter to Leinwand complaining about the interruption of the class.  This letter further escalated Leinwand's campaign and harassment against Plaintiff.

178.    On February 4, 2004, Plaintiff slipped on ice on school property.

179.    Plaintiff injured her back and felt pain in her extremities.  Plaintiff filed a Line-of-Duty Injury accident report.  The report was given to Leinwand with a note from Plaintiff's physician.

180.    Leinwand denied approval of Plaintiff's accident report.  Other teachers who have slipped on ice, a normal occurrence when it snows, had their reports approved by Leinwand.  Plaintiff had to unjustly forfeit two (2) days from her sick day bank, while other teachers are routinely approved when they have an accident and do not forfeit their days from their sick bank.  Plaintiff filled out grievance forms, however the UFT and all the individual Defendants of the UFT, abandoned Plaintiff by never initiating the gievance.

38

Plaintiff wrote numerous letters to the UFT regarding the line of duty injury; however, they never responded to any of Plaintiff's letters.

181.      Immediately after Plaintiff filed above accident report, Leinwand unlawfully barred Plaintiff's Line of Duty Injury.  This was in blatant violation of the contract.  Only the Superintendent, who is Superintendent Cashin, may bar a Line of Duty Injury.  Once again Leinwand usurps her power recklessly and intentionally to harm Plaintiff.

182.      Plaintiff did not find out about the unlawful bar placed by Leinwand until on or about February 2005.

183.      Additionally, the Comprehensive Accident Report dated by Leinwand was not adhering to the time limits required and is grievable if the time frames are not followed.  This information is cited in a 5 page letter addressing all UFT members regarding Line of Duty Injuries, written by Fritz.  Plaintiff wrote numerous letters to the UFT as Plaintiff wanted to grieve this.  UFT did not respond.  The UFT and the individual UFT Defendants abandoned her.

184.      Furthermore, Rita Guarimita, signed her signature on the Comprehensive Accident Report claiming to be the Community School Superintendent on February 2004.  Upon information and belief,  Rita Guarmita ("Guarmita") was not the Community Superintendent in 2004, as the New York City Board of Education was changed to New York City Department of Education, in the school year 2003-2004; and as a result it was overhauled as administrators and personnel were reassigned to different positions.  As a result, Guaramita is no longer Community Superintendent of Region 5.

39

185.    Additionally, on some documents, Plaintiff has in her possession, Rita Guarimita is listed as Community Superintendent as well as, and on other documents she is listed as Superintendent.

186.    On February 6, 2004, Sheehan served Plaintiff a threatening letter. Sheehan gave this letter to Plaintiff, dramatically announcing service of said letter in front of her peers, office personnel, students, parents and Leinwand. Leinwand smirked and stared at Plaintiff, in an effort to humiliate and frustrate Plaintiff, as Sheehan and Leinwand reclessly and intentionally schemed to severely humiliate Plaintiff in public. This letter was from Lavin to continue the meeting, "Are you sick? Are you well?" The alarming letter stated, "This may lead to further disciplinary action."

187.    Plaintiff was never given any disciplinary action by Lavin and now she is informed by Lavin she may receive further disciplinary action. It was very evident from this letter that Leinwand and Lavin were recklessly and intentionally destroying Plaintiff's career, out of nowhere; as Leinwand tried in the past two (2) and a half years to unlawfully force Plaintiff out of the school, due to her incessant harassment inflicted upon Plaintiff.

188.    Plaintiff was visibly upset, traumatized, and trembling upon receiving this letter. Plaintiff was expected to teach her last period class after being publicly humiliated as Leinwand stood outside Plaintiff's room with a smirk on her face observing Plaintiff with her class. To avoid Leinwand's intimidating presence, she took the class to the bathroom.

189.    To avoid hurt, and public humiliation, and to better serve the children, this letter should have been presented privately at the end of the school day which was approximately forty (40) minutes later. Plaintiff reported this letter to the UFT and Cooper who were hostile to Plaintiff and refused to help

40

Plaintiff.

190.      On February 6, 2004, Plaintiff's husband attempted to speak with Leinwand, once again, regarding the ill treatment of Plaintiff; however, Plaintiff's husband never entered the school nor did he speak with Leinwand. Leinwand went to the Police Precinct three (3) days later, and pressed charges against Plaintiff's husband for trespassing.

191.      However, Plaintiff was not informed of her husband's arrest until February 16, 2005, by a detective who called her home.

192.      In retaliation to Plaintiff's harassment log, and her nine (9) page log letter, on February 12, 2004, the Assistant Principal, Sheehan, stormed into a Staff Development Workshop where the entire staff was present. She approached and recklessly served Plaintiff with four (4) horrific non-file letters; threatening Plaintiff's career. None of the letters were dated February 12, 2004. This act was intended to intentionally cause Plaintiff further public humiliation.

193.      The incidents were baseless and harmless; however it was evident Leinwand and Lavin were twisting and distorting the facts as they recklessly and intentionally schemed to destroy Plaintiff's career. Their unlawful mission was successful, as they not only destroyed Plaintiff's career but her health and finances as well ... in essence her life.

194.      Additionally, since the UFT, NYSUT and DOE conspiracy continued incessantly for such a long period of time, Plaintiffs' families suffered irreparable harm, as well, as Plaintiffs and their families are closely knit, and therefore what happens to one family member happens to all.

41

195.     One letter was from Lavin rescheduling the February 10, 2004 meeting to February 25, 2004, whereby Lavin cites Plaintiff for insubordination for not showing up at that meeting, meanwhile Plaintiff was absent that day because she was suffering from the malevolent actions of Lavin and Leinwand.

196.     There were three (3) letters to Plaintiff from Leinwand.  All of these letters were unjustifiably critical of Plaintiff.  They discussed the issue of Plaintiff's time card in January 2004, whereby Leinwand hid Plaintiff's time card in order to falsely mark Plaintiff late; the request of change in schedule and Leinwand's visit to Plaintiff's classroom on February 3, 2004, whereby Leinwand intentionally and recklessly disturbed Plaintiff's lesson in retaliation for Plaintiff's nine (9) page log letter written to Leinwand on February 1, 2004, documenting all the ill treatment she encountered from Lavin and Leinwand.

197.     All these letters constitute a severe hostile work environment as Leinwand created disturbing, upsetting situations for Plaintiff, as she twists and distorts the facts, and then serves Plaintiff these letters, as if Leinwand had nothing to do with these situations.

198.     In reality, Leinwand and Lavin schemed these situations as they recklessly and intentionally wanted to harm Plaintiff's health and career.

199.     As a result, Plaintiff suffered public humiliation and felt extreme stress, anxiety and panic regarding these letters; as it was quite evident Plaintiff knew her career was being unjustifiably destroyed; and without the help of the UFT, she knew she could not seek relief from Lavin's and Leinwand's malevolent actions.

200.     On February 13, 2004, Plaintiff wrote a letter to Leinwand stating that she needed to go home

42

immediately, due to job related stress, resulting from stressful incidents and letters issued to Plaintiff by Leinwand, on February 12, 2004.

201.    Immediately after Leinwand received Plaintiff's letter, Leinwand served Plaintiff, in the main office, with an additional four (4) disciplinary letters, threatening Plaintiff's employment with false allegations. Again these letters were served in public as Leinwand appointed a teacher, as a witness, and the school secretary, to sit by Plaintiff's side, while she received these letters.  Leinwand ordered Plaintiff, in a loud and condescending manner, to "Sign the letters now!"

202.    Two (2) of these letters falsely accused Plaintiff of misconduct and threatened her with future disciplinary action.

203.    In another letter, Leinwand summoned Plaintiff to a meeting on February 24, 2004 to discuss allegations of Plaintiff's cell phone use as Plaintiff was forced to use her cell phone due to emergency set up situations recklessly schemed by Leinwand and O'Gara.  Leinwand advised Plaintiff to bring UFT representation; although she very well knew she orchestrated her UFT to abandon her.  The fourth letter, signed by Lavin stated, "I hereby direct a medical examination for the above employee whose immediate supervisor (meaning Leinwand) has requested this examination to determine (Plaintiff's) mental and physical capacity."  This was the prelude to the meeting where Lavin and Leinwand maliciously conducted the unlawful meeting, "Are you sick?  Are you well?"

204.    Additi<sub>o</sub>nally, the letter further directed Plaintiff to attend a 2568 exam to determine if Plaintiff was safe to teach children.

205.    Plaintiff was shocked by this letter as the 2568 exam is administered to those accused of serious offenses, such as hitting children and/or sexual misconduct. This letter was intended to further harass and torture Plaintiff, as Leinwand was very well aware that students and parents were extremely fond of Plaintiff and that her fellow colleagues praised Plaintiff in the presence of Leinwand.

206.    As a result, this caused Plaintiff further mental stress, trauma and public humiliation; and physical disabilities, such as feelings of faintness, shakiness, tremors, physical exhaustion, blurry vision, and hot and cold sweats.

207.    The 2568 exam was deliberately and recklessly intended to further psychologically harm Plaintiff, as Leinwand and Lavin were aware of the numerous and negative physical and mental effects their actions were having on Plaintiff.

208.    Moreover, Lavin did not have the authority to order a 2568 exam, as this was in violation of Section 2568 State Education Law. Only the Superintendent of Schools has the authority to order a 2568 exam. The Superintendent is Cashin. Lavin is Local Instructional Superintendent.

209.    Plaintiff immediately responded to all eight 8 letters received on February 12, and February 13, 2004. In her response, she listed the true facts that occurred. Lavin and Leinwand have a malicious pattern to twist the facts, or to distort the facts, to make it seem as if Plaintiff did something wrong, as it was their scheme to recklessly and maliciously destroy Plaintiff's career, health and finances. As a result, their mission was accomplished as Plaintiff and her husband suffered irreparable harm due to the abandonment by the UFT, and the individual Defendants of the UFT.

44

210.     After receiving these letters, Plaintiff sought the care of her psychologist, internist and on the advice of her physician, a psychiatrist. Plaintiff's psychiatrist documented that Plaintiff was suffering from post-traumatic stress.

211.     Leinwand wrote a mere five (5) sentence baseless report regarding her reasons for requesting Plaintiff's 2568 exam. No dates, times, circumstances were reported which was in contravention of numerous rules and procedures of Section 2568 Education Law.

212.     Additionally, the unlawful report of reasons was never sent to Superintendent Cashin as required by Section 2568 Education Law. The above reasons reported shows Leinwand grasping for straws as she was trying to unlawfully destroy the Plaintiff's career.

213.     Additionally, a teacher "must be provided with the letter sent by the Superintendent to the medical director outlining the reasons for the examination." This statement was provided to Plaintiff by Solomon, Director of Grievance Department. Superintendent Cashin never was involved regarding the 2568 exam or any part of Plaintiff's case.

214.     Plaintiff wrote numerous letters to her UFT regarding the violation of the rules and procedures of Section 2568 laws; however, she did not receive a response, as the UFT and the individual UFT Defendants abandoned Plaintiff.

215.     Additionally, the mere five (5) sentence report of reasons stated that Plaintiff "expresses extreme fatigue due to job responsibilities and complains of her inability to work a full afternoon schedule." This is true as Leinwand targeted Plaintiff to have all first period preps and all early lunches; the most undesirable

45

schedule which no other teacher had in school, as it would make any teacher "fatigued" in the latter part of the day, which was Leinwand's reckless mission to fulfill.

216.    She succeeded in her goal with the aid of the UFT abandoning Plaintiff's justifiable plight to have her schedule fair and equiable and shared equally amongst all teachers.

217.    Furthermore, a Report of Reasons must show the act was willfull and deliberate. It was clearly evident it was Leinwand's act, preying upon Plaintiff, that was willfull and deliberate, not Plaintiff's.

218.    The other two vague, false facts in Leinwand's Report of Reasons, was that Plaintiff had "unprovoked anger towards staff members; becomes easily agitated at times. Threatening behavior reflects emotional instability and volitality, poor interaction with colleagues (e.g. speaks menacingly)."

219.    These are extreme and outrageous statements as Plaintiff had for approximately ten (10) years out of the classroom jobs; including her present one at P.S. 66. One of the essential requirements being an out of the classroom teacher is the ability to accomodate and get along with her colleagues which Plaintiff was always praised by her colleagues as they expressed, in Leinwand's presence, how helpful she was with them and their students.

220.    The last false statement in her erroneous Report of Reasons stated, "Demonstrates inability to consistently follow school policies (e.g. constant use of cell phone in school building).

221.    This statement, as well, was outrageous and extreme, as Plaintiff has a perfect school file for nineteen (19) years which portrays a hard working teacher, always following school policies. The use of a

46

cell phone by Plaintiff was due to emergency alarming set up situations caused by Leinwand.

222.     It was quite clear, Leinwand was grasping for straws as she recklessly and intentionally schemed
to destroy Plaintiff's career; which severely destroyed her health and finances as it continues incessantly for
two (2) years three months (3) as the UFT abandoned Plaintiff.

223.     Additionally, Leinwand has also improperly circulated Plaintiff's social security number where a
file number suffices; thereby violating Plaintiff's privacy and subjecting her to be a victim of identity theft.
This added to Plaintiff's suffering creating further stress and anxiety.

224.     Plaintiff was shocked and traumatized by these letters.  These letters were solely intended to
publicly humiliate and harass Plaintiff in front of other teachers, school personnel, parents and children
causing Plaintiff further mental stress and public humiliation; and physical disabilities, such as, feelings of
faintness, rapid heart beat, shakiness, tremors, physical exhaustion, blurry vision, and hot and cold sweats.
Plaintiff asked the UFT to grieve all of her disciplinary letters.  some grievance forms were filled out, but the
grievances were never pursued by the UFT and the individual Defendants of the UFT, as they abandoned
Plaintiff.  Plaintiff wrote numerous letters to the UFT to grieve these letters, but they never responded.

225.     Leinwand wrote letters to the staff and to the P.S. 86 Community regarding the issues Leinwand
was falsely accusing Plaintiff of.  These letters written to the staff and to the P.S. Community were really
intended for Plaintiff to further stress Plaintiff.

226.     There were approximately seven (7) witnesses who observed Plaintiff being harassed by
Leinwand.  Many of the witnesses expressed their concern, and offered their sympathy, as Plaintiff looked

47

extremely ill. Plaintiff was forced to leave school that day due to overwhelming stress and documented same.

227.   From February 13, 2004 to present, Leinwand, Lavin and DOE personnel incessantly exploit Plaintiff's social security number on all documents circulated throughout the DOE. Plaintiff wrote numerous letters to Leinwand, Lavin and DOE personnel to cease exploiting her social security number. A file number suffices. However it fell upon deaf ears. Plaintiff wrote numerous letters to the UFT. Plaintiff wanted to file a grievance. The UFT and the individual Defendants of the UFT abandoned her.

228.   On February 13, 2004, Plaintiff ran to the medical clinic to seek relief form the severe anxiety and stress she received that day at school.

229.   Additionally, she saw her psychologist, Dr. Victor J. Defazio ("Defazio") who forbid Plaintiff to return back to school as she was suffering debilitating stress as a result of Lavin and Leinwand's malevolent actions.

230.   On February 16, 2004, Plaintiff was informed that Leinwand placed criminal charges against Plaintiff's husband for criminal trespassing. The incident happened when Plaintiff's husband attempted to speak with Leinwand regarding the ill treatment of Plaintiff. Plaintiff's husband never spoke to Leinwand nor entered the school. Leinwand used this charge to harass Plaintiff's husband and cause further psychological harm to Plaintiff. Upon information and belief, Leinwand also filed a false report against Plaintiff with the School Safety Police although DOE and UFT refuse to show report to Plaintiff.

231.   Plaintiff wrote numerous letters to the UFT requesting assistance, however, the UFT did not

48

respond as the UFT abandoned Plaintiff.

232.      On February 21, 2004, DeFazio, Plaintiff's psychologist, stated that Plaintiff would be temporarily unable to attend school, due to psychological injuries resulting from employment induced stress.

233.      On February 23, 2004, Plaintiff wrote a letter to Leinwand informing her that she will be absent until the horrific situation and discrimination is under control.

234.      Because Defendants have failed to remedy the discriminatory and hostile work environment fostered by Leinwand and Lavin, Plaintiff has not returned to work; due to severe psychological and physical injuries suffered as a result of Leinwand and Lavin's intentional misconduct.  Plaintiff wrote many letters to her UFT and visited the UFT on February 23, 2004, for desperately needed assistance.  In response to the foregoing, Samuels, Special Representative, intentionally mislead Plaintiff with inaccurate advice which resulted in an increase in Plaintiff's stress level, as it was clearly evident that UFT was unlawfully protecting Lavin and Leinwand.

235.      Additionally, Samuels promised Plaintiff he will try his hardest to clean out the false, malicious letters from Plaintiff's impeccable school file, help her obtain a medical sabbatical while her Line of duty injury is being approved; and in September 2004 transfer her to another school, close to Plaintiff's home, having a good position at that school.  However, it was just words as the UFT and all UFT Defendants abandoned Plaintiff.  Plaintiff wrote many letters to the UFT individual Defendants including Samuels regarding the above; however, the UFT Defendants never responded.

236.      As a result of the inaccurate advice provided to Plaintiff by her UFT, she was unable to file a

49

request for a Line of Duty Injury application in a timely manner. In or about March 2004, when Plaintiff did file a Line of Duty application, said application was denied by Lavin and Leinwand in a further effort to harass her.

237.    Additionally, Lavin and Leinwand do not have the authority to approve or disapprove Plaintiff's Line of Duty Injury which exceeded more than ten (10) days. Only the Superintendent can approve or disapprove the Line of Duty Injury.

238.    As a result, Lavin and Leinwand committed fraud as they were not supposed to approve or deny Plaintiff's Line of Duty Injury as well as they were the two (2) alleged, accused parties; the two (2) cohorts, who maliciously schemed to destroy Plaintiff's health, career and finances. It is outrageous that the Superintendent and the entire DOE allowed Lavin and Leinwand to unlawfully control Plaintiff's entire case.

239.    The UFT contributed to the fraud as they allowed the DOE, Lavin and Leinwand to continue the fraud. As a result, the UFT is acting as an accomplice, aiding and abetting the DOE and its employees, denying Plaintiff's rights under many laws, rules and procedures; as the UFT and the DOE conspire to cause irreparable harm to Plaintiff. UFT and the individual Defendants of the UFT refused to file grievances to protect Plaintiff although she wrote numerous letters to the UFT.

240.    Superintendent of Schools, Cashin, should have assigned objective, neutral decision-makers to approve or deny Plaintiff's Line of Duty application. In fact, Superintendent of Schools Cashin, is supposed to be directly involved in Plaintiff's Line of Duty Injury, not Lavin and Leinwand who were incapable of making an unbiased decision.

50

241.    If Plaintiff would have returned to school on February 23, 2004, as school was closed from February 13, 2004 to February 23, 2004, due to Midwinter Recess, she would have to contend with her husband being arrested by Leinwand, appear at a summoned meeting ordered by Leinwand on Tuesday, February 25, 2004; followed by another summoned meeting on Wednesday, February 26, 2004 ordered by Lavin. It was crystal clear that Lavin and Leinwand wanted to cause irreparable harm to Plaintiff as no human being living in the United States of America should be exposed to such mental and psychological torture.

242.    Additionally, these summoned meetings by Lavin and Leinwand were to be maliciously conducted without Plaintiff being protected by the UFT as Leinwand and Lavin were aware and made sure that Plaintiff's UFT abandoned her.

243.    Additionally, Lavin's letters did not adhere to the Chancellor's Regulations A-420 and A-421, as a Local Instructional Superintendent "must give 48 hours notice in all cases where she summons an employee."

244.    For over two (2) years, the severe hostile work environment permeated into Plaintiff's residence and incessantly continues to date.  As a result Plaintiff's home is not a place of solitude as the DOE, Lavin, Leinwand, and UFT seriously violated her continuously, to date.

245.    Further, on March 2, 2004, Plaintiff was unlawfully placed, via unsigned, stamped letter sent to her home, from Lawrence Becker, Chief Administrator, Division of Human Resources, informing her of disciplinary charges by DOE.  Plaintiff was never informed of the disciplinary charges, as Lavin unlawfully suspended Plaintiff, which resulted in Plaintiff being unlawfully charged with disciplinary charges.

51

246.     Additionally, Plaintiff was unlawfully placed on an Ineligible/Inquiry List, stigmatizing Plaintiff,
after being a dedicated, hard-working, successful teacher for nineteen (19) years.

247.     Lavin committed fraud as she did not have the power to initiate the above.  Her deliberate and
reckless abuse of power was intended to cause Plaintiff irreparable harm which she succeeded in doing so.

248.     Plaintiff called numerous times Lawrence Becker to try to rectify this unbearable mess.  Becker
never returned Plaintiff's phone calls.  Plaintiff wrote numerous letters to the UFT regarding this horiffic
mess and Fritz wrote Plaintiff a response back ignoring that Lavin did not have the authority to suspend
Plaintiff.

249.     Seroy, a Special Representative, on or about March 2004, sent Plaintiff an appeal form and upon
her advice appealed her placement on the Ineligible/Inquiry List even though no appeal ever took place.
Plaintiff wrote numerous letters to the UFT about the appeal, however they never responded.  The UFT
abandoned Plaintiff.

250.     On March 21, 2004, Lavin suspended Plaintiff, despite the fact that she did not possess the
authority to do so.  This was in violation of Section 3020-a Education Law.  No written charges were
provided, at the time, regarding Plaintiff's suspension.  Plaintiff wrote numerous letters to the UFT and the
individual Defendants of the UFT regarding the unlawful suspension.  UFT and the individual Defendants of
the UFT did not respond as they abandoned Plaintiff.  UFT is aiding and abetting the DOE, Lavin and
Leinwand to commit fraud.  As a result, the UFT and individual Defendants of the UFT are accomplices with
the DOE, Lavin and Leinwand; as they maliciously and recklessly intended to cause Plaintiff irreparable harm,
past and present, as this exacerbated Plaintiff's already serious condition.

52

251.    In March 2004, while Plaintiff is trying to recuperate from Lavin and Leinwand's malicious acts, they send new disciplinary letters to Plaintiff's home, as the severe hostile work environment continues at her home incessantly to date.

252.    In February 2004, Leinwand falsely accuses Plaintiff of abandoning her class when Plaintiff took the children to the bathroom to escape Leinwand's intimidating presence by her classroom. This incident happened, as previously mentioned, when Sheehan publicly announced in the office while serving Plaintiff a threatening letter, publicly humiliating her. Plaintiff never abandoned her class, and answered her alarming, fabricated letter with all the true facts that occurred. As mentioned previously, Leinwand's tactic is to omit facts or to distort the facts to make it seem Plaintiff did something wrong.

253.    As a result of above disciplinary letter, Leinwand states, "This misconduct may lead to additional disciplinary action, including a U-Rating and your termination."

254.    Plaintiff wrote many letters to the UFT, and all individual Defendants of the UFT, regarding the above matter. Plaintiff wanted to file a grievance. UFT and individual Defendants of the UFT did not respond, as they abandoned her.

255.    Simultaneously, March 2004, Plaintiff receives at home another disciplinary letter from Lavin. Lavin states in this disciplinary letter that Plaintiff was insubordinate when she left the January 16, 2004 meeting, "Are you sick? Are you well?" with no UFT representative present. Lavin states in her letter, "On February 23, 2004, I received a letter from you stating you were under a doctor's orders not to return to school, but you did not provide me with a statement regarding your insubordinate behavior." This comment by Lavin is extreme and outrageous as if Plaintiff is disciplining herself and admitting she is insubordinate.

53

256.     Lavin further states, "I find that you were insubordinate in leaving in the middle of the meeting

on January 16, 2004, and in failing to attend the meeting on February 25, 2004. Please be advised that his

may lead to further disciplinary charges including an unsatisfactory rating and charges which could lead to

your termination. You are hereby reassigned to the Regional Operation Center pending review of the Medical

Bureau and Office of Legal Services."


257.     As stated previously, Lavin does not have the authority to suspend a teacher. Plaintiff reported

this letter to the UFT and all Defendants of the UFT. Plaintiff wanted to file a grievance. UFT and the

individual Defendants of the UFT did not respond, as they abandoned her.


258.     On March 2, 2004, after Plaintiff being absent for one week, Leinwand placed Plaintiff on an

unlawful unauthorized leave. An unauthorized leave means that a teacher is AWOL, showed no medical

documentation. This was not true, as Plaintiff and her psychologist submitted a letter .   .

dated February 21, 2004, to Leinwand, as well as a letter from Plaintiff explaining why she is absent.

However, Leinwand ignored Plaintiff's psychologist and Plaintiff's letter.


259.     To date, for two (2) years and three (3) months, DOE and UFT keep Plaintiff on the unlawful

unauthorized leave although Plaintiff and her psychologist submit all the appropriate medical documentation

required by the DOE to Leinwand and the medical bureau.


260.     As a result, Leinwand usurped her powers by capriciously and arbitrarily informing the DOE that

Plaintiff was on an unauthorized leave. Leinwand committed fraud as she intentionally deceived the true

facts regarding Plaintiff's absence. This unlawful unauthorized leave which exists to date was never

eradicated. Plaintiff wrote numerous letters to the UFT and the individual Defendants of the UFT as Plaintiff

54

wanted to file a grievance. They did not respond, as they abandoned Plaintiff.

261.    Although Plaintiff was forced on a Leave Without Pay, at the same time Leinwand's unlawful unauthorized leave was enforced and remained, Plaintiff could not make use of her medical benefits when she was faced with a huge medical debt which resulted in ruining Plaintiff's impeccable credit rating. She was constantly threatened to be taken to Collections, and one of her medical debts was taken to Collections. As a result, this caused further frustration and further exacerbated Plaintiff's already serious medical condition caused by the reckless and deliberate malicious actions of Leinwand.

262.    Additionally, the unlawful unauthorized leave caused Plaintiff's pension to be frozen. Plaintiff cannot touch her pension money and possibly her TDA money, until the unlawful unauthorized leave is eradicated. However, to date the DOE and UFT willfully and recklessly inflict this torturous, illegal, unauthorized leave upon Plaintiff, causing Plaintiff much grief and irreparable harm as Plaintiff is constantly suffering daily agony as she has been robbed of her monies that rightfully belong to her.

263.    This is modern America, and it is completely inhumane as to the injustices as all Defendants are denying Plaintiff's property rights she is rightfully and lawfully entitled to, as well, as eradicating her unlawful, unauthorized leave.

264.    On March 12, 2004, Leinwand unlawfully suspended Plaintiff's Direct Deposit, as she wrote Plaintiff a letter stating this fact. Pursuant to the Direct Deposit Agreement, the account holder, in this case, the Plaintiff, is the only person who has the right to suspend their Direct Deposit. Plaintiff wrote letters to the UFT regarding the situation; however, she did not receive a response as the UFT and the individual UFT Defendants abandoned Plaintiff. This further increased the level of Plaintiff's stress and

55

anxiety which caused her irreparable harm, past and present, which is ongoing to this date.

265.     Leinwand and the DOE committed bank fraud by suspending Plaintiff's Direct Deposit Agreement.
Plaintiff had an agreement with the DOE that she was the only person to suspend Plaintiff's Direct Deposit.
Additionally, Leinwand and the DOE suspended Plaintiff's Direct Deposit as they schemed not to allow
Plaintiff to receive any more funds due her. Leinwand knew Plaintiff had remaining sick days which are
worth money that are paid by the DOE through Plaintiff's Direct Deposit.

286.     Furthermore, Leinwand and the DOE schemed to defraud Plaintiff by not allowing any of her
funds to be obtained "under the custody or control of" a bank. Plaintiff was and is an employee of the DOE
and is rightfully entitled to compensation from the DOE which was always deposited in her Direct Deposit;
however Leinwand is trying her best for Plaintiff to receive no compensation and that's why she maliciously,
unlawfully suspended Plaintiff's Direct Deposit.

287.     The UFT and all individual Defendants aided and abetted Leinwand's and DOE's bank fraud; as
they allowed it to happen; as they refused to file grievances for Plaintiff.

288.     On March 16, 2004, Leinwand unlawfully tampered with Plaintiff's salary by authorizing the New
York City Payroll Department to withdraw from Plaintiff's Direct Deposit account, her salary form March 1,
2004 to March 15, 2005. Plaintiff wrote letters to the UFT regarding the situation; however, she did not
receive a response as the UFT and the individual UFT Defendants abandoned Plaintiff.

269.     Leinwand and the DOE NYC Payroll committed bank fraud pursuant to the Rico violation 18
U.S.C. §1344 as she and the DOE obtained unlawful custody and control over Plaintiff's salary by

56

withdrawing Plaintiff's salary originally deposited by the DOE in Plaintiff's personal checking account. The DOE took the directives of Leinwand, as Leinwand falsely claimed Plaintiff exhausted her sick days and was not entitled to her salary. Plaintiff had approximately 22 sick days left, and as a result, the money was unlawfully withdrawn from Plaintiff's account as directed by Leinwand which was rightfully and lawfully Plaintiff's money, as that unlawful salary withdrawal covered for 10 days of her sick days, with a remaining 12 more days of sick leave.

270.     This is a serious criminal offense as a guilty party can be fined up to $1,000,000.00 or imprisoned for not more than 30 years, or both.

271.     Additionally, Leinwand committed extortion and embezzlement by removing Plaintiff's salary, as she usurped her powers by misinforming payroll that Plaintiff was not entitled to her salary.

272.     Plaintiff reported this serious incident to her UFT, however she received no response as the UFT and the individual UFT Defendants abandoned Plaintiff. As a result, the UFT aided and abetted the bank fraud committed by Leinwand and the DOE.

273.     Leinwand committed fraud as she concealed from the New York City Payroll Department that Plaintiff had sick days to cover for the salary put into her account. She also misinformed the New York City Payroll that Plaintiff was on unauthorized leave when she was not. Additionally, by Leinwand misinforming the New York City Payroll that Plaintiff was not entitled to her salary, when she was rightfully entitled to it, constitutes extortion and embezzlement.

274.     Plaintiff wrote numerous letters to the UFT regarding the above. She informed the UFT to file a

57

grievance.  UFT did not respond as the UFT and the individual UFT Defendants abandoned Plaintiff causing her irreparable harm.

275.        In or about the end of March 2004, Leinwand and Lavin send an additional two (2) more disciplinary letters to Plaintiff's home.  These two (2) letters are almost identical and complain about Plaintiff talking to parents.  This is modern  America, Plaintiff has a right to speak to parents.  Lavin and Leinwand sent these letters as well to the Medical Bureau.

276.        Plaintiff wrote numerous letters to the UFT regarding the two (2) letters above.  She informed UFT to file a grievance.  UFT did not respond as the UFT and the individual UFT Defendants abandoned her.

277.        Thus, from February to March 2004, Lavin and Leinwand, the two cohorts in crime, sent additional, absurd, false disciplinary letters to Plaintiff's residence and to the Medical Bureau complaining about Plaintiff speaking to parents which is a commonplace practice.

278.        They refused to acknowledge and mocked Plaintiff's doctors' warnings about Plaintiff's mental condition, which was due to their malevolent actions as Levin and Leinwand intentionally and recklessly further aggravated Plaintiff's severe medical condition.

279.        It was quite evident that once Leinwand and Lavin made sure Plaintiff's UFT abandoned her, their mission wasin full force as they maliciously schemed to prey upon Plaintiff by attacking her in every unlawful conceivable manner they wished; without any repercussions, as they were confident that their connection with the Chancellor would protect them from their wanton acts.

280.     By March 2004, Plaintiff had been served with approximately nine (9) letters at school and five (5) letters at home, from either Leinwand or Lavin, threatening her employment. In addition, from March 2004 to the present, because of Defendant's discriminatory action, Plaintiff has received numerous letters and notifications from the DOE, the Teacher's Retirement System, GHI, UFT Welfare Fund, hospital billing, and a collection agency; creating further problems and exacerbating Plaintiff's disability.

281.     In or about March 2004, Plaintiff submitted a medical sabbatical application to Leinwand for her signature. Leinwand never signed the application, nor was it forwarded to the Medical Bureau. A Medical Sabbatical entitles a tenured teacher, such as Plaintiff who has been working for approximately nineteen (19) years, to take a year off due to illness. While on a Medical Sabbatical, a Teacher is entitled to receive sixty percent (60%) of her salary plus a differential and medical benefits. A teacher is on active status, keeping her pension and benefits intact. To date, Plaintiff has never received a Medical Sabbatical. Plaintiff for the most part, has been without salary, or medical benefits, causing mental anguish and severe financial hardship.

282.     It was solely Leinwand's responsibility to sign all Medical Sabbatical applications and forward same to the Medical Bureau. Plaintiff was forced to submit her Medical Sabbatical application directly to the medical Bureau.

283.     On May 11, 2004, Plaintiff went to the Medical Bureau. Plaintiff was reprimanded, humiliated and mocked by the attending Doctors who informed her that she did not qualify for a Medical sabbatical without providing an explanation as to why. Plaintiff's psychologist, DeFazio, who accompanied Plaintiff at the Medical Bureau was ignored by the Doctors. The Medical Bureau refused to look at Plaintiff's medical file, which was in DeFazio's possession. The Medical Bureau, through Doctor Meyers, forced Plaintiff,

59

without her consent, to be placed on a Leave Without Pay for two (2) years. Immediately following Plaintiff's visit to the Medical Bureau, DeFazio commented, "This is a charade, a scam, a set-up. I would not believe what happened if I had not seen it with my own eyes."

284.     Despite Dr. Meyers' comments, approximately one (1) month later, Plaintiff's forced Medical Leave without Pay was reduced to four (4) months, which was reduced again, to approximately one month. Plaintiff's status was constantly rearranged, like musical chairs, as the DOE, UFT, Lavin and Leinwand consistently conspired to make sure Plaintiff suffers from all their reckless and deliberate maneuvers.

285.     In addition, on May 11, 2004, Leinwand faxed a fabricated medical evaluation of Plaintiff to the Medical Bureau. Leinwand unlawfully investigated Plaintiff. Leinwand manufactured, twisted and distorted allegations about Plaintiff's past and present employment at P.S. 66, and prior schools.

286.     Plaintiff is required to see all reports concerning her, prior to her appointment to the Medical Bureau. However Leinwand fraudulently concealed this report from Plaintiff, as well as the Medical Bureau. The Medical Bureau used Leinwand's unlawful report and lied about the date they received this report.

287.     This unlawful report was a direct violation of Section 2568 Education Law.

288.     It should be noted, that at the time Plaintiff attended this unlawful 2568 exam, she did not know it was unlawful. Once Plaintiff found out all the serious violations inflicted upon her by the 2568 exam, she would not participate in any more fraudulent 2568 medical exams. Plaintiff found out about Leinwand's unlawful report as  it was an exhibit in the Article 78 proceeding in July 2004.

60

289.     Leinwand is not a doctor, a judge, nor an investigator, as she claims to be all three (3) roles in her unlawful report, titled, "Medical Evaluation, Susan Tropeano" from Phyllis Leinwand.  If Leinwand wants to know about Plaintiff's past and present service history at school, Plaintiff's school file suffices which is impeccable.  Instead, Leinwand unlawfully usurped her authority by omitting facts and distorting facts, to serve her self-serving needs.

290.     Leinwand should be admonished and sanctioned for these illegal acts as she committed fraud and invaded Plaintiff's privacy.

291.     The DOE and the UFT should be admonished and sanctioned, as well, for allowing this to take place as they allowed Leinwand to defame Plaintiff.  Plaintiff wrote numerous letters to the UFT regarding this serious matter.  She wanted to file a grievance.  UFT and all the individual Defendants of the UFT, did not respond as UFT abandoned Plaintiff.

292.     In or about June 2004, Plaintiff was sent another alarming letter ordered unlawfully by Lavin, as a result of Leinwand's atrocious unlawful medical evaluation of Plaintiff, to report to an exam that may take up to FIVE (5) HOURS.

293.     At this point, Plaintiff was well aware of all the serious violations of the unlawful 2568 exam and did not attend.  This chilling, FIVE (5) HOUR exam was ordered unlawfully by Lavin, violating numerous rules and procedures of Section 2568 Education Law and was repeated two more times, in September 2005 and January 2006.

294.     The DOE and the UFT are incessantly subjecting Plaintiff to such chilling, unlawful, outrageous

61

FIVE (5) HOUR exam; as they are trying to make Plaintiff quit her teaching profession, or be unlawfully terminated based on fraud.

295.     All individual Defendants and entities stripped and robbed Plaintiff of all compensation, health and welfare benefits, her pension and TDA, while further torturing her with a chilling FIVE (5) HOUR exam. Plaintiff wrote numerous letters to the UFT. She wanted to file a grievance. The UFT and all individual Defendants of the UFT, did not respond as UFT abandoned her.

296.     From February 2004 to on or about June 2005, OP 198 documents were tampered with. OP 198's are medical documents required by the DOE to be submitted every three (3) months to be completed by Plaintiff and her psychologist. Plaintiff files these forms religiously with her psychologist.

297.     From February to June 2005 these documents were returned to Plaintiff, once Leinwand and Medical Bureau put in their information as well. When returned to Plaintiff from the Medical Bureau, significant information was whited out on the identical documents, and significant information was written on the identical documents and further changed on other identical documents, which constitutes fraud as well.

298.     Plaintiff wrote numerous letters to the UFT, and the individual Defendants of the UFT, regarding the seriousness of medical documents being tampered with. Plaintiff wanted to file a grievance. UFT and all the individual Defendants of the UFT, did not respond as UFT abandoned Plaintiff.

299.     On or about June 2004, Plaintiff initiated an Article 78 proceeding at Queens Supreme Court to seek emergency relief as she was stripped of salary since March 2004; and shortly thereafter, all benefits including medical and welfare benefits, pension and TDA.

300.     Plaintiff used Thomas Liotti's Law Firm for the Article 78 proceeding. At the law firm, Plaintiff was assigned a novice young attorney who destroyed Plaintiff's petition and exhibits by submitting a disarray of exhibits in an unclear, disorganized petition. Plaintiffs were furious at Thomas Liotti. Shortly after, the novice young attorney was fired.

301.     Thomas Liotti then assigned Plaintiff to correct the novice young attorney's overwhelming mess of petition and exhibits and to write the reply affidavit to the City's verified answer. Plaintiff was overwhelmed becoming an attorney overnight.

302.     Finally, Thomas Liotti assigned Alan Ansell to continue the Article 78 documents. Alan Ansell did not write the reply affidavit correctly, never served Plaintiff's sur reply, and fraudulently concealed from Plaintiff Article 78 documents submitted by the City, which was so easy to discredit.

303.     After Plaintiff released Thomas Liotti's Law Firm, Plaintiff was informed that Alan Ansell was and still is, a disbarred attorney. Plaintiff verified the fact by obtaining the order from Supreme Court State of New York, Appellate Division, Second Judicial Department.

304.     In July 2004, the City attorney who wrote the verified answer to the Article 78, cleared Plaintiff of disciplinary charges as she "affirmatively" sates, "That petitioner has not been a subject of "discipline" or had a penalty "imposed." Additionally, Patria Frias Colon, another City attorney swears, "That she has read the forgoing verified answer and that she believes it to be true..."

305.     Additionally, on May 6, 2004, Plaintiff was faxed, to her home, a preference sheet from her school, P.S. 66, as to what she would like to teach for the coming school year of September 2004 to June

63

2005.

306.     Plaintiff wrote numerous letters to the UFT and the individual Defendants of the UFT, regarding the above. The statements made above should have eradicated all the false, disciplinary letters which unjustifiably tainted Plaintiff's impeccable school file. However, the UFT and all the individual Defendants of the UFT, did not respond as UFT abandoned Plaintiff.

307.     Additionally, the City tampered with the title of the Section 2568 Education Law in order to fraudulently mislead and defraud the court in the Article 78 proceeding.

308.     Furthermore ,the Article 78 documents submitted by the City, some of which were never disclosed to Plaintiff by her unethical attorneys, consisted of blatant untruths.

309.     If Plaintiff had an ethical attorney, it would have been easily discredited, as Plaintiff had numerous documents to support the City's falsehoods. The City unlawfully won the Article 78 based on blatant lies, violations of State Education laws and the Collective Bargaining Agreement.

310.     In October 2004, Plaintiff desperately pleaded by letters to the UFT and all individual Defendants of the UFT, and messages left on their voicemails, that she was desperately in need of compensation and benefits as she is rightfully and lawfully entitled to. The UFT and all UFT Defendants, never responded as the UFT abandoned Plaintiff.

311.     In or about October 2004, Plaintiff spoke to Mrs. Ferguson ("Ferguson"), a DOE employee at the DOE Grievance Department. She explained to Ferguson that she needed her medical sabbatical followed by

64

her Line of Duty Injury. Ferguson informed Plaintiff to call her UFT and have them file a grievance. Plaintiff

informed Ferguson the UFT abandoned Plaintiff. She found that hard to believe.

312.    In essence, all that Ferguson could offer Plaintiff, "   without the assistance of the UFT, was

to give Plaintiff compensation for her sick days (which Leinwand previously committed extortion and bank

fraud regarding Plaintiff's sick days) borrow 20 days and a grace period.

313.    Plaintiff did not want to borrow 20 days from the DOE as that's a debt, and must be paid back

to the DOE. However, Plaintiff was, and is, in a desperate situation; as she is stripped of all medical

benefits and compensation. Thus, she was forced to take an unlawful debt with the DOE.

314.    Additionally, to add insult to injury, when a teacher uses her sick days, borrows 20 days and a

grace period, she is on active status and receives welfare and medical benefits. However, Plaintiff could not

make use of her welfare and medical benefits because Leinwand's unauthorized leave was simultaneously

enforced. Plaintiff wrote numerous letters to the UFT and the individual Defendants of the UFT regarding

this surreal situation. UFT did not respond as they abandoned Plaintiff.

315.    Furthermore, as it stands now, Plaintiff is stripped of all compensation and all benefits for two

(2) years, three (3) months.

316.    Plaintiff is definitely entitled to a medical sabbatical followed by a line of duty injury leave. A

medical sabbatical and a line of duty injury are leaves that give teachers compensation and benefits.

Plaintiff is rightfully and lawfully entitled to these leaves.

65

317.     Instead she was forced to take an unlawful debt from the DOE, as Plaintiffs, are suffering from great financial hardship.

318.     It is the deliberate and reckless goal of the DOE, UFT, NYSUT and all the individual Defendants of the DOE, UFT and NYSUT to heap upon Plaintiff huge and unlawful debts, and if Plaintiff participated in the unlawful, chilling 3020-a procedure; it was quite evident, if Plaintiff was not unlawfully terminated, the DOE would heap upon her unlawful high fines creating unlawful debts.

319.     As a result, the DOE committed extortion, a Rico violation, with the conspiracy of the UFT and NYSUT and all individual Defendants of the UFT and NYSUT, who abandoned Plaintiff; as they unlawfully chose to aid and abet the DOE, and all the individual Defendants of the DOE with the common goal to make Plaintiffs suffer unlawful severe financial hardship.

320.     Thus, all the Defendants committed extortion as they are robbing Plaintiff of compensation and all benefits that are rightfully and lawfully hers.

321.     To add insult to injury, all Defendants schemed to place Plaintiff on unlawful debts which are owed to the DOE as they want Plaintiff to pay heavy unlawful fines.

322.     The Defendants should be admonished and sanctioned for performing their wanton acts, as this is the United States of America.  The Defendants act like scavengers and prey upon Plaintiff denying her all her constitutional and civil rights.

323.     Additionally, Defendants' wanton acts constitute Rico violations as they conspire to extort monies

66

and benefits from Plaintiff that are rightfully and lawfully hers, but instead "held captive" as it is unlawfully possessed by the DOE.

324.     In essence, all the unlawful acts schemed by the Defendants by placing Plaintiff in heavy and unlawful debt, in an unlawful 3020-a proceeding, it was quite obvious Plaintiff would receive additional and unlawful debts or unlawful termination losing all her property rights if she attended the unlawful 3020-A.

325.     It is very clear Plaintiff is being severely victimized for all the unlawful acts placed upon her by all the Defendants.

326.     Additionally, all Defendants conspired in reckless and deliberate disregard for Plaintiff preventing her to receive a medical sabbatical followed by a line of duty injury leave, which include health and welfare benefits, pension and TDA.

327.     The only improper benefit the DOE and UFT and the individual Defendants of the UFT, offer Plaintiff is a leave without pay which would destroy Plaintiff as explained in detail in this Complaint, followed by Disability Retirement which pays a trickle amount of money; approximately $15,000.00 yearly whereby Plaintiff was making over $70,000 yearly.

328.     Disability Retirement is not the proper benefit for Plaintiff as she is not disabled due to a "natural" occurrence, as Leinwand and Lavin schemed to make her disabled as a result of their wanton acts.

329.     It should be noted if Plaintiff consented to Disability Retirement, all Defendants would never be discovered for their unlawful acts heaped upon Plaintiff.

67

330.     Additionally, Plaintiff could never take this benefit, as the DOE has full control over this benefit, and can take it away from her at any time; and they certainly would, as evidenced by their numerous wanton acts performed upon Plaintiff.

331.     Additionally, Plaintiff could be cited for fraud as she would have to sign a damaging waiver that she agrees to return to work.

332.     According to the DOE, the UFT informed Plaintiff that the DOE Medical Bureau does not have to agree with the Federal government's determination regarding Social Security disability.  The UFT is trying to defraud Plaintiff; as they would take delight having Plaintiff cited for fraud; as the DOE and UFT recklessly and deliberately scheme for Plaintiff's consent to take a leave without pay by "enticing" Plaintiff with reinstatement of her medical benefits.

333.     This too is a falsehood, as a leave without pay can be extended for only two (2) years.  It's over two (2) years, that Plaintiff is left without benefits or compensation.  Therefore, Plaintiff would not even have her benefits as it is a common procedure of the DOE and the UFT to provide Plaintiff with benefits after the fact.

334.     Furthermore, as explained throughout this Complaint, the proper lawful benefits for Plaintiff is a medical sabbatical followed by a line of duty injury whereby Plaintiff would rightfully and lawfully have relief.

335.     Furthermore, if Plaintiff consented to a leave without pay, Plaintiff could be cited for fraud, as the DOE and UFT are very well aware a leave without pay for Plaintiff is not the proper leave for Plaintiff; as she would have to sign a damaging waiver to a leave without pay that would destroy Plaintiff's plight for justice.  There are many

68

damaging facts to this waiver which would destroy Plaintiff. They are as follows:

    a.   A teacher cannot make a lawsuit against the DOE or the City of New York.

    b.   A teacher cannot collect compensation for that period of time she agrees to be on a leave without pay.

    c.   A teacher must return back to work at the termination of the leave; or otherwise a teacher could be terminated.

336.    Additionally, Solomon informed Plaintiff on April 2005 and also Procida informed Plaintiff in May 2006, that the DOE doesn't not necessarily have to agree with the Federal government's determination regarding Plaintiff's Social Security disability; as the DOE Medical Bureau may disagree with the Federal government's decision and inform Plaintiff she must go back to work.

337.    Their statements made to Plaintiff are extreme and outrageous as the DOE and UFT desperately try, incessantly, to date, for Plaintiff to take a leave without pay by "enticing" her with reinstatement of medical benefits.

338.    Furthermore, DOE and UFT may not care about the Federal government's social security disability; however, Plaintiff does, as the DOE and UFT are trying to defraud Plaintiff to take a leave without pay as she would commit fraud with the Federal government and that's exactly what these two corrupted entities schemed for her. Recently, on May 3, 2006, Procida informed Plaintiff that the resolution to the special complaint is once again a leave without pay.

69

339.     It's been two years three months that Plaintiff is without compensation or benefits. It is obvious

that the Special Complaint was a hoax as well; as Solomon finally admitted last May 2005 that Plaintiff has

been harassed; however, the UFT and DOE still punish Plaintiff and brazenly refuse to relinquish any proper,

legitimate relief which she is rightfully and lawfully entitled to according to the Collective Bargaining

Agreement.  The proper leaves are a medical sabbatical followed by a line of duty injury; as both leaves

offer a teacher compensation and benefits.


340.     Furthermore, a leave without pay can only be extended for two years.  Plaintiff was forced out

of her job by Leinwand and Lavin over two years ago.  Therefore, Plaintiff would not even have her benefits,

as it is a common procedure of the DOE and the UFT to provide Plaintiff with benefits after the fact.


341.     According to the UFT, Roth threatened Plaintiff that if she does not accept Disability Retirement,

the DOE may refuse to give Plaintiff anything else.  Thus, it is very evident, all Defendants scheme to

threaten and torture Plaintiff of all her property rights she is rightfully and lawfully entitled to.


342.     As a result, all Defendants committed extortion and Roth's threat; as stated above, was intended

to result in the Plaintiff's consent to depart with her valuable property rights.


343.     Additionally, DOE and all individual Defendants of DOE, committed embezzlement as they

fraudulently misappropriated Plaintiff's compensation, all health benefits, pension, TDA that is rightfully and

lawfully hers, as the UFT and the DOE has Plaintiff's property rights in their possession.


344.     To date, Plaintiff's pension account is in total disarray as contributions were taken out of

Plaintiff's account as the DOE is playing musical chairs with her status by placing Plaintiff's pension account

70

into a dummy account; as a result of the unlawful, unauthorized leave.

345.    In February 2006, DOE did not reimburse Plaintiff the correct amount of retroactive income received as a result of the new contract.

346.    UFT and all individual Defendants of the UFT, aided and abetted the DOE and all individual Defendants as the UFT as they refused to do any grievances for Plaintiff to rectify the horrific, wanton acts of denying Plaintiff her property rights, as they abandoned Plaintiff for two (2) years, three (3) months, which is ongoing to date.

347.    According to the DOE, Plaintiff has simultaneously been and/or is on five (5) different types of leaves and the duration of the time periods, of some of these leaves, are changed as well. Three (3) are approved by the DOE, one (1) is approved by Leinwand, and a fifth leave is uncategorized leave.

348.    Presently, to date, everyone at the DOE is confused as to Plaintiff's status, as Leinwand mishandled Plaintiff's files. Plaintiff's pension is grossly affected as pension money is placed in Plaintiff's pension account, and then taken out; as TRS does not have the correct status of Plaintiff; due to the DOE and Leinwand changing her status and the duration of time more than once.

349.    As a result, Plaintiff's pension account, and her other financial investments in the DOE are in constant turmoil.

350.    Plaintiff wrote numerous letters to the UFT and the individual Defendants regarding her status and pension account. In October 2004, Roth wrote back to Plaintiff she is on an unauthorized leave and a

71

leave without pay.  Needless to say, Plaintiff was exasperated by his remark and further wrote numerous letters to the UFT to eradicate the unauthorized leave by filing a grievance.  UFT, and the individual Defendants of the UFT, did not respond as the UFT abandoned Plaintiff.

351.      In addition, due to Leinwand's actions, and the DOE's attempt to protect Leinwand from her unlawful wrongdoings, Plaintiff's medical coverage has been canceled and briefly reinstated approximately three (3) times since March of 2004, without notifying Plaintiff.

352.      As a result, Plaintiff could not make use of the medical benefits as they were only briefly reinstated retroactively.  Thus, Plaintiff could not see her doctors to tend to her health, and to her new serious health ailments, as a result of the debilitating stress she was encountering from all defendants, especially Lavin, Leinwand and the UFT.  Plaintiff's husband, who was also covered under her plan, could not see doctors as well.

353.      The intentional and reckless conduct by Lavin and Leinwand and the entities, who willfully desired to cause Plaintiff and her husband irreparable harm, succeeded in doing so.

354.      Plaintiff wrote letters to Leinwand, Lavin, Donna Reynolds; School Secretary, Ferguson at DOE Grievance Department, UFT and many individual Defendants of the UFT, and Jacobson, DOE Medical Director, to eradicate Leinwand's unauthorized leave, as the DOE Medical Bureau simultaneously forced Plaintiff, without her consent, on a medical leave without pay.

355.      A medical leave without pay entitles a teacher to medical benefits.  However, the DOE and the Medical Bureau, unlawfully refused to lawfully reinstate her medical benefits leaving Plaintiff with a huge

72

medical debt amounting to approximately $15,000.

356.      Medical Director, of the DOE, Jacobson, recklessly and intentionally ignored Plaintiff's lawful rights to use her medical benefits as she ignored Plaintiff's letters and faxes sent to her regarding this serious matter.  Jacobson and all the Defendants schemed, in unison, to severely violate Plaintiff in every conceivable way they could.

357.      As a result, this caused Plaintiff an her husband irreparable harm.  Additionally, Plaintiff was sent to a collection agency destroying her impeccable credit of 10+.

358.      As a result, of the above-mentioned incidents, Plaintiff was awarded Long-Term Social Security Disability, commencing as of February 13, 2004, the date of the incident when Plaintiff's Line of Duty Injury occurred.  Plaintiff was placed on Long-Term Social Security Disability, the most serious classification, as a result of the severity of the hostile work environment and the abandonment of the UFT.

359.      This is a prima facie case as the Federal Government awards Plaintiff Long Term Social Security Disability, however the DOE does not grant compensation and benefits to the Plaintiff.

299.      Furthermore, Solomon on or about April 2005, informed Plaintiff, via telephone; as well as Procida; as just recently on May 3, 2006, also informed Plaintiff, via telephone, that although Plaintiff is on Long Term Social Security Disability granted by the Federal Government, the DOE Medical Bureau does not necessarily have to obey the Federal Government; as the Medical Bureau may disagree with their decision.

360.      It is important to note the DOE Medical Bureau is responsible for tampering with Plaintiff's official medical documents; as well as adding different information on identical medical documents and

73

contradictory information on identical medical documents.

361.	From February 2005 to March 2005, Plaintiff was informed by Cooper stating, "Susan, I haven't forgotten about you, the grievance department is diligently working on all your grievances putting all the numbers on it. I'll call you as soon as they are done." fifteen (15) months later, Plaintiff never received all her grievances from the Grievance Department, as Cooper claimed would be done. Thus Cooper defrauded Plaintiff.

362.	In February 2005, Plaintiff finds out from the unlawful UFT who had communication with her new law firm, Leeds, Morelli and Brown that Leinwand on or about February-March 2004 placed two (2) unlawful bars not only on Plaintiff's two (2) day line of duty injury when she slipped on the snow in but also her line of duty injury that commenced on February 13, 2004. February 2004. A bar placed on Plaintiff's line of duty injuries means that she cannot pursue her line of duty injuries as they were unlawfully blocked by Leinwand.

363.	Furthermore, Solomon, on or about April 2005, informed Plaintiff, via telephone; as well as Procida as just recently on May 3, 2006, informed Plaintiff via telephone that although Plaintiff is on long term social security disability granted by the Federal government; the DOE Medical Bureau does not necessarily have to obey the Federal government's determination, as the DOE Medical Bureau can disagree with their decision.

364.	It is important to note, the DOE Medical Bureau is responsible for tampering with Plaintiff's official medical documents as well as adding different information on identical medical documents and contradictory information on identical medical documents.

365.     This was in blatant violation of the contract, as only the Superintendent, who is Cashin, can bar a teacher's line of duty injury.

366.     A grievance was finally initiated by the UFT after twelve (12) months of abandonment. However, the grievance procedure was a hoax; in blatant violation of the contract as well. Almost every rule, protocol, and law of the grievance procedure was seriously violated, and the subject matter of barring the Line of Duty Injury was never discussed. The DOE and UFT were mocking the contract, and as a result, the Plaintiff, as they unlawfully protect the wrongdoings of Lavin and Leinwand.

367.     As a consequence of all this unlawfulness, it was the willful and reckless intention of the DOE and UFT and all individual Defendants of the DOE and UFT, to inflict irreparable harm upon the Plaintiff. They succeeded.

368.     Additionally, the UFT and DOE committed fraud and defrauded Plaintiff by not abiding by the rules, protocols and laws of the contract.

369.     On February 2005, Plaintiff was offered by the DOE and UFT a leave without pay. In reckless disregard of the truth, Plaintiff's law firm, Leeds, Morelli and Brown were unlawfully protecting the DOE, UFT, Lavin and Leinwand by pressuring Plaintiff to take a retroactive leave without pay, with approximately four (4) months remaining; whereby Plaintiff could make use of her long-awaited medical benefits. Retroactive leaves are a common tactic employed by the DOE throughout Plaintiff's case as Plaintiff receives medical benefits after the fact.

370.     More importantly, in order to apply for a leave without pay, a teacher is required to sign a

75

waiver. This waiver is very damaging for Plaintiff to sign as her law firm, DOE and UFT wanted to harm Plaintiff, as the waiver violated Plaintiff's procedural due process rights; as it prevented Plaintiff from initiating a lawsuit against the Board of Education and the City of New York.

371.     Additionally, it prevented Plaintiff from collecting any compensation from said period of time, and Plaintiff will be terminated if she does not return to school after the leave is over.

372.     Furthermore, if Plaintiff was to take a leave without pay it would protect the wanton acts of Lavin and Leinwand, as if Plaintiff became disabled as a result of "natural" causes; not as a result of Lavin's and Leinwand's wanton acts.

373.     The DOE, UFT and the Law Firm Leeds, Morelli and Brown were blatantly not acting on Plaintiff's behalf; as they knew Plaintiff filed a lawsuit and was granted Long Term Social Security Disability, and as a result she cannot return to work.

374.     It was the goal of the DOE, UFT and the Law Firm Leeds, Morelli and Brown to mislead and defraud Plaintiff as they intentionally and recklessly conspired for Plaintiff to be cited for fraud. Plaintiff and her doctors informed Social Security that she cannot work due to the overwhelming severe hostile work environment, inflicted upon her by Leinwand and Lavin, compounded with the abandonment of the UFT.

375.     Additionally, it would give the DOE the legal opportunity to terminate Plaintiff. Plaintiff could not claim any compensation from the DOE by taking a leave without pay.

376.     The UFT and the DOE have a contractual obligation to protect Plaintiff. Their wanton

Case 1:06-cv-02218-SLT-LB   Document 1   Filed 05/12/06   Page 78 of 144 PageID #: 80

misrepresentation with the aid of Leeds, Morelli and Brown was quite evident.

377.     Thus, retaining the Law Firm Leeds, Morelli and Brown was a nightmare experience for Plaintiffs as they were aiding the City and DOE in every aspect of Plaintiff's case.

378.     After releasing Leeds, Morelli and Brown, Plaintiff and her husband learned there are countless Rico/Malpractice lawsuits filed against the firm as they conspired with their client's defendants by making illegal, frightening monetary deals; and as a result their clients were grossly damaged.  Their cases are almost identical to Plaintiff's case.

379.     Plaintiff spent approximately $60,000.00 in legal fees, and unfortunately received no help from her unethical attorneys as she is involved in a corrupted chain of attorneys who never allow her lawsuit to go forward.  As a result, Plaintiffs are forced to take this multi-facet lawsuit to Federal Court and proceed on their own, pro se.

380.     It should be noted Plaintiff was promised by her previous attorneys that an order to show cause for relief and an appeal to the Article 78 must be initiated immediately.  However, those were empty promises, as they never acted on Plaintiff's behalf.

381.     Plaintiffs tried to seek help from politicians, Perb Court, Attorney General and so forth. However, none of these avenues helped Plaintiff.

382.     Perb Court judge informed Plaintiff and her husband "Why do grievances?  Grievances take years. Buy yourself some medical insurance, There's no need to take a medical sabbatical, There are no violations.

77

Pursue the line of duty injury," etc., etc.

383.    It should be noted that a Line of Duty Injury cannot be pursued before disciplinary letters are grieved from Plaintiff's file as well as grieving the unauthorized leave. To date, UFT and individual Defendants of UFT, refused to grieve Plaintiff's disciplinary letters as well as the unauthorized leave. These disciplinary letters were asked to be grieved by the Plaintiff over two (2) years ago, when these letters were received by Plaintiff, in February - March 2004.

384.    Additionally, the City Attorney perjured himself at Perb Court. Plaintiff and her husband reported this to the judge at Perb. The judge responded, "Don't worry about it."

385.    On or about November 2004, the Medical Bureau wrote Plaintiff a letter to be re-evaluated for a medical sabbatical. At the time, they wanted additional medical documentation which Plaintiff was reluctant to give, because it was very confidential.

386.    Furthermore, Plaintiff's psychologist never received Plaintiff's medical file from the medical bureau, although it was requested two times, a violation of Section 2568 Education Law.

387.    Most importantly, there was an Article 78 proceeding which Plaintiff was sure would be won, as plaintiff was waiting to get relief from the judge.

388.    Plaintiff finally was informed in January 2005, that the Article 78 relief was denied due to her unethical attorneys as explained previously.

78

389.    Plaintiff's psychologist finally received the Medical Bureau's file in January 2005.  After Plaintiff's psychologist reviewed the medical file, Plaintiff notified the Medical Bureau she will submit the additional medical evidence required as she was in dire need for compensation and benefits, as a medical sabbatical provided this.

390.    On March 21, 2005, Marino, Personnel Liaison Region 4/5, writes Plaintiff a letter stating, "As you are aware, your request for a medical leave was denied.  I hereby inform you that you continue to be on an unauthorized leave of absence."

391.    Plaintiff was unjustifiably punished because she re-scheduled her appointment for the medical sabbatical for good cause when she learned her Article 78 was denied and the Medical Bureau did not adhere to Section 2568 Education Law as they gave DeFazio Plaintiff's medical records approximately eight (8) months later.  However, Marino capriciously and arbitrarily responded to her, "... you continue to be on an unauthorized leave."

392.    Additionally, Marino placed Plaintiff on a continued unauthorized leave in retaliation for not accepting the leave without pay offered to Plaintiff in February 2005.

393.    Plaintiff wrote numerous letters to the UFT.  She wanted to file a grievance.  UFT, and all individual Defendants of the UFT, did not respond as they abandoned Plaintiff.  The reckless and intentional conduct of the UFT and all individual Defendants of the UFT, caused Plaintiff irreparable harm.

394.    On March 23, 2005, in further retaliation of Plaintiff not accepting the leave without pay, DOE is seeking to terminate Plaintiff under Section 3020-a Education Law.  Numerous laws, rules and procedures

79

were severely violated under Section 3020-a Education Law.

395.    As a result, Plaintiff did not attend.

396.    Furthermore, there were made-up charges with facts left out or facts distorted; initiated by Leinwand which Leinwand never documented. Additionally, some of the false charges were capriciously and arbitrarily thrown in, out of nowhere, as they were never documented by Leinwand.

397.    Plaintiff documented all the serious, chilling violations to the UFT, New York State United Teachers, hearing officer, Scheinman, and the DOE, and all the individual Defendants of the DOE, UFT and NYSUT. None of these parties responded, except Cooper, who informed Plaintiff, via telephone, "Relax Susan, I know there are many violations regarding the 3020-a procedure. Don't worry, everything will work out. Go out and enjoy the beautiful day." That was the last time Plaintiff heard from Cooper involving the unlawful 3020-a proceeding.

398.    Additionally, the UFT and all individual Defendants of the UFT refused to initiate grievances to remove the false disciplinary letters from Plaintiff's files.

399.    The UFT also refused to grieve Plaintiff's false, unauthorized leave.

400.    Grievances must be initiated before a 3020-a proceeding is initiated.

401.    UFT, NYSUT, DOE and all the individual Defendants of the UFT, DOE and NYSUT conspired not to represent Plaintiff according to the Collective Bargaining Agreement and State Education Laws, state laws

and federal laws as they were protecting the fraudulent, unlawful actions of Leinwand and Lavin.

402.     Thus, the UFT, NYSUT, DOE and all individual Defendants, unlawfully want Plaintiff terminated, so they are not exposed for their fraudulent, unlawful acts, as they recklessly and intentionally misrepresented Plaintiff.

403.     As a result, UFT and DOE committed fraud and defrauded Plaintiff.

404.     Additionally, all the charges in the 3020-a were false and trivial. One charge was repeated by Leinwand two times before. It was first rescinded by her, then used again at the Medical Bureau, although District informed Leinwand it's not a charge; and used again for the 3020-a. Another charge was that Plaintiff has excessive absences, although the DOE, Bey and Leinwand very well knew that all the proper medical documentation was submitted by Plaintiff and her psychologist religiously.

405.     Furthermore, Doe, Leinwand and Bey were very well aware that Plaintiff was awarded Long-Term Social Security Disability by the Federal Government on February 13, 2004; the day Plaintiff suffered her Line of Duty Injury.

406.     It should be noted it was of utmost importance for Plaintiff to be unlawfully terminated as DOE, NYSUT and UFT seriously wronged her and they did not want to be exposed for all the serious violations they heaped upon Plaintiff.

407.     Additionally, Plaintiff was unlawfully placed on the Ineligible/Inquiry List, with disciplinary charges, when Lavin unlawfully suspended Plaintiff in March 2004.

408.    In July 2005, Plaintiff was cleared of all disciplinary charges when the City attorney "affirmatively" stated, "The petitioner has not been a subject of "discipline" or had a penalty "imposed."

409.    In May 2004, Plaintiff was given a preference sheet to select what she wishes to teach for the upcoming school year 2004-2005, as she has not been the subject of "discipline' or had a penalty "imposed."

410.    In March 31, 2005, Judy Nathan, a DOE attorney sent Plaintiff a threatening, humiliating letter stating, "I have determined that the nature of the charges against you require your immediate removal." She further informed Plaintiff that when she returns from her unauthorized leave she would be assigned administrative duties.  The intent of this letter was to alarm Plaintiff as it insinuates that she allegedly committed an immoral act.  This exacerbated Plaintiff's already serious long term disability as she was traumatized by the offensive language of Judy Nathan.

411.    On the bottom of Judy Nathan's letter, she exploits Plaintiff's Social Security number; although Plaintiff has informed the DOE countless times not to exploit her Social Security number.  It fell upon deaf ears.  The Plaintiff wrote letters to the UFT.  The UFT did not respond as they abandoned Plaintiff.

412.    Additionally, this was Plaintiff's second unlawful suspension.

413.    Her first unlawful suspension was on March 2, 2004 unlawfully ordered by Lavin.

414.    Neither a Local Instructional Superintendent, nor a DOE lawyer, have the authority to suspend a teacher.  According to Section 3020-a Education Law, only the Superintendent has the authority to suspend a teacher, who is Superintendent Cashin.

82

415.     Moreover, since Plaintiff's last day of school was February 13, 2004, it is unlawful to subject her to a second suspension, as she never returned to school after February 13, 2004.

416.     It is clearly evident, that when Plaintiff denied a leave without pay, in March 2005, which would terminate her employment in June 2005, the DOE immediately retaliated on March 25, 2004, by subjecting her to an unlawful 3020-a proceeding as they desperately wanted Plaintiff to be unlawfully terminated.

417.     In April 2005, Cooper informed Plaintiff to make an appointment with Seroy, as Plaintiff had to fill out numerous papers regarding the 3020-a proceeding. Plaintiff did make the appointment with Seroy.

418.     Seroy informed Plaintiff and her husband to arrive early it will take a couple of hours to complete these papers. However, when Plaintiff and her husband met with Seroy, she did not have any papers available. Plaintiffs asked Seroy what happened to the papers Plaintiff was to fill out. Seroy ignored their question.

419.     The meeting with Seroy took approximately ten (10) minutes. Seroy was very hostile towards Plaintiffs. There was absolutely no reason for this meeting. It was a waste of time.

420.     In May 2005, Seroy sends information regarding Plaintiff to the Chancellor, State Education Department and Bey, via certified mail. Seroy claims it was a request for a 3020-a hearing.

421.     However, she was not telling the truth, as a hearing must be requested within ten (10) days which had to be initiated in March 2005. Plaintiff with her law firm sent the request for the hearing within the time limits in March 2005.

83

422.    To this date, Plaintiff does not know what Seroy sent regarding her.

423.    Plaintiff reported all the chilling, unlawful tactics to the UFT and NYSUT, and all individual Defendants of UFT and NYSUT.  NYSUT General Counsel, Sandner, responded to Plaintiff by further violating Section 3020-a Education Law in a letter written to Plaintiff.

424.    NYSUT Legal Department "chose" for Plaintiff an outside attorney once Plaintiff cited the unlawfulness performed by NYSUT.  It was quite clear this chilling referral "selected" from NYSUT would not be acting on her behalf as they severely violated Plaintiff.

425.    As a result, Plaintiff never attended.  The goal of all the Defendants was to make Plaintiff seriously ill from all their corrupted tactics; and thus they succeeded.

426.    It should be noted, NYSUT is an affiliate of the UFT, and therefore NYSUT had no intention of helping plaintiff.

427.    This unlawful 3020-a proceeding should have been eradicated as soon as it was initiated.

428.    The UFT allowed approximately 40+ grievances to go unattended for two (2) years, and three (3) months.  UFT had a contractual obligation to pursue these grievances for Plaintiff.  They failed to do so as they deliberately and recklessly chose not to.

429.    DeFazio wrote letters to the DOE, UFT and Leinwand warning them that Plaintiff's condition is "serious and life threatening" due to the hostile work environment she encountered at school and continues

84

incessantly, to date, as they violate every conceivable law, rule and procedure, for over two (2) years.

430.        However, DOE, UFT and Leinwand recklessly and intentionally ignore Plaintiff's doctors and psychologist as well as the Federal government's determination granting Plaintiff long term social security disability.

431.        They continue to violate Plaintiff in every conceivable way they can as if they will never suffer the consequences for their wanton acts.  Plaintiffs hold them liable for their wanton conduct, as they severely destroyed Plaintiff's career, health and finances.

432.        Additionally, since the corruption has been taking place for such a long period of time, it destroyed Plaintiffs' families, health and finances as well.

433.        The DOE tries to initiate the unlawful 3020-a proceeding two more times in August 2005 and then September 2005; causing further suffering to Plaintiff, as the overwhelming unlawfulness never ceases. DOE and UFT are incessantly subjecting Plaintiff to these unlawful 3020-a procedures as they are desperately trying to make Plaintiff quit her teaching profession or be unlawfully terminated based on fraud. Plaintiff wrote numerous letters to the UFT regarding the above.  UFT never responded as the UFT abandoned her.

434.        In May 2005 Plaintiff sent a so-called "neutral" Hearing Officer, Scheinman, to lengthy letters consisting of 36 pages, with 36 exhibits, to support the overwhelming violations heaped upon Plaintiff.  These violations consist of State Education laws, State laws, Federal laws, and the Collective Bargaining Agreement.  However, Sheinman ignored Plaintiffs' letters as it fell upon deaf ears; as the usual pattern of

85

all Defendants is to recklessly and intentionally violate Plaintiff, as they desired to inflict upon Plaintiff chilling, unlawful procedures with reckless disregard to the consequences that may follow; as all Defendants believe they are above the law.

435.      Additionally, in May 2005, Sheinman, the so-called "neutral" Hearing Officer, who was unlawfully, automatically assigned to Plaintiff's unlawful 3020-a as Plaintiff never had the lawful opportunity to select a Hearing Officer and was never lawfully given biographical information about any hearing officers; which are blatant violations of Section 3020-a State Education laws.

436.      Instead, it was the deliberate and reckless intention of all Defendants to select Sheinman, for their own self-serving needs, as Scheinman; like all other Defendants, severely harassed and ignored Plaintiff's pleadings for justice.

437.      To add further overwheling stress upon Plaintiff, Scheinman incessantly sent Plaintiff unlawful, alarming, official mail unlawfully rescheduling the unlawful 3020-a; then cancelling it, until Plaintiff attends the unlawful, chilling 2568 exam consisting of an unlawful, alarming FIVE HOUR exam by a panel/neuro rehabilitative psychologist unlawfully ordered by Lavin as if Plaintiff was a criminal, a dangerous misfit to society.

438.      Thus, Plaintiff's home was not a place of solitude or peace; or a place to recuperate from the severe hostile work environment, as the Defendants, for two (2) years and three (3) months, and ongoing to date, recklessly and deliberately allowed the severe hostile work environment. The Defendants, for two (2) years and three (3) months which is ongoing to date, recklessly and deliberately allowed the severe, hostile work environment to permeate into her house, as alarming mail and phone calls continued incessantly. In May

86

2005;      Scheinman's office ~was~ demanding her to participate in the unlawful pre-hearing telephone 3020-a

conference. This is another violation of 3020-a State Education Law; among many others, as a "pre-hearing

conference ... shall be held in the school district or county seat of the county, or any county, wherein the

employing school board is located," not via telephone.


439.      In July 2005, Plaintiff's psychologist, DeFazio, wrote a very serious letter to Scheinman

explaining how the unlawful 3020-a proceeding is seriously deteriorating Plaintiff's health; as DeFazio

informed Scheinman, if Plaintiff attends the unlawful 3020-a proceeding, DeFazio stated, " ... it can result in

severe mental and/or physical injury from which she might literally die; because of the overwhelming stress.

I have absolutely forbidden her to attend. This letter is to inform you of my total and unqualified opposition

to her attendance at this event."


440.      Additionally, he informed Scheinman that Plaintiff was adjudged permanently disabled by the

Social Security Administration due to the stress and depression initiated by the events and actions of the

DOE.


441.      However, the reckless disregard of Plaintiff's psychologist's and the Federal government's

determination was brazenly ignored and mocked by Scheinman, as it is a pattern of all Defendants to

recklessly and deliberately disregard Plaintiff's psychologist, doctors, as well as the Federal government's

determination. The Defendants recklessly and intentionally desire Plaintiff to suffer serious health

consequences; even death, as they are exploiting Plaintiff and using her as a smokescreen; to cover up for

the overwhelming unlawfulness.


442.      Additionally, Scheinman is listed as having two addresses, one of which is a fake address as it is

87

an empty plot of land with no residence existing.

443.    Furthermore, Scheinman uses a Pitney Bowes meter which is not used properly according to United States Post Office regulations.

444.    It should be noted in the contract, Article Twenty-Six titled, Conformity to Law-Saving Clause, states, "If any provision of this Agreement is or shall at any time be contrary to law, then such provision shall not be applicable or performed or enforced."

445.    UFT, NYSUT, Leinwand and Lavin and all individual Defendants, made every provision of the Agreement "contrary to law."

✱ 447.    However, any benefit connected with TRS, Plaintiff cannot make use of, as the City of New York and DOE control TRS; as the DOE is unlawfully not allowing Plaintiff to touch her pension which is in TRS. The same unlawful tactics can occur again for Plaintiff if she elects a benefit from TRS.

✱ 446.    Accident Disability retirement is a retirement benefit connected with TRS which is the proper benefit for Plaintiff, as a teacher is entitled to 75% of her salary plus all health and welfare benefits due to a line of duty injury suffered at school.

448.    In May 2005, after fifteen (15) months of abandonment by the UFT, and no response to Plaintiff's appeal to her harassment log, Solomon finally admitted to Plaintiffs that Plaintiff has been harassed by Lavin and Leinwand. He informed Plaintiff a Special complaint will be initiated in September. 2005.

88

449.       Article Twenty-Six of the Collective Bargaining Agreement defines a  Special Complaint as

follows:  "A special complaint is a complaint by an employee in the bargaining unit that persons or groups

are engaging in a course of harassing conduct, or in acts of intimidation, which are being directed against

him/her in the course of his/her employment and that the school principal or assistant superintendent has not

afforded the employee adequate relief against such course of conduct or acts of intimidation."


450.       This Special Complaint should have been initiated when Plaintiff was forced to leave school as

the result of the severe hostile work environment of Lavin and Leinwand.


451.       Furthermore, although Solomon admits to Plaintiff that she was harassed, he incessantly informed

Plaintiffs, "I don't know if I can  help you."


452.       Additinally he states, "We don't care if you have Social Security disability.  It has nothing to do

with the DOE."


453.       In June 2005, Plaintiff asked Solomon if she could get her medical sabbatical while her line of

duty injury is being approved.  Please note, a line of duty injury pays full salary and all benefits.  A medical

sabbatical pays 60% of a teacher's salary, plus a differential and all benefits.  Solomon nastily informs her

to call the Welfare Fund.  Welfare Funds informs Plaintiff to tell her UFT to make a grievance for a medical

sabbatical.


454.       In August 2005, Solomon writes Plaintiff a nasty letter after he returns from his two (2) month

vacation after not offering any help to Plaintiff.  He reprimands Plaintiff by stating, "Failure to fully

cooperate with Ms. Procida (Ms. Procida is the representative handling the Special Complaint) will result in

89

my withdrawing the grievance from consideration this term."

455.    Among other nasty, frustrating comments Solomon states, "If they (meaning Welfare Fund) have advised you to file a grievance, you must call the Queens UFT Office and have them advise you as to the appropriate steps you need to take."

456.    Solomon offers no solutions for Plaintiff to seek relief, as he very well knows the Queens UFT abandoned Plaintiff. He also knows that Plaintiff must monitor her thyroid with her doctor, take tests and medication for her thyroid. For two (2) years, and three (3) months, Plaintiff was forced to neglect her thyroid condition for lack of compensation and benefits from the DOE. However, Solomon, like the rest of the UFT, arrogantly speaks to Plaintiff in a merry-go-round of words which leads nowhere.

457.    In late October – November 2005 Plaintiff and her husband met with Procida for the Special Complaint. Procida was very cordial and understanding at the time. Plaintiff and her husband also met with Mr. Cullen representing the DOE. He, as well, was very cordial and understanding. They thought this time the UFT and DOE were finally helping.

458.    However, after the initial meeting, Procida made it known she was not on Plaintiff's side as Plaintiff and her husband called Procida to inquire about her Special Complaint.

459.    In or about January – February 2006, Procida referenced to facts stated in the new upcoming contract which takes effect in February 2006, such as, "A teacher can grieve her letters at a 3020-a proceeding, sometimes we do a Special Complaint after a teacher goes to a 3020-a proceeding. I don't know if I can do anything about your unauthorized leave," etc., etc.

90

460.     It should be noted the UFT had two (2) entire years to grieve Plaintiff's letters. Other teachers' letters were being grieved, however not Plaintiff's. If UFT would have grieved Plaintiff's false letters in February 2004, as they were contractually obligated to do, her file would not have accumulated with an abundance of letters, as she received two (2) false disciplinary letters in February 2004.

461.     However, since they chose to abandon Plaintiff, she has an approximately nine (9) false letters to be grieved.

462.     Further frustrating, chilling conversations continued with Roth, at the Queens UFT who tried every conceivable way to mock Plaintiff and the Collective Bargaining Agreement as he desperately tries to protect the unlawful acts of Lavin and Leinwand.

463.     In September 6, 2005 via telephone and by letter, Roth prohibited Plaintiff to come to the Queens UFT office.

464.     On or about February 2006, Roth informed Plaintiff via telephone, "We can't grieve your letters. The DOE won't allow it, DOE holds the power, if you don't accept Disability Retirement you may be left with nothing." He too was referencing the new contract taking effect in February 2006.

465.     In March 2006, Roth contradicted himself, via telephone, to Plaintiffs, to what he previously stated in a letter to Plaintiff; as he was desperately trying to unlawfully protect Leinwand.

466.     Many other unlawful statements were expressed to Plaintiffs by Roth via telephone, as he intentionally and recklessly tries to severely infuriate Plaintiff as he is well aware he is aggravating Plaintiff's

91

stressful medical condition.

467.      In February 2006, Plaintiff receives incorrect pay from to DOE regarding retroactive salary due to the new contract as the DOE did not pay her the full amount which she was entitled to.

468.      On February 10, 2006, Plaintiff receives a letter from Procida regarding the Special Complaint. She states, "Mr. Cullen and I have completed our investigation regarding your Special Complaint.  We are in the process of discussing possible resolutions.  As soon as we have a proposed resolution for you to review or consider, we will notify you.  It is my hope that a resolution can soon be reached in your Special Complaint.  Thank you for your continued patience in this matter."

469.      In March 2005, as a result of all the unlawfulness performed by the DOE, NYSUT and UFT, and all the individual Defendants, and the UFT refusing to grieve Plaintiff's letters, Roth informed Plaintiff and her husband he will research what can be done.

470.      Plaintiff's husband works part-time as a tile setter.  As a result of Plaintiff's "serious and life threatening" condition as expressed in many letters to the DOE and UFT, and some of the individual Defendants in the DOE and UFT, written by DeFazio; Plaintiff's husband has to forfeit some of his part-time work, as he needs to stay home to take care of Plaintiff.  Plaintiff is suffering from chronic stress and major depression from the severe hostile conversations and the illegal acts of the DOE, UFT and NYSUT.

471.      As a result, Plaintiff and her husband are living day by day very precariously, as they have depleted their savings by paying lawyers who conspired with the DOE, UFT and NYSUT.  Plaintiffs can lose their home and car for lack of funds to keep them.

92

472.     It is now the beginning of May 2006.  Plaintiffs do not see any relief in sight.  A special

Complaint, according to the contract is supposed to be handled promptly.  It has been seven (7) months since

the Special Complaint was initiated, and from recent conversations with Procida regarding the Special

Complaint, it's established that no relief will be given to Plaintiff.


473.     In May 3, 2006, Procida defrauds Plaintiff, via telephone, informing her that although Plaintiff

has been granted long term Social Security disability; the DOE does not have to agree with the Federal

government's determination that Plaintiff is too ill to work.  The DOE Medical Bureau can disagree with the

Federal government's decision and make their own determination; as if the DOE is above the law.


474.     It is important to note the Medial Bureau is responsible for tampering with Plaintiff's official

medical documents as well as adding additional information and contradictory information on the same

identical medical documents.


475.     Furthermore, Procida informed Plaintiff, "We are not planning to give you leaves with pay.  My

hope is to give you a leave without pay."  Her response was outrageous and extreme as this was the

offering by the DOE and UFT, a year ago, which Plaintiff denied, as this leave would destroy her; which was

previously explained in this complaint.


476.     Thus, a special complaint was a hoax, as well, as the UFT admitted that Plaintiff was harassed

by initiating a special complaint.  However, as usual, in order to protect the unlawfullness of all the

Defendants, especially Lavin and Leinwand, Plaintiff suffers for their wanton acts by not receiving legitimate

relief she is lawfully and rightfully entitled to which is a medical sabbatical followed by a line of duty injury.


93

477.     Cashin, the Superintendent, remained silent throughout Plaintiff's suffering.  She relinquished her
authority by permitting Lavin and Leinwand to supersede her role, the two (2) alleged cohorts in crime, who
destroyed Plaintiff's health, career and finances.  Upon information and belief, Leinwand and Sheehan were
promoted to Plaintiff's school in 2001, as they protected the wrongs of the administration at their former
school, J.H.S. 210.  Sheehan was a dean at J.H.S. 210 and Leinwand was one of the Assistant Principals.
Sheehan became Assistant Principal at Plaintiff's school, P.S. 66, in September 2001; and Leinwand became
Principal at Plaintiff's school, P.S. 66, in September 2001.

478.     As soon as they ventured into Plaintiff's school, they wilfully and recklessly targeted Plaintiff.
They succeeded in their malicious mission as they destroyed Plaintiff's career, health and finances and as a
result, destroyed Plaintiff's family health and finances as well.

479.     Plaintiff has done nothing to deserve this outrageous, inhumane and malicious treatment.  There
can be no doubt that the Defendants, the Plaintiff brings this lawsuit against are conspiring and intentionally
and recklessly destroyed her career, finances and health in order to unlawfully protect the malicious,
reckless, illegal actions of all the Defendants, and especially Lavin and Leinwand.

480.     All Defendants are intent on severely abusing and harassing Plaintiff.  Their reckless disregard for
Plaintiff is inhumane and wanton as they blatantly disrespect DeFazio's repeated warnings as he has stated
in many letters written to Defendants, that Plaintiff's condition is, "serious and life threatening."

## FIRST CAUSE OF ACTION
## BREACH OF COLLECTIVE BARGAINING

481.     UFT, DOE, NYSUT and all the individual Defendants of the DOE, UFT and NYSUT failed to

94

represent Plaintiff in good faith when it concerns Plaintiff as no grievances were pursued except one unlawful grievance. The rules, procedures and protocol for this grievance were grossly violated. As a result, the UFT breached its duty of fair representation to Plaintiff.

482.     Additionally, for two (2) years, three (3) months, Plaintiff wrote to UFT approximately 500 letters to all UFT Defendants, pleading to initiate outstanding grievances, approximately 40+ in all. UFT blatantly turned their backs on Plaintiff, as they recklessly,negligently, deliberately disregarded Plaintiff's plight for justice. As a result, of their wanton misrepresentation, Plaintiff's career, health and finances have been destroyed; and Plaintiff s' family health and finances, as well.

483.     Additionally, UFT, DOE, NYSUT and all individual defendants of the UFT, DOE and NYSUT, breached their contract and agreement when it concerned Plaintiff by failing to assist, represent and support her plight with the New York City Department of Education and the City of New york concerning, inter alia, benefits and entitlements lawfully due to Plaintiff.

484.     Plaintiff suffered harm and damages as a result of the breach of contract and the participation in the conspiracy to breach the contract. The conduct of the UFT, NYSUT, DOE and all the individual Defendants of the UFT, DOE, and NYSUT are malicious and/or in wanton and willful disregard of Plaintiff's rights. DOE, UFT, NYSUT and the individual Defendants of NYSUT and UFT, should have known that their actions would harm Plaintiff and are recklessly indifferent to the consequences of their actions to Plaintiff, causing Plaintiffs irreparable harm, past and present, which is ongoing, to date.

## SECOND CASE OF ACTION
## BREACH OF FIDUCIARY DUTY

95

485.      UFT, DOE, NYSUT and all individual Defendants of the DOE, UFT and NYSUT breached their professional and fiduciary duties to Plaintiff, which was done for the benefit of unlawfully protecting the reckless, deliberate, negligent acts of Leinwand and Lavin and other DOE employees, for which they are jointly and severally liable.

486.      Plaintiffs suffered irreparable harm, past and present, which is ongoing to date, and damages as a result of defendants' breaches of fiduciary duties and participation in the conspiracy to defraud Plaintiff. The conduct of NYSUT and UFT with the individual Defendants, are malicious and/or in wanton and willful disregard of Plaintiff's rights. Defendants knew or should have known that their actions would harm Plaintiff and/or were recklessly indifferent to the consequences of their actions to Plaintiff.

## THIRD CAUSE OF ACTION
## FRAUD

487.      DOE, UFT, NYSUT and the individual Defendants of the DOE, UFT and NYSUT, conspired to commit fraud as they falsely misrepresented Plaintiff and concealed from Plaintiff information.

488.      Plaintiff was forced to become well-versed in Education Law, State Law, Federal Law and the Collective Bargaining Agreement to protect herself from being falsely misrepresented.

489.      False statements, false documents and false procedures were made for the purpose of deceiving Plaintiff as they were unlawfully protecting the wanton acts of Lavin and Leinwand and other DOE employees.  They tried to mislead Plaintiff to sign documents that would greatly damage her.

490.      Defendants deprived Plaintiff her life, liberty and property rights by denying Plaintiff procedural

96

due process.

491.    DOE also tampered with evidence to deceive and defraud Plaintiff and the court. UFT was an accomplice to this fraud.

492.    Plaintiff suffered harm and damages as a result of defendant's fraud and participation in the conspiracy to defraud Plaintiff.

493.    The conduct of Defendants was malicious and/or wanton and willful disregard of Plaintiff's rights. Defendants knew or should have known that their actions would harm Plaintiff, and were recklessly indifferent to the consequences of their action to Plaintiffs.

494.    Lavin and Leinwand conspired as they usurped their powers by taking the role of the Superintendent.

495.    They grossly violated Plaintiff's procedural due process depriving Plaintiff of life, liberty and property rights.

496.    Leinwand also took the role of an investigator as she fraudulently investigates Plaintiff's past and present work history, and fraudulently conceals it from Plaintiff, and thus defrauds Plaintiff.

497.    Leinwand also takes the role of a doctor where she states "Line of Duty Injury unsubstantiated" although all the proper medical documentation required by the DOE and the DOE's medical bureau was submitted religiously to date.

97

498.     Additionally, Leinwand, with her cohort, Lavin, should not be the decision makers for Plaintiff's line of duty injury as they are not neutral decision makers. They are the two accused parties that committed Plaintiff's line of duty injury.

499.     It is outrageous and extreme that the DOE and the UFT permitted their misuse of power to continue incessantly as it is ongoing, to date.

500.     Leinwand fraudulently concealed and defrauded New York City DOE Payroll that Plaintiff did not have sick days, as she falsely authorized the New York City Payroll to withdraw Plaintiff's salary from her personal account.

501.     Leinwand fraudulently placed Plaintiff on an unlawful, unauthorized leave, after one week of absence, ignoring that she and Lavin were responsible for the severe hostile work environment which caused Plaintiff's line of duty injury. All medical documentation was shown to Leinwand.

502.     Leinwand fraudulently suspended Plaintiff's direct deposit, as Plaintiff is the only person who can suspend her direct deposit.

503.     Leinwand fraudulently informed Plaintiff the meeting with Lavin to discuss Plaintiff's concerns about her schedule was all to benefit Plaintiff. Leinwand grossly mislead Plaintiff by bribing her to meet Lavin. At this meeting, without UFT representation, as UFT abandoned Plaintiff, Lavin in reckless disregard to Plaintiff's plight; incessantly asked Plaintiff, "Are you sick? Are you well? Are you sure you're not sick? Are you sure you're well?" This fraudulent meeting was intended to ruin Plaintiff's career.

98

504.     Leinwand fraudulently arrests Plaintiff's husband by maliciously and recklessly creating a false police report.

505.     Upon information and belief, Leinwand filed a false police report against Plaintiff with the School Safety Police which Leinwand, DOE and UFT refuse to conceal to Plaintiff.

506.     Leinwand concealed other documents from Plaintiff as well.

507.     Additionally, as a result of Leinwand's unlawful, unauthorized leave, all Plaintiff's benefits, pension, TDA and salary came to an abrupt halt.   Plaintiff is not able to touch her pension monies as her pension is placed in a dummy account, and upon information and belief, her TDA as well; due to Leinwand's unlawful, unauthorized leave.

508.     Superintendent Cashin and Chancellor Klein are accomplices to all this fraud, as they remained silent and refuse to help.   They allowed Lavin, Leinwand and Sheehan, Assistant Principal, to grossly violate Plaintiff.

509.     Sheehan committed fraud, as well, as she reprimanded and humiliated Plaintiff for a common practice used daily by all teachers.

510.     Bey committed fraud as she grossly violated Plaintiff to unlawful procedures violating Education Laws, Collective Bargaining Agreement, State Laws, Federal Laws, with reckless and intentional disregard to harm Plaintiff.

99

511.     All Defendants committed fraud as they brazenly ignore and mock Plaintiff's doctors and the

Federal government's Social Security disability granted to Plaintiff.


512.     Plaintiff and husband suffered harm and damages as a result of Defendants' fraud and

participation in the conspiracy to defraud Plaintiff.  The conduct of Defendants are malicious and/or wanton

and willful disregard of the Plaintiff's rights.  Defendants knew or should have known that their actions

would harm Plaintiffs, and are recklessly indifferent to the consequences of their action to Plaintiffs, which

is ongoing.


513.     Marino, DOE Personnel Liaison, committed fraud as she conspired with Leinwand to put Plaintiff

on a continued unauthorized leave which is ongoing to date.  Thus Plaintiffs suffered irreparable harm, past

and present, which is ongoing to date.


514.     All Defendants are negligent as they failed to protect and act on behalf of Plaintiffs against

unreasonable harm or risk, as they all participate in a conspiracy to destroy Plaintiffs.


515.     The conduct of Defendants are malicious and/or in wanton and willful disregard to Plaintiffs'

rights.  Defendants knew or should have known that their actions would harm Plaintiff and were recklessly

indifferent to the consequences of their actions to Plaintiff, which is ongoing to date.  Thus Plaintiffs

suffered irreparable harm, past and present, which is ongoing to date.


## FIFTH CAUSE OF ACTION
## TORTUROUS INTERFERENCE WITH THE CONTRACT

516.     UFT, DOE, NYSUT and all the individual defendants of the UFT, DOE and NYSUT have a fiduciary

100

duty with Plaintiff. Lavin, Leinwand, Sheehan, Marino, Cashin, Klein, Jacobson and Bey maliciously, illegally and intentionally interfered with Plaintiff's relationship with the UFT and NYSUT, wrongfully and without justification or excuse.

517.     The UFT and NYSUT deliberately and recklessly chose to unlawfully represent the above Defendants instead of Plaintiff.

518.     UFT and NYSUT promoted the Defendants wanton actions by not protecting Plaintiff and denying her fair representation, as provided by the Collective Bargaining Agreement.

519.     As a result, UFT and NYSUT reversed their roles and protected DOE Defendants instead of the union member, who is Plaintiff.

520.     DOE is a responsible party ,as well, as they have an agreement with the UFT to bargain in good faith, which they grossly failed to do for Plaintiff.

521.     Plaintiff suffered harm and damages as a result of the torturous interference.

522.     The conduct of the UFT, NYSUT, DOE and individual Defendants of the DOE malicious and/or in wanton and willful disregard of the Plaintiff's rights.  Such Defendants knew or should have known that their actions would harm Plaintiff and are recklessly indifferent to the consequences of their action to Plaintiff, which is ongoing to present.  Thus Plaintiffs suffered irreparable harm, past and present, which is ongoing to date.

101

## SIXTH CAUSE OF ACTION
## NEGLIGENT, INTENTIONAL AND RECKLESS INFLICTION OF
## PHYSI:OLOGICAL, EMOTIONAL, MENTAL, PHYSICAL AND
## PSYCHOLOGICAL DISTRESS

523.     The conduct of all the Defendants are intentional, reckless and negligent as well as extreme and

outrageous.

                                                         Physiological
524.     The Plaintiff has suffered severe emotional, psychological, mental and physical distress, as a

result of the wanton behavior of all Defendants as they heaped upon Plaintiff violation upon violation.

525.     They exacerbated Plaintiff's stress and frustration, resulting from the severe hostile work

environment and UFT abandonment, as the chilling violations incessantly repeats at her home, to date.

526.     As a result, Plaintiff cannot find peace and solitude at her home as she is inundated night and

day, for two (2) years and three (3) months with unlimited violations which destroyed her career, health and

finances ... in essence her life!  In modern America, this is inhumane, how the Defendants can perform such

wanton acts, and face no consequences, for the "living hell" they deliberately and recklessly conspired for

Plaintiffs and their families.

527.     They recklessly disregard Plaintiff's doctors and psychologist who warned Defendants Plaintiff's

condition is "serious and life threatening."

528.     The Defendants act like scavengers taking delight in destroying her pension, TDA, benefits,

compensation, and all her finances which rightfully belong to her.

529.     As a result, of the wanton conduct of the Defendants as their pattern of racketeering continues,

Plaintiffs have suffered and will continue to suffer permanent and irreparable damages.  Plaintiffs have

suffered severe and demonstrable emotional, physical, physiological and psychological harm caused by Defendant's wanton

conduct, past and present, which is ongoing to present.

## SEVENTH CAUSE OF ACTION
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

530.     UFT, DOE, NYSUT and all individual Defendants of NYSUT, UFT and DOE have a fiduciary

relationship with the Plaintiff.  They breached the duty of good faith and fair dealing owed to Plaintiff.

531.     As a direct and proximate result of UFT, NYSUT, DOE and the individual Defendants of NYSUT,

UFT and DOE breaching the covenant of good faith and fair dealing, Plaintiff has sustained damages and

irreparable harm which is ongoing to date.

## EIGHTH CAUSE OF ACTION
## DISCRIMINATION (AGE, GENDER, DISABILITY, RETALIATION
## SEVERE HOSTILE WORK ENVIRONMENT)

532.     DOE and the individual DOE Defendants discriminated against Plaintiff because of her age; ERISA

discrimination, ADEA, gender and disability which occurred February 13, 2004, the day Plaintiff's psychologist forbid

Plaintiff to return back to school due to the severe hostile work environment.

533.     Leinwand constantly asked Plaintiff if she reached the magic age of 50.

534.     Presently, Plaintiff has approximately three (3) more years to collect full retirement.  Leinwand

recklessly and intentionally destroyed Plaintiff's retirement, as she immediately put Plaintiff on an unlawful

103

unauthorized leave, after one week of absence.

535.     As a result of Leinwand's unlawful unauthorized leave, Plaintiff is forbidden to touch her pension money which is rightfully hers as Plaintiff's pension is unlawfully placed in a dummy account.  This unlawful unauthorized leave has been in effect and is ongoing to present for two (2) years and three (3) months.

536.     Additionally, as a result of the unlawful, unauthorized leave, Plaintiff cannot collect any compensation, obtain her medical and welfare benefits, and upon information and belief, her TDA.

537.     Marino reinforces Leinwand's unlawful unauthorized leave, as she informs Plaintiff she continues to be on an unauthorized leave, which is ongoing to present.

538.     Furthermore, not only is this age discrimination, but ERISA and ADEA discrimination as well.  Plaintiff was robbed of all her property rights by the DOE, UFT, NYSUT and all individual Defendants of the DOE, UFT and NYSUT, which was violated by Leinwand and Marino.

539.     The DOE and UFT are well aware that Plaintiff is not on a true unauthorized leave.  As according to the DOE, a teacher who is absent for 20 days without notice may be deemed to have resigned.  Plaintiff never resigned.  To date, Plaintiff documents her absence every three months as required by the DOE.

540.     UFT and all individual Defendants of the UFT are an accomplice to the discrimination by not eradicating Leinwand's unauthorized leave reinforced by Marino.

541.     The UFT and all individual Defendants of the UFT aided and abetted the DOE, Leinwand and Marino to carry out this crime; robbing Plaintiff of all her property rights vested in the DOE.

542.     All Defendants in this case are very well aware Plaintiff was awarded Long-Term Social Security Disability on February 13, 2004, as the severe hostile work environment which is ongoing to date, created debilitating stress for Plaintiff, as DeFazio reported.  This is a prima facie case as the Federal Government grants Plaintiff Social Security Disability but the DOE stripped Plaintiff of all benefits and income.

543.     DOE, and the individual DOE Defendants discriminated against Plaintiff on the basis of her gender as Leinwand wanted to replace Plaintiff's teaching position with a young, non-tenured male teacher.

544.     Plaintiff had property rights in her teaching position as she is a tenured, successful teacher for nineteen (19) years.  Leinwand, with the help of Marino and the DOE, interfered in her property rights, once again.

545.     Plaintiff became disabled as a result of the reckless and deliberate retaliatory, unlawful tactics of Lavin, Leinwand and Sheehan which culminated into a severe hostile work environment as a result of the UFT and all individual Defendants of the UFT abandoning her.

546.     The date of Plaintiff's disability began February 13, 2004, when Plaintiff's psychologist forbid Plaintiff to return back to school as she was suffering debilitating stress, emotional, physical, psychological distress, and severe trauma from Lavin and Leinwand, as she could not be subjected to their retaliatory tactics any longer which were severe and pervasive.

547.     The severe hostile work environment permeated into Plaintiff's home.

548.     As a result, her home is not a place of peace and solitude.  Incessant, repeated violations are continuing at her home by all Defendants for two (2) years and three (3) months.  Violations never cease, as it is ongoing to present.

549.     The discriminatory retaliatory and illegal mistreatment of Plaintiff who is an employee of the DOE, is ongoing to date thus (a) causing Plaintiff irreparable harm, past and present which is ongoing to date, and (b) warranting both declaratory and injunctive relief.

550.     UFT, and all individual Defendants of the UFT, are an accomplice to the discriminatory, retaliatory and illegal mistreatment of Plaintiff, as to date, they offer absolutely no relief for Plaintiff; although Plaintiffs pleaded to the UFT and all individual Defendants of the UFT to file grievances for two (2) years and three (3) months.

551.     Plaintiff and her husband wrote approximately 500+ letters to all UFT members and recently had conversations with many of the Defendants of the UFT, but to no avail.  They continue to grossly violate and act extremely hostile to Plaintiffs as the UFT made up their mind to aid and abet the DOE and all individual Defendants of the DOE to perform their illegal acts which continues incessantly to date.

**NINTH CAUSE OF ACTION**
**CIVIL AND CRIMINAL CONSPIRACY**
Federal Rico Violation - 18 U.S.C. 1962d,
Rico Conspiracy
Against All Defendants

552.    DOE, UFT, and all individual Defendants of the UFT, DOE, and NYSUT with Defendant Sandner,
conspired to commit the aforementioned fraud and other
torturous, wanton conduct and breaches of duty with Plaintiff which is ongoing to date.

553.    In furtherance of the conspiracy, all Defendants engaged in fraudulent acts which were performed
to, inter alia, deprive the Plaintiffs of benefits and compensation they reasonably expected to receive as a
result of the Collective Bargaining Agreement.

554.    Plaintiff's husband is suffering from this as well, as he was covered under Plaintiff's medical
benefits and welfare benefits, and as a result he cannot tend to his health needs as well as Plaintiff.

555.    DOE, UFT and all individual Defendants of the DOE and UFT conspired this wanton, torturous
conduct to occur to Plaintiffs.  Leinwand extorted and embezzled Plaintiff's salary form her bank account,
thus committing bank fraud.  DOE and UFT and all individual Defendants of the UFT and DOE are
accomplices to Leinwand's extortion and embezzlement which constitutes bank fraud as they conspired by
allowing these wanton, torturous tactics to be inflicted upon Plaintiff which is ongoing to date.

556.    DOE, UFT and all individual Defendants of the DOE and UFT, all conspired to allow Leinwand to
place Plaintiff on an unlawful unauthorized leave, as she robbed Plaintiff of her property rights, that is, her
pension, TDA, medical benefits, welfare benefits, and compensation.

557.    DOE and UFT, and all individual Defendants of the UFT and DOE, are accomplices to Leinwand's
unlawful unauthorized leave.  They conspired by allowing this wanton, torturous conduct to be inflicted upon
Plaintiff which is ongoing to date.

107

558.     DOE, UFT and all individual Defendants of the DOE and UFT, conspired to invade Plaintiff's privacy by allowing Leinwand to fraudulently investigate Plaintiff's past and present work history when a school file suffices.

559.     They conspired to allow this wanton, torturous conduct to be inflicted upon Plaintiff which is ongoing to date.  DOE, UFT, and all individual Defendants of the DOE and UFT, conspired to invade Plaintiff's privacy, by allowing Plaintiff's social security number to be exploited throughout the entire DOE and who knows where else.

560.     DOE, UFT, and all Defendants of the DOE and UFT, made Plaintiff a prime victim of identity theft.  Plaintiff repeatedly informed all Defendants a file number suffices to identify Plaintiff. However, they arrogantly ignored Plaintiff.  They conspired by allowing this wanton, torturous tactic to be inflicted upon Plaintiff which is ongoing to date.

561.     DOE, UFT, and all individual Defendants of the DOE and UFT, conspired to allow medical and official documents concerning Plaintiff, to be tampered with.  They conspired by allowing this wanton, torturous conduct to be inflicted upon Plaintiff which is ongoing to date.

562.     DOE, UFT and all individual Defendants of the UFT and DOE, conspired to allow Leinwand to suspend Plaintiff's Direct Deposit which constituted bank fraud.  They conspired by allowing this wanton, torturous conduct to be inflicted upon Plaintiff which is ongoing to date.

563.     DOE, UFT, NYSUT and all individual Defendants of the UFT, DOE, and NYSUT conspired to grossly violate State Education Laws, Federal Laws, State Laws, and the Collective Bargaining Agreement.

They conspired by allowing this wanton, torturous conduct to be inflicted upon Plaintiff which is ongoing to date.

564.     DOE, UFT and all individual Defendants of UFT and DOE conspired to recklessly and deliberately ignore all Plaintiff's doctors and psychologist, as well as the Federal Government, as Plaintiff was awarded Long Term Social Security Disability. They conspired by allowing this wanton, torturous conduct to be inflicted upon Plaintiff which is ongoing to date.

565.     DOE, UFT, and all individual Defendants of the UFT and DOE, conspired to allow DOE employees to take on the role of another DOE employee, and to state on some documents the false title of that employee. They conspired by allowing this wanton, torturous conduct to be inflicted upon Plaintiff which is ongoing to date.

566.     DOE, UFT, and all individual Defendants of the DOE and UFT, conspired to allow Plaintiff's husband to be falsely arrested by Leinwand and, upon information and belief, Leinwand wrote a report about Plaintiff, Susan Tropeano, to the School Safety Police. They conspired by allowing this wanton, torturous conduct to be inflicted upon Plaintiffs.

567.     DOE, UFT, and all individual Defendants of the DOE and UFT, conspired to conceal Leinwand's ten year history with the UFT, as she made other teachers' lives miserable, as reported to Plaintiff by Cooper. They conspired by allowing Leinwand's wanton, torturous conduct to be inflicted upon Plaintiff which is ongoing to date.

568.    All Defendants conspired to mock and brazenly ignore Plaintiff's doctors and the Federal governments' long term Social Security disability granted to Plaintiff.

569.    DOE, UFT and individual Defendants of the UFT and DOE, conspired to pressure Plaintiff, to take a leave without pay which would ruin Plaintiff's plight for justice.  They conspired by allowing this wanton, torturous conduct to be inflicted upon Plaintiff.

570.    This conspiracy occurred as early as January 2002, as all Defendants conspired to deny Plaintiff her excessing seniority.

571.    DOE, UFT and individual Defendants of the UFT and DOE, conspired to allow incessant, repeated violations to be heaped upon Plaintiff.  They conspired by allowing this wanton, torturous conduct to be inflicted upon Plaintiff which is ongoing to date.

572.    Their goal is to make Plaintiff so sick of the overwhelming violations heaped upon her that she will resign; or be so distressed from their numerous wanton acts that she will not be able to proceed with a lawsuit.

573.    As a direct and proximate result of the engagement in a civil and criminal conspiracy, of all Defendants, Plaintiffs have sustained damages and irreparable harm, and will in the future continue to sustain harm and irreparable harm.

574.    The extreme and outrageous acts of all Defendants are malicious, willful, and wanton, and justify an award of punitive damages to Plaintiff .

110

575.     Beginning in at least in the year 2002 and continuing to present, as Defendants continue to conceal, mislead and misrepresent Plaintiff, Defendants conspired with one another to violate the provisions of 18 U.S.C. Section 1962, as set forth above.

576.     During the relevant times, each Defendant, by words and conduct, knowingly agreed to commit the aforementioned acts in violation of 18 U.S.C. Section 1962 and in furtherance of a common purpose as set above.

577.     Each Defendant agreed to facilitate the predicate acts set forth above with knowledge that their acts were in furtherance of their pattern of racketeering activity.

578.     As a result of the Defendants' conspiracy to violate 18 U.S.C. Section 1962, Plaintiff was harmed in her career and denied lack of funds, benefits due her, and property rights; such as her pension and TDA.

579.     In furtherance of the conspiracy, Plaintiff's husband was harmed as they defamed his good name and reputation and as he suffers lack of consortium due to Plaintiff, Susan Tropeano's stated injuries.

580.     Additionally, Plaintiffs suffer severe lifestyle changes and financial hardships such as they cannot take care of their medical needs, as both Plaintiffs cannot see doctors; as Plaintiff's husband was covered under Plaintiff's medical plan.

581.     Furthermore, they have incurred huge legal fees, and costs as aforesaid.  As a result, Plaintiffs are depleted of all funds, and live very precariously day by day.  Plaintiff suffered irreparable harm, past and present, which is ongoing to date.

## TENTH CAUSE OF ACTION
## INVASION OF PRIVACY

582.     DOE, and individual DOE Defendants, severely violated Plaintiffs as they unjustifiably intrude upon Plaintiff privacy in many aspects; one of which is her social security number blatantly circulated throughout the entire DOE, UFT and who knows where else.

583.     As a result, Plaintiff is a prime victim for identity theft.

584.     As mentioned above, this complaint incorporates many other aspects of Plaintiffs' privacy being intruded upon, as the DOE, and individual DOE Defendants, publicized information and documented information that unreasonably places Plaintiffs in a false light; which continues incessantly to date.

585.     UFT, and individual UFT Defendants, are an accomplice to these wrongful facts, as they recklessly and deliberately ignored Plaintiff's pleadings to initiate grievances against these wanton acts.  As a result, Plaintiffs suffer irreparable harm, past and present. which is ongoing to date.

586.     It should be noted Plaintiff's husband applied for a job when Leinwand unlawfully arrested him in February 2004.  The charge was eradicated.  However, before the charge was rescinded, Plaintiff could not be hired as a result of Leinwand's unlawful arrest charge.

## ELEVENTH CAUSE OF ACTION
## BANK FRAUD
### (Federal Rico Against DOE, Leinwand, UFT
### and all Individual Defendants of the UFT - U.S.C. 1344)

587.     In March 16, 2004, Leinwand committed bank fraud pursuant to the Rico Violation U.S.C. Section 1344 which is a serious criminal offense.  A guilty party can be fined up to $1,000,000 or imprisoned for

112

not more than 30 years, or both.

588.     Leinwand and the DOE committed bank fraud as Leinwand and the DOE obtained unlawful custody over Plaintiff's salary, by withdrawing Plaintiff's salary, which was originally deposited by the DOE into Plaintiff's personal checking account.

589.     The DOE took the directives from Leinwand, as Leinwand falsely claimed that Plaintiff exhausted her sick days, and was not entitled to her salary.

590.     Plaintiff had approximately 22 or more sick days left, and as a result, the salary was unlawfully withdrawn from Plaintiff's account as directed by Leinwand, which was rightfully and lawfully Plaintiff's money.  The salary unlawfully withdrawn covered for 10 days of her sick days; with 12 more sick days remaining.

591.     UFT and all individual Defendants aided and abetted the DOE's and Leinwand's bank fraud as Plaintiff immediately wrote numerous letter and made phone calls to the UFT, and all the individual Defendants of the UFT; however they did not respond as the UFT and all individual Defendants of the UFT, abandoned Plaintiff.

592.     The conduct of the DOE, Leinwand and the UFT, and all individual Defendants of the UFT, knew and were very well aware of the bank fraud; however they chose to allow it to happen.  They refused to file an immediate serious grievance for Plaintiff as they arrogantly turned their backs on Plaintiff.

593.     Leinwand and the DOE further committed bank fraud by unlawfully suspending Plaintiff's Direct

113

Deposit as they schemed their best not to allow Plaintiff any more funds due her; as they knew Plaintiff had remaining sick days, which are worth money, and would be paid in the future through her Direct Deposit.

594.    As a result, additional compensation was due Plaintiff by the DOE; however Leinwand and DOE tried their best not to allow Plaintiff have her funds that were rightfully and lawfully hers; by unlawfully suspending Plaintiff's Direct Deposit. This is in violation of Federal Rico, Section 1344(2).

595.    As a result Plaintiffs suffer irreparable harm, past and present, which is ongoing to date.

## TWELFTH CAUSE OF ACTION
## MAIL FRAUD
### (Federal Rico Against DOE, Leinwand, UFT
### and all Individual Defendants of the UFT - 18 U.S.C. Section 1341)

596.    All Defendants committed mail fraud. Mail fraud was committed by sending letters to Plaintiff exposing her to chilling, frightening, unlawful procedures for her to participate in; which violated Federal, State, Education Laws and the Collective Bargaining Agreement.

597.    Many of these letters arrived at Plaintiff's home via certified mail and by official mail, as the mailman incessantly rang Plaintiff's doorbell alarming her with this mail.

598.    There are other countless letters Plaintiff possesses which constitutes mail fraud. Some of the letters include:

a)    In March 2, 2004, Lavin sends a letter to Plaintiff informing her that she is insubordinate when she does not show up at a meeting as Plaintiff was absent that day as a result of being ill.

114

b)     In March 2, 2004, Lavin suspends Plaintiff although she does not have the authority to do

so.

c)     In March 12, 2004, Leinwand suspends Plaintiff's Direct Deposit.

d)     In March 30, 2004, Leinwand informs the Medical Bureau that Plaintiff spoke to parents.
an almost identical
A copy of this letter was sent by Lavin to Plaintiff.  Plaintiff has a right to speak to parents.  Lavin violated

the first amendment.  Additionally, Lavin has no right to send a letter to the Medical Bureau that Plaintiff

spoke to parents.  Speaking to parents is a constitutional right.  It has nothing to do with medical.

e)     In March 30, 2004, Lavin further states and writes to the Medical Bureau that she sent,

"Mrs. Tropeano a summons letter requesting that she meet with me to discuss this matter.  She responded

via faxed letter to Mrs. Leinwand that she would not attend this meeting as she is "... compelled by my

doctors not to be subjected to any more employment induced stress..."  Lavin fraudulently ignores Plaintiff's

doctor's orders and the summons letter was not to discuss talking to parents.  It was about continuing the

conversation with Plaintiff without UFT representation, regarding Lavin's incessant questions to Plaintiff, as

she questioned, "Are you sick?  Are you well?  Are you sure you're not sick?  Are you sure you're well?"

f)     In March 21, 2005, Marino informs Plaintiff in a letter that she is on a continued

unauthorized leave.

from Leinwand,
g)     In an undated disciplinary letter mailed to Plaintiff's home the same day, Plaintiff receives

Lavin's March 30, 2004 letter.  Leinwand reprimands Plaintiff, as well, for talking to parents.  She states, "I

find your behavior unprofessional in that you contacted the homes of children within a school that you are no

115

longer assigned to work and communicated messages to those families which were inappropriate and inflammatory." Plaintiff informed parents the facts that occurred as she was close with the children and many parents. The parents expressed their sincere sympathy to Plaintiff; and informed Plaintiff they will write letters for her if needed. Like Lavin, Leinwand violated Plaintiff's constitutional rights.

h)     As a result of the above letter, Leinwand informs Plaintiff that "Dr." Lavin has reassigned Plaintiff and therefore informs Plaintiff that she "should not have any reason to utilize any of the personal information you may possess regarding the students at P.S. 66. Leinwand further states, "I am directing you to cease and desist from any further communication with any of the families of P.S. 66. Your unprofessional behavior will lead to an unsatisfactory rating and further disciplinary charges."

i)     In or about June 2004 the original OP 198's medical documents required by the DOE for Plaintiff and her psychologist, to fill out and submit; were returned by mail to Plaintiff with significant white-outs. Additionally, identical OP 198's were returned with important information omitted or conflicting facts on the exact OP 198's.

j)     In October 2004, Roth informs Plaintiff in a letter she is on an unauthorized leave and a leave without pay.

k)     In March 31, 2005, Judy Nathan, a DOE attorney, writes a letter to Plaintiff stating, "I have determined that the nature of the charges against you require your immediate suspension. However, since you are currently on an unauthorized leave of absence, pursuant to Education Law Section 3020-a, upon your return from said leave, you will be reassigned to administrative duties." This letter was in reference to the "second" unlawful suspension. Plaintiff never returned to school to be suspended again.

116

l)    Furthermore, a DOE attorney cannot suspend a teacher; only the Superintendent, who is Cashin, can suspend a teacher. Additionally, Judy Nathan alarms Plaintiff as she demoralizes Plaintiff as if she was a criminal or a misfit to society. To add insult on top of injury, Judy Nathan's letter exploits Plaintiff by exposing her social security number.

m)    In March 23, 2005, Bey, Community Superintendent, mails charges to Plaintiff exposing Plaintiff to an unlawful 3020-a although she never returned or worked in the school year of 2004-2005. One of the charges Bey lists for Plaintiff's 3020-a is excessive absences. Bey very well knows Plaintiff and her psychologist religiously submit, to date, all the proper medical documentation required by the DOE plus her award letter that Plaintiff is collecting Long Term Social Security Disability as of February 13, 2004, the day Plaintiff suffered her Line of Duty Injury. Plaintiff was cleared of all false disciplinary charges in July 2004, and given a preference sheet on May 2004 for the school year 2004-2005, as to what she wants to teach.

n)    In March 2005, Marino sent a letter to Plaintiff as she informs Plaintiff she is on a continued unauthorized leave, very well knowing Plaintiff and her psychologist religiously submit, to date, the all the proper medical documentation, required by the DOE. Additionally, Plaintiff submitted : ·    : : her award letter to the DOE and Marino : which shows she is collecting Long Term Social Security Disability as of February 13, 2004, the day Plaintiff suffered her Line of Duty Injury.

o) In May 2005, Sandner writes Plaintiff a letter violating Section 3020-a Education Law.

p)    In August 2005, Mr. Solomon reprimands Plaintiff in a letter, that if she is not cooperative, he will withdraw the Special Complaint.

117

q)    Mr. Roth informs Plaintiff in a letter that she is prohibited to come to the UFT office as he was informed by her past attorney of this fact.

599.    The list of mail fraud continues incessantly as Plaintiff has at least 75 letters or more, to constitute mail fraud.

600.    Defendants committed mail fraud pursuant to 18 U.S.C. Section 1341

601.    The Defendants participated in a scheme or artifice to defraud.

602.    The Defendants had a specific intent to defraud.

603.    The Plaintiffs were deceived as a result of the scheme or artifice to defraud.

604.    The mail was used in furtherance of the scheme to execute or attempt to defraud and/or to execute the scheme or artifice to defraud.

## THIRTEENTH CAUSE OF ACTION
### Wire Fraud
### (Federal Rico Against All Defendants)
### (Federal Rico Against DOE, Leinwand, UFT and all
### Individual Defendants of the UFT - 18 U.S.C. Section 1343)

605.    There are countless conversations via telephone which constitute wire fraud. Some of the conversations are as follows:

a)    NYSUT, DOE, UFT and all individual Defendants of the DOE, UFT and NYSUT violate Section

118

3020-a Education Laws and Section 2568 Education Laws, via telephone conversations.

b)    The title of Section 2586 Education Law was tampered by the DOE, via fax.

c)    In February 2005 - March 2005, Cooper informed Plaintiff, via telephone by leaving two (2) messages, "We are diligently working on all your grievances. The Grievance Department is putting the numbers on all your grievances. Susan, I haven't forgotten about you. I will call you when they are ready." Fifteen (15) months later, no grievances were made except one unlawful one.

d)    In or about April 2005, Solomon informs Plaintiff, via telephone, to meet with him. He arrogantly informs Plaintiff that he does not know if he can help Plaintiff, but he will finalize all issues once and for all. He further arrogantly stated to Plaintiff that she thinks everyone is against her, that is, the union and the DOE.

e)    In February 2006, Roth informs Plaintiff, via telephone that the DOE will not allow Plaintiff to grieve her letters. He informs her of this fact, after the new contract was initiated. Plaintiff pleaded with the UFT in numerous letters written to them, to grieve her letters two years ago, in February - March 2004. He further stated, "DOE has all the power, if you don't accept disability retirement you may wind up with nothing."

f)    In May 2005 Scheinman's secretary called, via telephone, Plaintiff's home, torturing and harassing Plaintiff that she must attend the unlawful 3020-a. Scheinman brazenly refused to take no as an answer from Plaintiff as she informed him by letters and voice mail to stop harassing her at home with the chilling procedures he is inflicting upon her.

119

g)      In July 2005, Scheinman faxes a letter to Plaintiff's home unlawfully cancelling the unlawful 3020-a until an unlawful FIVE HOUR exam which is unlawfully ordered by Lavin is completed.


h)      In or about February 2006, Cashin informs Plaintiff via telephone she wants to help her. An appointment was made, but shortly cancelled, never to be made again, as Cashin deserted and deceived Plaintiff as Plaintiff believed Cashin would help her.


i)      In or about February - March 2006, Cooper informs Plaintiff via telephone, once again, that the UFT is working on her grievances.  Cooper informed Plaintiff she is working on the white-outs of her medical documents.  She informed Plaintiff she will call her shortly.  It is now May 2006.  Cooper never contacted Plaintiff, as it's just words.  UFT deceives, defrauds and teases Plaintiff.


j)      In May 3, 2006, Procida defrauds Plaintiff, via telephone, that although Plaintiff has been granted long term Social Security disability, the DOE Medical Bureau does not have to agree with the Federal government's determination that Plaintiff cannot work.  The DOE Medical Bureau can disagree with the Federal government and make their own determination.


k)      Upon information and belief, numerous telephone conversations were made between the Defendants, as many of the Defendants Plaintiffs spoke to, all reported the identical pattern of unlawfulness to Plaintiffs.


in May 3, 2006,
l)      Futhermore, Procida informed Plaintiff, via telephone, "We are not planning to give you leaves with pay.  We are trying our best to give you a leave without pay; however, it's very difficult as you have an outstanding 3020-a."  Her statement is outrageous and extreme as the UFT abandoned Plaintiff and

120

never pursued Plaintiff's outstanding 40+ grievances which would eradicate the unlawful 3020-a.

606.    The Defendants participated in a scheme or artifice to defraud.

607.    The Defendants had a specific intent to defraud.

608.    The Plaintiffs were deceived as a result of the scheme or artifice to defraud.

609.    The wire was used in furtherance of the scheme to execute or attempt to defraud and/or to execute the scheme or artifice to defraud.

610.    As previously mentioned, the telephone conversations consisting of fraud are endless. There are many faxes as well to constitute wire fraud, one of which is the unlawful medical evaluation, from Leinwand, faxed to the medical bureau.

611.    The predicate acts referred to above were related, in that all Defendants shared the common purpose, result and victims with regard to scheme to deprive the Plaintiff her civil and constitutional rights.

612.    The Defendants committed wire fraud pursuant to 18 U.S.C. Section 1343.

613.    The Defendants participated in the scheme or artifice to defraud.

614.    The defendants had a specific intent to defraud.

121

615.    The Plaintiffs were deceived as a result of the scheme or artifice to defraud.

616.    The wires were used in furtherance of the scheme to execute or attempt to defraud and to execute the scheme or artifice to defraud.

617.    As a result, Plaintiffs suffered irreparable harm, past and present, which is ongoing to date.

## FOURTEENTH CAUSE OF ACTION
### Extortion
### (Federal Rico Agsinst All Defendants)

618.    DOE, UFT, NYSUT and all individual Defendants of the DOE, UFT, and NYSUT are guilty of extortion.

619.    In March 2004, Leinwand unlawfully authorized New York City Payroll to withdraw Plaintiff's salary from her personal bank account.  Plaintiff had sick days to cover for her salary.

620.    In March 2004, Leinwand placed Plaintiff on an unlawful, unauthorized leave, after one week of being absent; although Plaintiff called the school daily reporting her illness.

621.    Additionally, in February 2004, Plaintiff wrote a letter to Leinwand and Lavin explaining the reasons for her absence.

622.    In February 2004, DeFazio, Plaintiff's psychologist wrote a letter to Leinwand explaining the reasons for Plaintiff's absence.

623.    However, to date, Leinwand and the DOE, UFT and all individual Defendants of the DOE and UFT, ignore all medical documentation and unlawfully placed Plaintiff on an unlawful unauthorized leave which continues to date.

624.    The illegal unauthorized leave robs Plaintiff of all her property rights as she is stripped of all compensation, health and welfare benefits, pension and TDA, for two (2) years, three (3) months.

625.    In March 2004, Leinwand and DOE suspends Plaintiff's Direct Deposit.  Plaintiff is the only person who can authorize suspension of her Direct Deposit.

626.    It should be noted, Leinwand and DOE unlawfully suspended Plaintiff's Direct Deposit as they schemed the best possible way for Plaintiff not to receive any more funds due her.

627.    In March 2005, Marino reinforces and continues Leinwand's unauthorized leave, very well knowing that all the proper medical documentation required by the DOE is submitted religiously, to date.

628.    Additionally, Marino is very well aware that Plaintiff was awarded Long Term Social Security Disability on February 13, 2004, the day her Line of Duty injury began.

629.    In March 2005, Bey reinforces the unauthorized leave by charging Plaintiff with excessive absences as she is very well aware, as well, that Plaintiff submitted all the proper medical documentation.

630.    Additionally, Bey is aware that Plaintiff was awarded Long Term Social Security disability.

123

631.    To date, NYSUT, UFT and all the individual Defendants of NYSUT and UFT, are aware of the above, and offer no relief for Plaintiff, but rather subject Plaintiff to chilling, unlawful procedures as UFT, NYSUT and DOE conspired to severely violate and abuse Plaintiff while simultaneously denying her property rights under 42 U.S.C. Section 1983.

632.    All Defendants are engaging in extortion "under color of official right," as they are essentially using the government powers with which they have been trusted to gain personal or illegitimate rewards.

633.    In essence, DOE, UFT, NYSUT and all individual Defendants are conspiring and scheming not to only deny Plaintiff her property rights, but also to place her on heavy fines and debts owed to the DOE as explained previously in this lawsuit.

634.    All Defendants are victimizing Plaintiff so that their unlawful, wanton act are never discovered. Thus they use Plaintiff as their smokescreen; as they hide behind Plaintiff and exploit her, constantly throwing darts at her to cover-up for their unlawfulness. As a result, Plaintiffs suffer irreparable harm, past and present, which is ongoing, to date.

### FIFTEENTH CAUSE OF ACTION
### EMBEZZLEMENT/RACKETEERING
(Federal Rico Against All Defendants)

635.    The DOE, and all individual Defendants of the DOE, fraudulently robbed Plaintiff of all her property rights which include her compensation, health and welfare benefits, TDA and pension. Plaintiff's pension was placed in an unlawful dummy account, which means she is not allowed to use or touch her pension as a result of the unlawful, unauthorized leave, first placed by Leinwand and reinforced by Marino.

124

636.    Additionally, the DOE refuses to give Plaintiff the proper leaves she is rightfully and lawfully
entitled to; which is a medical sabbatical, followed by a line of duty injury leave. Both these leaves entitles
a teacher to compensation, full medical and welfare benefits, pension and TDA intact; growing and accruing
interest.

637.    Instead, as stated above, all Defendants recklessly and deliberately schemed to place Plaintiff on
an illegal unauthorized leave for over two (2) years, thus leaving Plaintiff robbed of all her property rights.

638.    All Defendants are very well aware Plaintiff is on Long-Term Social Security disability; as a result
of all the unlawfulness involved and racketeering which is ongoing for two (2) years, three (3) months.

639.    This is a prima facie case, as the Federal Government grants Plaintiff compensation, however the
DOE, UFT and all individual Defendants rob Plaintiff by refusing to give Plaintiff what she is lawfully entitled
to.

640.    As a result, all Plaintiff's monies and benefits are being unlawfully possessed by the DOE.

641.    To add insult to injury, the Defendants deliberately and recklessly forced Plaintiff to take a loan
from the DOE.

642.    Additionally, if Plaintiff participated in the chilling, unlawful procedures schemed by the Defendants,
she would be further severely abused by being unlawfully terminated, or in further debt to the DOE by having
heavy fines unlawfully placed upon her.

125

643.    These patterns of racketeering by the DOE, UFT, NYSUT and all individual Defendants of the DOE,

UFT and NYSUT, caused Plaintiffs irreparable harm, past and present, which is ongoing, to date.


## SIXTEENTH CAUSE OF ACTION
### Negligent Retention

City of New York,

644.    DOE, Klein, NYSUT, UFT, Weingarten, Chess and Cashin are held responsible for allowing UFT,

NYSUT, and DOE and individual Defendants of DOE, NYSUT and UFT, to conspire to perform wanton acts

against Plaintiffs.


645.    They recklessly and deliberately disregarded Plaintiff's plight for justice.


646.    They recklessly and deliberately violated Federal laws, State laws, State Education laws and the

Collective Bargaining Agreement.


DOE, City of New York,

647.    As a result Klein, NYSUT, UFT, Weingarten and Chess and all individual Defendants were well

aware these outrageous acts were being committed, and permitted it to continue incessantly, to date,

causing irreparable harm to Plaintiffs, past and present, as it continues thus far for two (2) years, three (3)

months.


648.    As a result, the above Defendants are held responsible for these extreme acts performed upon

Plaintiff as the above employees and entities are held liable for their barbaric acts.


## SEVENTEENTH CAUSE OF ACTION
### Defamation

649.    All Defendants committed defamation, as Plaintiffs' good names and reputations have been severely

damaged. Plaintiff, Susan Tropeano's career was unlawfully destroyed, as all Defendants tried to exposure her to chilling, unlawful procedures as if she was a misfit to society.

650.    UFT, NYSUT and all individual Defendants of UFT and NYSUT, reinforced and promoted defaming Plaintiffs as they refuse to cease and control the wanton acts of the DOE, and all individual Defendants of the DOE. As a result, Plaintiffs suffered irreparable harm, past and present, which is ongoing, to date.

## FIFTEENTH CAUSE OF ACTION
### Embarrassment

651.    All Defendants embarrassed Plaintiffs by inflicting upon Plaintiffs demoralizing tactics that only a misfit or a criminal should be exposed to. Plaintiffs are respected, moral United States citizens.

652.    UFT, NYSUT and individual Defendants of the UFT and NYSUT, reinforced and promoted the embarrassment as they refuse to cease and control the wanton acts of the DOE, and all individual Defendants of the DOE. As a result, Plaintiffs suffered irreparable harm, past and present, which is ongoing to date.

## EIGHTEENTH CAUSE OF ACTION
### Humiliation

653.    All Defendants committed humiliation as they disgraced Plaintiffs in public. Plaintiff, Susan Tropeano, was mocked and abused in front of children, parents, school personnel and teachers. Plaintiff, Joseph Tropeano, was mocked and abused in front of school staff, as well, as Leinwand schemed to destroy his good name and reputation by falsely arresting him which further humiliated Plaintiff, Susan Tropeano, in the presence of her colleagues and school personnel.

127

654.     UFT and NYSUT reinforced and promoted the humiliation of Plaintiffs, as they refused to cease and control the wanton acts of the DOE, and all the individual Defendants of the DOE.  As a result, Plaintiffs suffered irreparable harm, past and present, which is ongoing to date.

## NINETEENTH CAUSE OF ACTION
### Civil and Criminal Liability (Joint Liability)

655.     All Defendants are responsible for criminal and civil liability and deliberately and recklessly performed numerous wanton acts upon Plaintiffs.

656.     UFT and NYSUT, and all individual Defendants of the UFT and NYSUT, reinforced and promoted the DOE and individual Defendants of the DOE to perform these wanton acts as they refuse to cease and control the wanton acts performed by the DOE and all the individual Defendants of the DOE.  As a result, Plaintiffs suffered irreparable harm, past and present, which is ongoing to date.

## TWENTIETH CAUSE OF ACTION
### Libel

657.     All Defendants committed libel as there are numerous false, unlawful printed material concerning Plaintiffs as all Defendants recklessly and deliberately disregarded Plaintiffs as they intentionally wanted to hurt the reputation and good name of Plaintiffs.

658.     UFT, NYSUT, and all individual Defendants of the UFT and NYSUT, also contributed to libel, as they published false, unlawful printed material regarding Plaintiff.

659.     Additionally, they reinforced and promoted libel to continue by the DOE; as they refused to cease and control it, but rather aided and abetted the DOE and DOE Defendants.  As a result, Plaintiffs suffered

128



irreparable harm, past and present, which is ongoing to date.

## TWENTY-FIRST CAUSE OF ACTION
### Recklessness

660.    All Defendants are held responsible for their reckless conduct as they consciously severely

disregarded Federal, State, State Education Laws, Civil and Constitutional Rights, and the Collective

Bargaining Agreement, causing Plaintiffs irreparable harm, past and present which is ongoing, to date.

## TWENTY-SECOND CAUSE OF ACTION
### Retaliation and Violation of
### Constitutional Rights

661.    All Defendants are held responsible for their retaliation and severe violations of Constitutional

Rights inflicted upon Plaintiffs which is ongoing to date.  Defendants violated the first amendment, fifth

amendment and fourteenth amendment.  This caused Plaintiffs irreparable harm, past and present which is

ongoing, to date.

## TWENTY-THIRD CAUSE OF ACTION
### Infringement of the Right to Complain
### About Personnel Action

662.    Plaintiff had an absolute right to complain about her first period preps to Leinwand, as it was not

fair and equitable.  As a result of Plaintiff's complaining about her unfair schedule, Leinwand went on a

rampage to destroy Plaintiff's career, health and finances ... in essence her life.

663.    The DOE, UFT, NYSUT and all individual Defendants of the DOE, NYSUT and UFT, reinforced

Leinwand's violations as they initiated a pattern of racketeering for at least four (4) years against Plaintiffs,

causing Plaintiffs to suffer irreparable harm, past and present, which is ongoing to date.

## TWENTY-FOURTH CAUSE OF ACTION
### Severe Physical and Physiological Trauma

664.     Plaintiffs and their families, are constantly under physical and physiological trauma as the pattern

of conspiracy and racketeering against Plaintiffs never ceases, as it is ongoing to date.


665.     Plaintiff, Susan Tropeano, developed very high blood pressure, rapid heart beats, cold sweats,

insomnia, nightmares, blurry vision, severe anxiety, tremors, extreme nervousness, nausea, numbness in

extremities, severe headaches, stomach aches, severe anxiety, nightmares, exhaustion, faintness and breathing

problems.


666.     Plaintiff, Joseph Tropeano, experiences many of the same ailments as well.  This caused Plaintiffs

irreparable harm, past and present, which is ongoing to date.


## TWENTY-FIFTH CAUSE OF ACTION
### Severe Psychological Trauma and Distress

667.     Plaintiff, Susan Tropeano, suffered and suffers severe psychological trauma, harm and damages, as a result

of the wanton conduct of the Defendants as their pattern of racketeering continues, which resulted in

Plaintiff receiving Long Term Social Security Disability from the Federal Government.


668.     Plaintiff, Joseph Tropeano, is also affected psychologically, as no human being living in modern

America should be exposed to such corruption.


## TWENTY-SIXTH CAUSE OF ACTION
### Severe, Torturous Harassment

669.     As a result of the wanton acts of all the Defendants and their incessant pattern of racketeering,

130

Defendants have inflicted upon Plaintiffs severe, torturous harassment which caused irreparable harm, past and present, which is ongoing to date.

## TWENTY-SEVENTH CAUSE OF ACTION
### Severe Financial Hardship

670.    As a result of the wanton acts of all the Defendants, and their incessant pattern of racketeering, Plaintiffs are undergoing severe financial hardship as Plaintiff, Susan Tropeano, was making over $70,000.00 yearly.

671.    It's extremely difficult to live on one salary, which is not always full-time, and social security disability which pays a trickle of money.

672.    Plaintiffs were covered with full medical and dental benefits under Plaintiff Susan Tropeano's medical and dental benefits.

673.    With the unlawful loss of Plaintiff's compensation and medical benefits, Plaintiffs cannot afford to see doctors to take care of their health.

674.    Plaintiff needs her health benefits reinstated, as she is suffering from serious physical ailments brought on by the Defendants' wanton acts.  This caused Plaintiffs irreparable harm, past and present, which is ongoing, to date.

675.    Plaintiff needs copmensation and benefits from the DOE as a result of Leinwand and Lavin creating a severe hostile work environment for Plaintiff making Plaintiff permanently severely ill; Plaintiff needs her

131



retirement replenished by the DOE so she can retire with full retirement benefits as she has approximately,

to date, three more years before retirement age.

## TWENTY-EIGHTH CAUSE OF ACTION
### Severe Lifestyle Changes

676.     Due to the unlawful acts of all Defendants depleting Plaintiff of her salary and all her medical and

dental benefits, Plaintiffs live very precariously day by day, not knowing if they will be able to pay their high

bills.

677.     As a result of Defendants' wanton acts, Plaintiffs for the first time in their lives are faced with

debts; for lack of funds, causing Plaintiffs irreparable harm, past and present, which is ongoing to date.

678.     Plaintiffs depleted their savings to attorneys that aided and abetted the DOE, UFT and NYSUT, and

all the individual Defendants of the UFT, DOE, and NYSUT.  As a result, these attorneys refused to seek

relief for Plaintiff, as Plaintiff is living without relief from the DOE for two (2) years, three (3) months,

causing irreparable harm, past and present, which is ongoing to date.

## TWENTY-NINTH CAUSE OF ACTION
### Torturous Interference with Contractual Relations

679.     Defendants of the DOE and especially Leinwand and Lavin, unlawfully interfered with UFT, NYSUT

and all the individual Defendants of the UFT and NYSUT, to deprive Plaintiff of her rights pursuant to the

Collective Bargaining Agreement.

680.     As a result, the UFT and NYSUT were protecting the unlawful acts of Lavin and Leinwand, as the

UFT, NYSUT and all individual Defendants of UFT and NYSUT refused to do any grievances for the Plaintiff,

causing Plaintiff irreparable harm past and present, which is ongoing to the present.

## THIRTIETH CAUSE OF ACTION
### Individual Rights Under City, State
### and Federal Law

681.    As a result of the numerous overwhelming violations heaped upon Plaintiff, as the pattern of

racketeering continues, Defendant violated and denied Plaintiff her civil and individual rights under City, State

and Federal laws causing Plaintiff irreparable harm, past and present, which is ongoing to present.

## THIRTY-FIRST CAUSE OF ACTION

### Unfair Labor Practices

682.    All defendants are held responsible for unfair labor practices as their pattern of racketeering

continues as they arrogantly refused to use the Collective Bargaining procedures when it concerned Plaintiff;

as the UFT abandoned Plaintiff by blatantly refusing to initiate grievances.  The one and only grievance that

was initiated was grossly unlawful and did not follow the procedure, rules or protocols of a grievance as

outlined in the Collective Bargaining Agreement.  As a result, UFT, NYSUT, DOE and all individual Defendants

of UFT, DOE and NYSUT severely breached its contract and agreement with Plaintiff by failing to support,

represent and assist Plaintiff in her continued plight with the DOE and the City of New York concerning,

inter alia, benefits and entitlements lawfully due Plaintiff.

## THIRTY-SECOND CAUSE OF ACTION
### Violation of State Education Laws

683.    As a result of the numerous overwhelming violations of State Education Laws heaped upon Plaintiff

by all Defendants as their pattern of racketeering continues, Plaintiffs suffered irreparable harm, past and

present, which is ongoing to date.

133

### THIRTY-THIRD CAUSE OF ACTION
### Doctrine of Respondent Superior

684.     Due to the actions of DOE and the individual Defendants of the DOE and the City of New York are liable and accountable to the doctrine of respondent superior, causing irreparable harm to Plaintiffs, past and present, which is ongoing to date.

### THIRTY-FOURTH CAUSE OF ACTION
### Stated Injuries
### Loss of Consortium Due to Stated Injuries

685.     Plaintiff, Joseph Tropeano, has had to endure a loss of consortium. He has not been able to engage in many of the activities and interactions that a husband should be able to have with his wife due to the injuries Plaintiff, Susan Tropeano, has encountered herein, causing irreparable harm to both Plaintiffs, past and present, which is ongoing to date.

### THIRTY-FIFTH CAUSE OF ACTION
### Severe Apprehension

686.     Plaintiffs have suffered severe stress, severe anxiety and severe apprehension due to the wanton acts performed by all Defendants as their pattern of racketeering continues causing irreparable harm, past and present, which is ongoing to date.

### THIRTY-SIXTH CAUSE OF ACTION
### Gross Negligence

687.     All Defendants are grossly negligent when it concerns Plaintiffs as they continue incessantly their pattern of racketeering performing numerous wanton acts. As a result, Plaintiffs suffered irreparable harm, past and present, which is ongoing to date.

134

## THIRTY-SEVENTH CAUSE OF ACTION
### Criminal Negligence

688.     All Defendants committed criminal negligence as their wanton conduct has caused severe life-threatening medical conditions not only to Plaintiffs, but to Plaintiffs' families as well.

689.     All members of Plaintiffs' family were in good health before Defendants conspired to destroy Plaintiff, Susan Tropeano's career, health and finances.

690.     Because Defendants' pattern of severe unlawfulness continued incessantly for such a long period of time, Plaintiffs and their families are suffering health ailments which are life-threatening.

691.     Furthermore, all Defendants mock and brazenly ignore Plaintiff's doctors and the Federal governments long term Social Security disabilty granted to Plaintiff.

692.     As a result, Plaintiffs and their families suffer irreparable harm, past and present, which is ongoing to date.

## THIRTY-NINTH CAUSE OF ACTION
### Reckless Endangerment

693.     All Defendants committed reckless endangerment as they recklessly engage in wanton conduct that created serious physical injuries to Plaintiffs and their families.

694.     All members of Plaintiffs' family were in good health before Defendants conspired to destroy Plaintiff, Susan Tropeano's career, health and finances.

135

695. Because Defendants' pattern of severe unlawfulness continued incessantly for such a long period of time, Plaintiffs and their families are suffering very serous health ailments which are life-threatening.

696. Additionaly, all Defendants brazenly ignore and mock Plaintiff's doctors and the Federal government's long term Social Security disability granted to Plaintiff.

697. As a result, Plaintiffs and their families suffered irreparable harm, past and present, which is ongoing to date.

## FORTIETH CAUSE OF ACTION
### Tampering with Evidence

698. Official documents consisting of seniority documents, medical documents and the title of an official law were tampered by the DOE and individual defendants of the DOE; as they deliberately and recklessly intended to cause Plaintiff's irreparable harm, past and present which is ongoing to date.

699. UFT, NYSUT and all individual Defendants of the UFT and NYSUT, are very well aware that these documents are tampered with; as Plaintiff incessantly pleaded with the UFT to file a grievance regarding the serious tampering of these documents.

700. As a result, of the above wanton acts performed by the UFT Defendants, abandoning Plaintiff, they aided and abetted the DOE and the individual Defendants of the DOE, as they intentionally and recklessly disregarded Plaintiff's pleadings to file grievances on her behalf but rather promoted the tampering to take place.

136

## FORTY-FIRST CAUSE OF ACTION
### Misuse and Abuse of Designated Official Roles

701.    All Defendants abuse their role by not adhering to the Collective Bargaining Agreement, State

education laws, Federal laws and State laws.

702.    Additionally, some DOE Defendants, misuse their roles as they take it upon themselves to usurp

their powers by playing the role of a different administrator or to falsely claim to be a certain administrator,

which in actuality, they are not the administrator they claim to be.

703.    The parties responsible for these wanton acts are Leinwand, Levin, Nathan, Cashin and the individual Rita

Guaramita.

704.    UFT and NYSUT and all individual Defendants of the UFT and NYSUT are accomplices to the

wanton acts as they refuse to grieve this unlawfulness but rather promoted it to continue.

705.    Additionally, UFT, NYSUT and individual Defendants of UFT and NYSUT misuse and abuse their

roles as they fail to fairly represent Plaintiff pursuant to the Collective Barganinng Agreement.  They

recklessly and deliberately conspire with the DOE and all DOE Defendants not to represent Plaintiff on her

behalf as they abandoned Plaintiff.

706.    As a result, Plaintiffs suffer irreparable harm, past and present, which is ongoing to date.

### FORTY-SECOND CAUSE OF ACTION
### Embezzlement from Pension and Welfare Funds
### Against all Defendants
### (Federal Rico 18 U.S.C. Section 664

137

707.    All Defendants commimitted embezzlement from Plaintiff's Pension and Welfare Fund as they do not allow Plaintiff to touch her pension money.  Rather, her pension is placed in a dummy account, as a result of Leinwand's unlawfull, unauthorized leave reinforced by Marino which continues incessantly to date, for two (2) years three (3)  months.

708.    Furthermore, all Plaintiff's pension contributions have been unlawfully terminated due to Leinwand's unlawful, unauthorized leave which is ongong to date, for two (2) years, three (3) months.

709.    Additionally, Plaintiff's Welfare Fund was unlawfully terminated as a results of Leinwand's unlawful, unauthorized leave, reinforced by Marino which continues incessantly to date, for two (2) years three (3) months.

710.    All Defendants are very well aware of their wanton acts as they refuse to stop the embezzlement of Plaintiff's Pension and Welfare Fund as Plaintiff wrote numerous letters pleading to eradicate Leinwand's unauthorized leave so that Plaintiff's pension would be made whole again.  As a result, Plaintiff suffered irreparable harm, past and present, which is ongoing to date.

## FORTY-THIRD CAUSE OF ACTION

### Obstruction of Justice
### Federal Rico Against all Defendants · Section 1503

711.    All Defendants committed obstruction of justice as they deprive Plaintiff of life, liberty and property rights without due process of law.

712.    UFT, DOE and all individual Defendants of UFT and DOE refuse to fairly represent Plaintiff as they

138

do not pursue Plaintiff's outstanding 40+ grievances pursuant to the Collective Bargaining Agreement.

713.     Additionally, all Defendants heap upon Plaintiff overwhelming violations of state laws, federal laws, state education laws and the Collective Barganining Agreement.

714.     Furthermore, all Defendants heap upon Plaintiff chilling, unlawful procedures which they recklessly and intentionally scheme incessantly as they are trying to have Plaintiff participate in unlawful, chilling procedures which continues incessantly to date.

715.     Additionally, DOE attorney perjured himself at Perb Court.  Plaintiffs reported perjury to the Perb Judge.  He responded, "Don't worry about it."

716.     All Defendants were very well aware of their wanton acts.  As a result, Plaintiffs suffered irreparable harm, past and present, which is ongoing to date.

## FORTY-FOURTH CAUSE OF ACTION

### Fraud in Connection with Identification Documents

#### Federal Rico Against all Defendants
#### 18 U.S.C. Section 1028

717.     All Defendants committed fraud pursuant to 18 U.S.C. Section 1028 as certain documents of Plaintiff's were tampered with.  These include excessing seniority, Medical OP 198's, School Profiles; Status Reports, and an exhibit whereby the title of a law was changed.

718.     Additionally, fraud was cited in Article 78 legal documents and Perb legal documents, as well as

139

an Affidavit of Service by the DOE.

719.    Furthermore, DOE, UFT, NYSUT and all individual Defendants of the UFT, DOE and NYSUT

defrauded the Collective Bargaining Agreement, State education laws, as they cited fraud in letters written to

Plaintiff.

720.    In February to March 2004, Lavin and Leinwand cited fraud in numerous letters addressed to

Plaintiff.

721.    Additionally, Leinwand cited fraud in her document "Medical Evaluation, Susan Tropeano" from

Phyllis Leinwand dated May 2004.

722.    UFT and individual Defendants of the UFT cited fraud in many letters addressed to Plaintiff.

723.    DOE Medical Bureau cited fraud in many letters addressed to Plaintiff which is ongoing.

724.    In March 2005, Marino cited fraud in a letter addressed to Plaintiff.

725.    In May 2005 Sandner cited fraud in letters addressed to Plaintiff.

726.    From February to June 2005 Leinand committed fraud on OP 198 medical forms as she wrote line

of duty injury is unsubstantiated.    Medical Bureau whited out this information.

727.    Plaintiff possesses countless documents of fraud initiated by Defendants, too lengthy to list all,

140

including numerous audio recordings and photographs.

728.     All Defendants are very well aware of their fraud cited in documents as Plaintiff pleaded with the UFT to initiate grievances in order to eradicate this fraud. However, they recklessly and deliberately ignored Plaintiff's numerous pleadings. As a result, this caused Plaintiffs irreparable harm, past and present, which is ongoing to date.

## CLAIMS FOR RELIEF

Wherefore Plaintiffs demand judgment (relief) against all Defendants for each cause of action, consisting of forty-four (44) causes of action.

A.     Additionally, Plaintiffs demand for each Rico cause of action (extortion, embezzlement, racketeering, bank fraud, mail and wire fraud, civil and criminal conspiracy, embezzlement from pension and welfare funds, obstruction of justice, and fraud in connection with identification documents), compensatory and punitive damages, treble damages, all previous attorneys' fees, filing fees, costs and disbursements with interest, present filing fees, costs and disbursements with interest, provided by statute, and such other relief as the court may deem fair and equitable resulting from Rico violations.

B.     Plaintiff further demands her pension account to be replenished by the DOE with additional service credit, which was given to all teachers; as per the new contract, which commenced 2006, and to rectify monies and interest loss from her pension account as the DOE severely mishandled her pension; with additional interest returned.

C.     Additionally, the DOE and Leinwand placed Plaintiff on an unlawful unauthorized leave; however

141

Plaintiff was on active status at the time but due to the mishandling of Plaintiff's status, Plaintiff's pension account never received active contributions with interest being accrued. Thus, Plaintiff demands her pension account and TDA be made whole and return her pension and TDA due her with interest, to Plaintiff, as Leinwand and DOE unlawfully robbed her of her pension and TDA; as TDA, as well, must be made whole; replenished, past and present, with interest.

D.     Moreover, Plaintiff further seeks her pension account to be replenished by the DOE, as to date, Plaintiff has approximately another three (3) years till retirement. As a result, Plaintiff demands her pension account to be replenished fully by the DOE, the additional years needed to reach her retirement age, so that she may retire now on full retirement; without any interference from Leinwand, Lavin and the DOE.

E.     Plaintiff was caused to sustain severe damages and injuries, which include, but are not limited to loss of salary which includes front and back pay with interest, one year medical sabbatical with interest, and line of duty injury, past and future pay with interest, damages and loss of pension, TDA and retirement savings replenished, loss of health and welfare benefits; retroactive and present; medical debt damages, severe emotional, physical, physiological trauma and psychological damages, mental and physical distress damages, severe stress, severe apprehension, severe anxiety damages caused to both Plaintiffs, loss of consortium damages caused to Plaintiff's husband, retaliation, humiliation, embarrassment, defamation and civil and criminal liability damages caused to Plaintiffs, invasion of privacy damages, breach of fair representation and interference of contractual relations damages, reimbursement of all union dues, past and present, punitive and compensatory damages caused to Plaintiffs, reimbursement of all previous attorneys' fees, filing costs, disbursements and other costs with interest, reimbursement of loss of personal savings damages with interest loss.

142

F.        As a result, Plaintiff demands reinstatement and permanent injunction enjoining Defendants from

any further actions abridging Plaintiffs' rights and all further relief, equatable or otherwise, to which the

Plaintiffs are entitled and/or which the court deems just and proper.  Plaintiffs also demand a jury trial.

Respectfully,

_Susan Tropeano, Plaintiff_

Susan Tropeano, Plaintiff

_Joseph Tropeano, Plaintiff_

Joseph Tropeano, Plaintiff

30 Grace Avenue
Apt. 3E
Great Neck, New York  11021
Tel. # (516) 773-1877

143